# Meyer, Trustee, *et al.* v. Johnston and Stewart, Trustees.

### *Bill in Equity to foreclose Mortgages.*

1. *Pendency of suit in Federal Court; when not bar to suit in State Court.*—A trustee of a first mortgage, upon a portion of a railroad, cannot plead the pendency of suit by him for foreclosure in the United States court, in bar of a foreclosure suit in a State court against him and others, by trustees of a subsequent mortgage, covering the entire property of the company, including that mortgaged to him—especially when on account of their citizenship, his bill in the United States court was dismissed as to the complainants in the State court.

In the year 1848, this State chartered the Alabama and Tennessee River Railroad Company to build a road from the Alabama River at Selma, to a convenient point on the Tennessee and Coosa Railroad, a road expected to be built by a corporation chartered for that purpose.   The Alabama and Tennessee River Railroad Company, following the route authorized by its charter, constructed some 135 miles of road from Selma to Blue Mountain, and did some work beyond that point in the general direction authorized by its charter.

In the year 1866, (no such road as the Tennessee and Coosa Railroad having been constructed) the Alabama and Tennessee River Railroad Company was authorized to extend its road from Blue Mountain to "such point on the Georgia State line as the company might select."   By this act the company was authorized also to unite and consolidate its road, stock and franchises with those of any other company in or out of the State, or to purchase the stock, property and franchise of any other company in or out of the State with which it might become united.   The Alabama and Tennessee River Railroad Company was by this same act, authorized to change its name, and to continue to exist under the new name "with all rights, liabilities and obligations as under the present name;" the act expressly declaring

[Meyer v. Johnston.]

that nothing contained in it should release the company from any legal or equitable obligation whatever.

At and prior to this time there existed two railroad corporations, chartered by the State of Georgia, to build a road from Dalton, Ga., or some other point in the western part of that State "to or towards the Alabama line," and these corporations were also authorized to unite and consolidate their stock, railroads and franchises with those of any railroad of that or any adjacent State.   Neither of the Georgia corporations had built any railroad, or owned any property except their franchises.  In August, 1866, an agreement was entered into by the three companies, "with a view to complete and own and use a continuous line of railroad from Selma by way of Rome to Dalton, under the authority and control of one set of officers," and in continuation of the 135 miles already built.   The agreement recited that all the companies were united and consolidated together, with the rights, powers and franchises which belonged to either one or all of them, and the property of each was vested in the consolidated company.   Stock-holders in each of the companies were to be entitled to the same amount of stock in the consolidated company; the stock-holders in the Georgia company owing subscriptions to be allowed to pay up, or abandon their subscriptions, and retire as they preferred.   The officers of the Alabama and Tennessee River Railroad Company were to exercise all control and power over the property of all the companies, and to contract debts for which the property of all the companies was to be bound, and that was to be the acting and controlling company, under its charter and name, until a new name should be given to said consolidated company, and the organization of the Georgia companies was to be kept up only for the purpose of preserving, and enabling the Alabama company to exercise the franchises, thereby consolidated with those of the latter company, until the agreement should be confirmed.

Afterwards the States of Georgia and Alabama by separate legislative acts ratified the agreement for the consolidation of the Georgia companies with the Alabama and Tennessee River Railroad Company, and authorized the consolidated company to adopt the name of the Selma, Rome and Dalton Railroad Company, and to adopt as its charter the charter of the Alabama and Tennessee River Railroad Company, "as now existing with all amendments."   After this, the consolidated company assumed a contract which the Alabama and Tennessee River Railroad Company had made for the building of the road from Blue Mountain to Dalton, and under this contract the road was completed to Dalton.

*Held,*

2.  The Georgia companies were dissolved by the consolidation and approval thereof by the legislatures of Georgia and Alabama, and their franchises were transferred to the Alabama and Tennessee River Railroad Company.

3.  The organization of the Alabama and Tennessee River Railroad Company continued with its powers unimpaired and its charter unaltered, save that authority from the State of Georgia had been given it to build the road from the State line to Dalton by way of Rome, the legislative acts of both States conferring power on it for that purpose, under a new and more appropriate name.

4.  The Selma, Rome and Dalton Railroad Company, which finished the road from Blue Mountain to Dalton, Ga., must be regarded as the same entity or body poliitic which under the name of the Alabama and Tennessee River Railroad Company, built the road from Selma to Blue Mountain, and held liable accordingly for the legal and equitable obligations of the Alabama and Tennessee River Railroad Company.

In the original charter incorporating the Alabama and Tennessee River Railroad Company, the directors consisted of nine persons including the President, and it is provided that "the president and directors or *a majority of them,*" may borrow money and pledge the property of the company, &c.

Vol. LIII.

[Meyer *v.* Johnston.]

By an amendment, passed February, 1852, it was enacted that two additional directors may be elected, so as to make eleven directors including the president, instead of nine including the president, as authorized by the original charter, the new directors to be elected in the manner provided by the old charter, the eleven directors including the president, to be thus elected, to be subject to all the restrictions and to have all the powers and rights applying to the board elected under the old charter  *  *  *  provided that six directors, including the president, shall constitute a quorum to do all business." *Held* :

5. The charter and amendment being in *pari materia* must be construed together, and that the evident purpose of the legislature in using the words "including the president," to designate what should constitute a *quorum*, was to indicate that the president, when present, should be considered as one of the six directors essential to form a *quorum*, and not to make him an integral part of the corporation, without whose presence all the other directors could not constitute a quorum to do any business.

6. A trust deed to secure a loan prepared and executed in accordance with instructions of a meeting of six or more directors, from which the president was absent, is the valid deed of the corporation.

The Alabama and Tennessee River Railroad Company, on July 1st, ✗ 1852, executed a deed of trust to secure a series of bonds it was about to issue. After referring to the original charter, and the amendatory act of February, 1852, the deed recites that the company was engaged in constructing a railroad in the State of Alabama, on the route mentioned in the charter through certain named counties, "in the direction of the Tennessee river," the route of which railroad has been duly surveyed and located," &c. The words of the deed were very broad—it grants, conveys, sets over and transfers to the trustees and the survivor of them, the "railroad constructed and to be constructed" [by the Alabama and Tennessee River Railroad Company] as aforesaid, with all appurtenances thereof, including "all lands, fixtures, structures," &c.,  *  *  *  machinery, piers,  *  *  * franchises, privileges and rights, and *all other property now owned and which may be hereafter owned by the railroad company,"* together with tolls, incomes  *  *  and avails from sale of bonds, &c. The deed contained ample covenants for further assurance.

When this deed was executed the Alabama and Tennessee River Railroad Company was not authorised to accept a grant of lands from the United States, and an act passed previously in that year, amending the charter, empowered the company "to acquire such quantity and parcels of lands as may be necessary for right of way, and for stations, depots, turn-outs," and the like. The legislature in 1858 accepted lands granted by Congress in 1856 to the State for the use of the company, and by the act of 1858 confirmed and vested said grant in the company. *Held* :

7. The title of the Alabama and Tennessee River Railroad Company to the lands granted, dates from 1858, and the lands held under this grant are not covered by the trust deed. When it was made the company had no power to accept such a grant, and the acquisition of the land granted by it was not in contemplation.

8. A separate branch road connected with the Alabama and Tennessee River Railroad Company, known as the "Ashby branch," which was constructed under a special charter granted in 1863, by which other persons than the Alabama and Tennessee River Railroad Company might become stock-holders, did not pass by the trust deed of 1852. At that time the construction of but one main line was authorized or in contemplation, and it is only upon this the trust deed operates.

9. Cars, locomotives and other rolling stock from time to time purchased or acquired by the company, either under its old or new name, as well as those in existence at the execution of the trust deed were embraced by it, subject, however, to any liens created thereon before or when they were acquired.

[Meyer *v.* Johnston.]

10. Rolling stock, purchased by the receivers managing the railroad corporation, pending its sale by the court of chancery, is subject to the liens authorized by the court in the order for its purchase, and such liens cannot be superseded or lessened by the trust deed.

11. The fact that a portion of the road, at the northern end, not built when the deed of trust was executed, was afterwards constructed, not on the route then surveyed and located, but on another route in the general direction authorized by the charter ,and amendments, did not deprive the holders of bonds secured by the trust deeds on the road to be constructed in Alabama, of the right to a first lien on it.

12. A portion of the route on which the railroad had done some grading, but was afterwards abandoned for another route on which the road was built, did not pass by the trust deed, but reverted to the owners of the soil.

13. *Mortgage of road to be constructed; when takes effect.*—A mortgage of a railroad *to be constructed* and of its appurtenances to *be acquired*, by a company chartered to build it, is valid, and the several appurtenances and items of property mentioned, which the company had authority to acquire, as soon as they came into existence were covered by the mortgage.

14. *Franchise to exist as a corporation.*—The franchise which a railroad company in this State transfers by its mortgage, is not its franchise to exist as a corporation, but only such of its franchises or privileges as will enable the grantee to have the same use and beneficial enjoyment of the property which the company itself had—especially is this the case when the charter merely authorizes the company to mortgage "its means, property and effects," without express mention of franchises.

15. *Same.*—The franchise to exist as a corporation pertains to the stockholders as such, and each one's interest therein accompanies the transfer of his share of stock. By statute in this State, the purchasers of a railroad are enabled to constitute themselves into a body corporate, and have all the rights and franchises in respect to it the company was vested with.

16. *Prior mortgage; lien of, by what not divested.*—Neither the making of necessary repairs upon a railroad, under a contract with the company giving a lien until paid for, nor payment therefor, in bonds secured by a subsequent mortgage, give the trustees therein any "lien for repairs" against prior incumbrancers.

17. *Railroad, receiver of; when should not be appointed.*—The case ought to be one of urgency to justify a court in appointing a receiver to manage and operate the business of a railroad at all; and officers conducting such a business, to whom no fraud or fault is imputed, should not be displaced from the *ad interim* management, pending litigation, merely because the corporation is insolvent.

18. *Same.*—It might, instead, be sometimes more expedient to require the earnings of the road to be paid over to, and disbursed by a receiver appointed by the court, and to prevent by injunction the interference of others with the management, in the meantime.

19. *Same.*—A court of chancery in this State has authority, without the aid of a statute, to take charge of, manage and operate a railroad, which is the subject of litigation, by its receivers, when such a cause is indispensable to secure the rights of creditors and others or to prevent a failure of justice.

20. *Railroad; power of court over, when receiver has been appointed.*—Where a court has been compelled to take possession by its receiver of a railroad, its whole power over it is confined to making necessary repairs and protecting the property. As from the nature of the property, it must be continued in operation and sold as a going concern, to prevent serious injury and impairment in value, the court may continue the running of trains and the usual business of the road, with a view to its economical conservation; and if the income is insufficient for that purpose, may provide the requisite means by creating charges upon the property.

21. *Receiver's certificates; when may be authorized.*—A court of chancery

VOL. LIII.

[Meyer *v.* Johnston.]

has power, after proper notice to, and hearing of interested parties to authorize the issue even of negotiable certificates of indebtedness creating a first lien, displacing other liens to that extent, on the property of a railroad which it is operating through its receiver, whenever it is necessary to raise money for the economical management and conservation of the property.

22. *Same; for what purpose can not be authorized.*—A railroad company the fruits of whose labor and expenditures are about to be lost by the failure of its enterprise, can not, in order to raise money to complete it, create liens upon its property which will displace an older lien, and no prerogative of a court of equity, arms it with power to do so.

23. *Receiver's certificates; what should be shown before authorizing.*—The court should not authorize the issue of receiver's certificates of indebtedness, unless a detailed statement is first made out specifying the items of the sum needed and the purposes to which it is to be applied, supported by clear proof of the correctness thereof and of the necessity for raising the money, and after proper notice to, and hearing, of the parties interested.

24. *Same; can not be sold at discount.*—The chancellor has no power to disregard the laws against usury, by authorizing a receiver to borrow money, by selling interest bearing receiver's certificates of indebtedness at less than their face value.

25. *First mortgagee; what security not entitled to.*—Holders of bonds secured by deed of trust upon property, which together with other property, not included in the deed of trust, was afterwards mortgaged to secure a subsequent series of bonds, some of which were placed in the hands of a special trustee, "to be applied exclusively for the purpose of discharging the property conveyed from prior liens," are not entitled to have the fund for the payment of their liens increased by means of the bonds in the hands of such trustee, it being the evident purpose of the deposit of the bonds, to put all the debts of the company upon an equal footing, and not to increase the security already existing for the payment of the first bonds.

26. *Rolling-stock, liens upon; how affected by being placed on a mortgaged railroad.*—Rolling stock is a chattel personal, not converted into realty by being put upon the railroad, and liens existing upon it when delivered to the railroad company will not thereby be displaced, so as to subject the property first to the operation of prior mortgages given by the railroad company upon its road and equipments.

27. *Mortgage creditors; of what can not complain.*—Mortgage creditors can not complain of a decree requiring payment of unsecured debts, due by the company before the filing of the bill, to connecting railroads for moneys it had collected, when their refusal, because of the failure to pay them, to continue business relations with the receiver, would have greatly diminished the receipts and injured the business of the road.

28. *Costs; rule as to in mortgage suits.*—In general the mortgagee is entitled to the payment of his costs before the subsequent mortgagees receive anything. If, however, the mortgagee commences or adopts a suit for the administration or sale of the mortgagor's estate, the costs of the suit are the first charge, if the estate is insufficient; or if he set up an unfounded claim or unjust defence he may be deprived of his cost.

29. *Same.*—The litigation being mainly between the first and third mortgagees in respect to unfounded claims, made by each adversely to the other, the court, for the relief of second mortgagees whose lien was on a part only of the property, supposed to be insufficient to pay all, taxed costs and expenses against the funds going to the litigating parties, one-half against each.

APPEAL from Chancery Court of Dallas.
Heard before Hon. CHARLES TURNER.

16

[Meyer v. Johnston.]

On the 19th day of March, 1873, James Boorman Johnston and John A. Stewart, as trustees, under a mortgage executed to them on October 1st, 1867, by the Selma, Rome and Dalton Railroad Company, filed this bill, in behalf of themselves, and all other creditors of the company, against the Selma, Rome and Dalton Railroad Company; Uriel A. Murdock, special trustee under the deed of·mortgage executed to complainants; Gazaway B. Lamar, as surviving trustee of a mortgage executed by the Alabama and Tennessee River Railroad Company to said Lamar and W. R. Hallett; Hannah E. Reynolds, as administratrix of Walker Reynolds, deceased, and T. G. Barrett, as holders of bonds secured by a mortgage, made by·the Alabama and Tennessee River Railroad Company, on the 17th of January, 1855, to one Edwards, as trustee, who was then dead; W. H. Fellows, as trustee in a mortgage executed to him, on the 20th of July, 1865, by the same company on the lands donated to it by Congress; Alfred Shorter as mortgagee in a deed executed by the Georgia and Alabama Railroad Company, on the property of that company; J. P. Wallace, as trustee, in a deed of trust executed to him by the Selma, Rome and Dalton Railroad Company, on the 1st of July, 1870, and "such other persons as may be made defendants." After the bill was filed, various judgment creditors were permitted to intervene by petition, and filed answers asserting their respective claims.

The bill alleges the insolvency of the defendant corporation, its default in payment of interest; that "it is necessary for the protection of the mortgaged property, and to preserve it from ruin and decay, as well as to prevent interruption in the means of travel, and for the accommodation of the ·public, that a receiver be appointed;" and it prays for the appointment of a receiver; that conflicting liens be adjusted and priorities settled; that the road and property be sold for their payment, and for general relief.

It is shown by the bill that the Selma, Rome and Dalton Railroad Company is the owner of a railroad and its appurtenances, completed, equipped and in operation, extending from Selma, in the State of Alabama, to Dalton, in the State of Georgia, a distance of two hundred and thirty-five miles; of which, one hundred and seventy-two miles are in the State of Alabama, and the residue in the State of Georgia; and that the company is also the owner of rolling stock and other personal property, and of about four hundred thousand acres of land, granted to it by the Congress of the United States, on the 3d day of June, A. D., 1856.

[Meyer *v.* Johnston.]

The bill gives a history of the corporation, and of the consolidation of the franchises of the Georgia and Alabama Railroad Company, and the Dalton and Jacksonville Railroad Company, as hereinafter shown, with those of the Alabama and Tennessee River Railroad Company.

It is alleged that the mortgage to Lamar and Hallett is claimed to be a first lien on the property of the company, but its validity is assailed on the ground that it was not a corporate act, because a legal quorum of the directory was not present when it was ordered to be executed, and that if valid it was never properly proved and recorded. This latter objection does not seem to have been insisted on here, and was not discussed by the court; further reference to it is therefore omitted.

The bill alleges that the railroad which the Alabama and Tennessee River Railroad Company was originally engaged in constructing, was a railroad from Selma to Gadsden, in the State of Alabama; that it completed the railroad from Selma to Blue Mountain, a distance of one hundred and thirty-five miles, and no further; that the road was broken up during the war, and was afterwards in a ruinous condition, and unfit to be operated; that the company then owning it was insolvent, and unable either to repair or complete it; that in this condition of things the Selma, Rome and Dalton Railroad Company acquired and took charge of the road, its property and appurtenances, under the articles of consolidation and the acts relating thereto, issued its bonds secured by the mortgage to complainants, and with the means thus raised, repaired, and equipped the road from Selma to Blue Mountain, at an expense of about one million dollars; and changing the route and terminus of the road, as originally projected, constructed and completed it from Blue Mountain, to Dalton, in the State of Georgia; that these repairs and improvements were made with the *knowledge* and *consent* of the prior mortgage bondholders. It claims on behalf of the holders of the bonds secured by the mortgage to complainants, a lien on the whole road, prior to all other liens, to the extent and value of such improvements and repairs.

It is averred in the bill that none of the mortgages executed by the Alabama and Tennessee River Railroad Company, include any portion of the railroad from Blue Mountain to Dalton, or any portion of the rolling stock furnished by the Selma, Rome and Dalton Railroad Company, and that none of them, except that in favor of Reynolds, include any part of the "public lands."

[Meyer v. Johnston.]

It is alleged that a large portion of the public lands was forfeited by non compliance with the terms of the original grant, but that afterwards, by an act of Congress, approved May 23, 1872, the grant was renewed and confirmed to the State of Alabama, for the use and benefit of the Selma, Rome and Dalton Railroad Company.

Lamar, after publication as to him, answered on the 4th of August, 1873. He protested against the court's taking jurisdiction, and set up in bar of this suit, a suit in which he joined as complainant, to foreclose the mortgage made to him, brought by Amy and Moran, against the Selma, Rome and Dalton Railroad Company and others, in the district court of the United States for the Middle District of Alabama (which then had circuit court powers) on the 3d day of December, 1872.

Amy and Moran were citizens of New York, and holders of a number of bonds secured by the deed of trust to Lamar. In their bill for foreclosure, Lamar and John A. Stewart, James Boorman Johnston, trustees in the deed of trust of October 1st, 1867, and Murdock, special trustee therein, the three last named being citizens of New York, the same State with complainants, together with the Selma, Rome and Dalton Railroad Company, and others, were made defendants.

The judge of the district court (Busteed) upon the filing of this bill, which among other things, prayed for a receiver, appointed a receiver, who took possession of the road, rolling stock and property of the defendant corporation in Alabama, with authority to operate and manage the same, and to borrow money and to issue receiver's certificates, &c. About this time the act of Congress giving circuit court powers to the district court of the United States for the Middle District of Alabama, was repealed, and causes cognizable in the circuit court and pending in the district court, were by operation of law transferred to the circuit court of the United States at Mobile.

On 28th March, 1873, the circuit judge of the United States court, (Hon. W. B. Woods) on petition of the railroad company, vacated the order appointing a receiver, and its property was restored, after having been in the custody of the receiver for several weeks.

On the 19th day of May, 1873, the bill filed by Amy and Moran was amended by joining Lamar as complainant and striking him out as defendant, and dismissing it as to the complainants in this suit, and Uriel Murdock, who were citizens of the same State with complainants. The bill as

[Meyer *v.* Johnston.]

thus amended, was pending in the circuit court at Mobile, when Lamar answered. On the 19th day of June, 1873, the complainants in the suit in the circuit court of the United States, moved that court for an order appointing a receiver, which was denied.

Lamar, in his answer, sets out the original charter of the Alabama and Tennessee River Railroad Company, and the organization of that company under it, and the various amendments to the charter. He avers that the first mortgage was duly executed and recorded; that the railroad from Selma to Talladega was built prior to January 1st, 1861; and to Blūe Mountain in 1863, and the grading of the road to Jacksonville finished before January 1st, 1864. His mortgage is averred to be a first lien on the road from Selma to Jacksonville, and on all the lands, property and franchises of the Alabama and Tennessee River Railroad Company, owned when his mortgage was executed, or at any time thereafter.

The amended charter of February 20th, 1866, is also made a part of his answer, which avers that under it the company surveyed and located and partly graded a line for its road from Jacksonville to the Georgia line, in the direction of Rome, which is the line of the present road.

The answer admits the contract of consolidation on the 8th day of August, 1866, and avers that before complainants' mortgage was executed, the first mortgage was a valid and first lien on the railroad from Selma to the Georgia line.

Lamar avers the grant of lands by Congress, by act approved June 3d, 1856, and the grant of the same lands, by the State, to the Alabama and Tennessee River Railroad Company, by act approved January 20th, 1858, and sets out each of these acts in his answer. He avers the confirmation of the grant by act of Congress, approved May 23d, 1872, and makes that act a part of his answer, and insists that his mortgage constitutes a prior lien on all these lands. He avers that the complainants' mortgage estops the grantor and all who claim under the grantor, from asserting that the first mortgage does not convey and grant all the property and rights which it professes to convey and grant.

The issue of bonds under the first mortgage and their sale by the company to *bona fide* purchasers, from time to time, to the amount of several hundred thousand dollars is averred, as also the payment of interest on some of these bonds up to 1864, and on all up to 1860.

The answer avers that Murdock, special trustee, received $1,600,000, of the bonds issued nnder complainant's mortgage in trust for the benefit of the holders of first mortgage

bonds, and second mortgage bonds; and that sixteen-fiftieths of the proceeds of the sale of all property covered by complainants' mortgage and not covered by the first mortgage, must be applied to the payment of said first and second mortgage bonds. He avers actual notice to the complainants of the existence of the first mortgage before their mortgage was executed.

Lamar insists that his mortgage is a just and valid lien on all the road, franchises, lands and other property owned by the Alabama and Tennessee River Railroad Company, when it was executed, or at any time thereafter. He admits the execution of the mortgage to Charles G. Edwards, trustee, and the execution of the mortgage to W. H. Fellows, trustee.

The making of the Breed contract of May 25th, 1866, for the extension of the road from Blue Mountain to the Georgia line, in the direction of Rome, and to Rome, and thence to Dalton in Georgia; and the construction of all the new line, from Blue Mountain to Dalton, under that contract, are stated, and it is denied that the Selma, Rome and Dalton Railroad Company built that part of the road from Blue Mountain to Dalton.

He admits the execution of the mortgage to Alfred Shorter, and to complainants, and to James P. Wallace, respectively; but claims a lien superior to all of them.

Lamar avers that all the rolling stock, which belonged to the Alabama and Tennessee River Railroad Company or the defendant corporation, and that acquired out of the earnings of the road, were subject to his mortgage.

Decrees *pro confesso* were taken against Murdock, Wallace and Shorter. Fellows answered, claiming that the mortgage to him was a lien on the lands donated by Congress, paramount to all others. Mrs. Reynolds, in her answer, admits the validity of the mortgage to Lamar and Hallett, and to Edwards, and the superiority of the first mortgage; but insists that the property conveyed by the first mortgage, and not covered by the second, shall be first applied to the satisfaction of the first mortgage. The defendant corporation answered, admitting all the allegations of the bill.

The main points of controversy in this court, and, in the court below, related chiefly to the issue of receivers certificates and the consolidation of the franchises of the three corporations, and in that connection, the scope and effect of the various mortgages executed by the defendant company, and the companies which formed it.

To aid in an understanding of these various questions, it
VoL. LIII.

[Meyer *v.* Johnston.]

has been thought best to make a separate statement of the facts relating to each, together with extracts from such portions of the charter and acts of the legislature as bear upon them.

## HISTORY OF THE CONSOLIDATION.

The Alabama and Tennesse River Railroad Company was chartered by act of the general assembly of Alabama, on March 4th 1848, the third section of the charter providing that "said railroad shall extend from some point on the Alabama river, at or near the town of Selma, in Dallas county, Alabama, to some convenient point on the Tennessee and Coosa Railroad, and may be, and hereby is authorized to connect with the same."

This latter road was not then in existence, and has never been built, but the general assembly passed an act in January, 1844, to incorporate a company to build it, between Guntersville on the Tennessee river, and some point on the Coosa river, supposed to be Gadsden. With this objective point in view, the Alabama and Tennessee River Railroad Company commenced work from Selma shortly after its organization. In 1852 the company had surveyed and located a railroad from Selma by way of Blue Mountain and Jacksonville to Gadsden, and had commenced work on portions of the road at Selma, and other points. From that time on, the work slowly but gradually progressed, until May 1862, when the company had constructed and put in operation a line of road from Selma to Blue Mountain, a distance of one hundred and thirty-five miles, finished the grading to Jacksonville some ten miles beyond, and had done some other grading further on in the direction of Gadsden. Blue Mountain remained the northern terminus of the road for several years.

Sometime during the war, under a contract with the Confederate States government, in the year 1862 or 1863, a survey was made in the direction of Rome, and under that contract a few miles of grading were done from Jacksonville in the direction of Rome. The close of the war, however, found the road greatly worn, and the Alabama and Tennessee River Railroad Company insolvent and without means to repair the road or push it to completion. Besides the property then owned by it, it held some 375,000 acres of land, granted to it by Congress in 1856, to which more particular reference will be made further on.

By an act of the general assembly, approved December 8th, 1863, the Alabama and Tennessee River Railroad Com-

[Meyer *v.* Johnston.]

pany was authorized to construct a branch road, in such direction as the board of directors might deem best, for the development of the mineral coal in the vicinity of their railroad," provided the branch road commenced at Ashby Station on the Alabama and Tennessee River Railroad, and terminated at or south of Elyton, in Jefferson county, Alabama. This act authorized the Alabama and Tennessee River Railroad Company to build the branch alone, or in connection with such persons as subscribed stock, expressly for the construction of the branch, and provided in certain contingencies for a special board of directors, &c. In 1864 the branch road was located, and some six miles of grading done from Ashby Station in the direction of Elyton, but no work of any kind has ever been done on it.

It is not shown by the evidence whether this work was done by the Alabama and Tennessee River Railroad Company alone, or by it and stockholders who were authorized to subscribe to the building of the road.

On the 20th of February, A. D., 1866, the legislature passed "an act amending certain sections of the charter and amended charter of the Alabama and Tennessee River Railroad Company." By that act the second, third, and fourth sections of the act of March 4th, 1848, and the sixth section of the act of February 10th 1852, were amended as hereinafter stated, and the amending act declares, that the "powers and privileges in addition to those conferred, in and by the sections and acts aforesaid, and other existing acts relating to said railroad company, specified in the subsequent sections of this act, are hereby conferred upon said company." The other sections of that act, so far as pertinent to the present case, are as follows:

Section two enacts, that said railroad company, acting by their board of directors, shall have the right and power to lay out, locate, and construct and operate a railroad, over such route as may be determined by said board of directors, from such point, at or near the town of Jacksonville in this State, to which their present railroad may be completed, to such point on the line separating this State from the State of Georgia, as the said board of directors may determine, and all the provisions of the acts aforesaid chartering said company, and of all acts amendatory thereof, so far as the same may be pertinent, shall apply to, and form part of, the rights and privileges granted in and by this act.

Section three provides, that said railroad company, acting by its board of directors, shall have the power and right to connect their railroad or any portion thereof, (including the

[Meyer *v.* Johnston.]

road or roads which may be constructed under the provisions of this act,) with the railroad or roads of any other company in this State, or in any other State, on such terms as may be agreed with the company or companies owning or controlling the road or roads, which may be connected with, and may unite and consolidate their railroad or any portion thereof, (inclnding the road or roads which may be constructed as aforesaid,) and their stock and franchises, or any portion thereof, with the road or roads and the stock and franchises, or any portion thereof, of any other railroad company or companies in this State, or in any other State, on such terms as may be agreed on, with the interested and contracting companies.

"Said Alabama and Tennessee River Railroad Company, shall have power to purchase and own, the stock and railroad and appurtenances and franchises or any portion thereof, of any company existing in this State, or in any other State, and to subscribe for and own stock in any other railroad company or companies, with whose road, the road of this said company or any part thereof, (including the road or roads which may be constructed under this act,) may become united or connected with, on such terms and conditions as may be agreed on by and with the interested and contracting parties; the objects of these provisions being to promote and facilitate, as far as practicable, connection between the railroads and systems of railroads in this State, and the railroads and systems of railroads in adjacent States, constructed or to be constructed." All the rights powers and privileges possessed and to be possessed by the said Alabama and Tennessee River Railroad Company, under their act of incorporation and other acts, may and shall be extended and applicable to all railroads, and railroad companies which may become connected or united or consolidated with the road or stock or franchises, in whole or in part of said Alabama and Tennessee River Railroad Company, or any road to be constructed by them, under the provisions of this act, so far as said rights, powers and privileges may be pertinent, or applicable to the companies or roads which may be united or consolidated with, in whole or in part. All contracts or agreements which may be made by said company, with any other railroad company or companies, in pursuance of the provisions of this act, and having in view the object and purposes of these enactments as above declared, * * * * shall be valid according to the terms thereof, so far as the same shall not be contrary to law.

Section four provides, that said railroad company shall

[Meyer v. Johnston.]

have power and they are hereby authorized, so to extend their railroad in any direction over such roads as their board of directors may determine to connect with any railroad leading to or in the direction of Gadsden, in the county of Cherokee, and they shall have the same power and authority to extend their railroad southwardly from the city of Selma, crossing the Alabama river, and construct their extended road over such route as may be determined by their board of directors, so as to connect and form a junction, as may be agreed on with any railroad or roads, extending from the direction of Mobile or from the bay of Pensacola.

The fifth section provides that the railroad company shall have power to make all contracts and agreements, not contrary to law, which may be deemed necessary or advantageous to carry out the objects of this act. It authorizes in broad terms the issue of bonds or other obligations, or that the company may guaranty the bonds of other companies or corporations carrying out the objects of the acts; and to secure such indebtedness, provides that "the company shall have power to create a lien or liens by mortgage or deed or deeds of trust, in such forms and with such provisions and conditions as their board of directors shall prescribe, on all the property, means, effects and rights of every kind, or any part thereof, possessed and to be possessed by said company, which shall be valid and binding according to the tenor and effect of such deed." This section also authorizes an increase of the capital stock to an amount not exceeding the costs of building and equipping the road.

Section six provides, that said company shall have the power to change the name of their company, if they shall so desire, at any time, for one less inconvenient in length, and in case of change, the corporate name shall be such as the company shall select, and declare by resolution of stockholders, and continue under the new name in all respects with all rights, privileges, liabilities and obligations, as under the present name.

Section seven declares, that no change in the name of said company, should the name be changed as authorized by this act, nor any thing in this act contained, shall have the effect to release said company from any legal or equitable obligation, whatever of said company, but all such obligations shall be and remain in full force after, as before the passage of this act.

At this time, there were two railroad companies chartered by the State of Georgia—the Georgia and Alabama Railroad Company, and the Dalton and Jacksonville Railroad Com-

pany. The original charter of the latter company authorized it to construct a road from Dalton, in Whitfield county Georgia, to "some fit and eligible point on the Alabama line or the most practicable route from Dalton to Gadsden," and by an amendment it was authorized to take its present name. The charter of the former company is not set out in the record. Neither of these companies, so far as the testimony shows, had constructed any railroad. What property they owned is not shown, beyond the statement that one of them had borrowed a sum of Confederate money from one Shorter, and given him a mortgage "on its property and franchise" to secure the debt.

On the 26th day of May, 1866, the Alabama and Tennessee River Railroad Company made a contract with A. D. Breed to build, complete and equip, the road from Blue Mountain to Dalton. This agreement recites that it was made in contemplation of the expected consolidation with the Georgia companies, and, that the Dalton & Jacksonville Railroad has "indicated its perfect willingness to enter into any arrangement with the party of the first part, (the railroad company,) to carry into effect the plans and wishes of the Alabama and Tennessee River Railroad Company, for a consolidated and continuous line of railway from Selma to Dalton," &c. Under this contract, Breed undertook to complete and equip the road from Blue Mountain to Dalton, within forty months, and leased the finished portion, which he was to improve, repair and operate at a specified annual rental, until the road was turned over to the company upon completion.

It was stipulated in this contract, that for the purpose of securing to Breed the payment of all sums to become due him under this agreement, that the contract should constitute a lien as in the nature of a mortgage,   *   *   *   upon the road then constructed or thereafter to be constructed in Alabama or Georgia, and on the franchises then owned or to be acquired,   *   *   *   "and on all lands and all real and personal property possessed or which may be hereafter acquired." It was also stipulated "that this lien shall be subject and subordinate to existing liens, and to liens which may be created for the security of bonds of the party of the first part, which may hereafter be issued, to be used in the extinguishment of the present mortgage bonds, or to be exchanged therefor, or to discharge any debt of the party of the first part having any lien, or to raise funds to be used in the construction of said railroad contracted to be constructed."

[Meyer v. Johnston.]

On the 31st day of May 1866, the road and all the rolling stock of the company, were turned over to Breed, under the contract, by the terms of which, at the termination of the lease, a schedule was to be made of the property returned, and if less was returned than he receipted for, Breed was to account for the difference, and on the other hand, if he put on additional rolling stock, as he was authorized to do, the value of the excess of such rolling stock, over and above that received by him, was to constitute a debt against the company.

No work was done under this contract, beyond repairing the road from Selma to Blue Mountain.

On the 8th day of August, 1866, the three companies entered into the following contract, which states "that *whereas*, by acts of the legislatures of the States of Georgia and Alabama, the said parties to this contract and agreement, are fully authorized to unite together, so as to form one consolidated company, with all the rights, powers, privileges and franchises, now belonging to either of said parties, and, *whereas*, it is to the interest of each one of said parties to unite together into one company, so as to complete and own, and use one continuous railroad from Selma, by way of Rome to Dalton, under the authority and control of one set of officers, therefore the said parties do contract, and agree, and bind themselves each to the other as follows :

1st. That the Alabama and Tennessee River Railroad Company, the Georgia and Alabama Railroad Company, and the Dalton and Jacksonville Railroad Company, be, and they are hereby united together, and consolidated into one company, with all the rights, powers, and privileges and franchises which now belong to either one and all of said companies.

2d. That all the property real, personal and mixed, and all franchises now belonging to either one of the parties to this contract, are hereby declared to be the property and franchises of the consolidated company.

3d. That each and every stockholder, in either of the said companies, who has paid his or her subscription of stock, shall be a stock-holder to the extent of such payment in the consolidated company.

4th. That the president and board of directors of the Alaabama and Tennessee River Railroad Company shall have and exercise full power and control over all the property of all of said companies, hereby made the property of the consolidated company, and said president and directors shall cause the railroad which is now completed from Selma to

Blue Mountain, to be extended and completed from Blue Mountain by way of Rome to Dalton, over the best and most practicable route, and to enable them to do so, and to liquidate the debts of said company, the said president and directors are hereby authorized to issue bonds and execute a mortgage or mortgages on any part or all of the property and franchises of all of said companies, including the roadbed and right of way from Selma to Dalton.

5th. That all the debts, contracts, obligations and liabilities of each of said parties to this contract and agreement are hereby assumed by the consolidated company, formed under this contract.

6th. That all acts, contracts, and obligations, done, and made or assumed, by and under the authority of the president and directors of the Alabama and Tennessee River Railroad Company, and all such acts, contracts and obligations, done made and assumed, by and under the authority, of said president and directors, shall be valid and binding on all said companies, hereby consolidated into one.

7th. That at the next annual meeting of the stock-holders, of the Alabama and Tennessee River Railroad Company, all the stock-holders of each one of said companies shall have the right to vote, according to the amount of his or her stock.

8th. That each of the parties to this contract and agreement shall ask of the legislature of their respective States the enactment of a law, giving one name to all of said companies hereby consolidated, under authority from each of said States.

9th. The railroad to be extended and constructed, under this contract, shall be extended by way of Rome to Dalton, at each of which places suitable buildings are to be erected for the accommodation of the people.

10th. That until a common name shall be lawfully given under which the franchises of each of said companies shall be united, the Alabama and Tennessee River Railroad Company shall be the active and controlling corporation, and the organization of the other companies may be continued until then, for the purpose only of preserving and enabling the acting and controlling company to exercise the franchises hereby consolidated with the franchises of said acting and controlling company, and all the contracts and obligations, which may be entered into or made for said consolidated company shall be done, until a common name shall be lawfully given as aforesaid, in the name and in accordance with

[Meyer v. Johnston.]

the franchises of the Alabama and Tennessee River Railroad Company.

11th. That no further payment shall be required on subscriptions of stock of the Georgia and Alabama Railroad Company, or the Dalton and Jacksonville Railroad Company, but any subscriber to the stock of either of said companies, shall have the right at any time, within three years, to pay a part or all of his subscription, according to the terms thereof, and such payment shall make the party a stock-holder of the consolidated company.

On the 8th of February 1867, the legislature passed "an act approving the consolidation of the Dalton and Jacksonville Railroad Company with other companies therein named, and to authorize the consolidated company to adopt a name and a charter, and to act under the same."

This act provides that "the consolidation of the Dalton and Jacksonville Railroad Company, and the Georgia and Alabama Railroad Company of the State of Georgia, with the Alabama and Tennessee River Railroad Company of this State, as agreed on by and between said companies, so as to form one consolidated railroad company, for the construction and use of a railroad, to be constructed from Blue Mountain in the State of Alabama, as a continuation of the Alabama and Tennessee River Railroad Company, by way of Rome to Dalton, in the State of Georgia, be and the same is hereby ratified and approved, and the said consolidated company, acting by its board of directors, shall be, and is hereby authorized and empowered to adopt as its corporate name and style, the name and style of the Selma, Rome and Dalton Railroad Company, and to adopt as its charter, the charter of the Alabama and Tennessee River Railroad Company, as now existing, with its amendments, and under and by said name and style and charter, so authorized, may and shall have, possess, enjoy and exercise, all the lawful rights, functions, powers and privileges, and shall be subject to all the lawful liabilities and responsibilities incurred or contracted, by said consolidated company, *provided* always, that nothing in this act shall be so construed as to release either of said companies from any obligation or liability incurred or contracted by them or either of them, prior to their consolidation."

The legislature of Georgia, on the 13th of December 1866, approved the consolidation by an act, the title and terms of which were almost identical with the above act.

After this consolidation, and on the 20th day of September, 1867, Breed and the Selma, Rome and Dalton Railroad

[Meyer v. Johnston.]

Company, modified the contract of the 26th of May 1866, in certain particulars which need not be set forth, and that company assumed the liabilities of the Alabama and Tennessee River Railroad Company under the original contract.

According to the testimony, the route from Jacksonville to Rome and Dalton was not finally located and adopted until 1868 or 1869, and the route thus selected diverges at Jacksonville, in a direction north by east, from the grading and location between Jacksonville and Gadsden.

On November 4th 1862, the general assembly passed an act authorizing the Alabama and Tennessee River Railroad Company to construct a branch road from Jacksonville in the direction of Rome, Georgia, to the Georgia State line. This act recites that such a connection is considered a "military necessity," by the Confederate Congress, and the act is passed to enable the company to construct that portion of the road in Alabama, in accordance with the views of the president.

Breed, using the grading and work of the Alabama and Tennessee River Railroad Company from Blue Mountain to Jacksonville, and that done from that point in the direction of Rome, finished and equipped the road from Blue Monutain to the Georgia State line, a distance of about thirty seven miles, and from that point to Dalton Georgia, some sixty-three miles further on, making a total of about one hundred miles built by him. In October 1870, he delivered possession of the railroad to the defendant corporation.

Among the additions, made by Breed to the rolling stock, during his lease, were some engines and cars, valued at $173,340, which Breed sold to the New York Guaranty and Indemnity Company. The railroad company agreed with this company to buy the rolling stock and pay for it in a year, the title to remain with the owner until payment of the purchase money ; but this had not been done when the present receivers were appointed, and this stock was a portion of that referred to in their report, and the purchase of which the court confirmed by its decretal order of June 7th 1873.

Breed received from the Selma, Rome and Dalton Railroad Company, something over six hundred and fifty thousand dollars for work and repairs done upon the road from Selma to Blue Mountain, and about three milions of dollars for constructing and equipping the portion of the road from Blue Mountain to Dalton. These payments were made chiefly with bonds secured by complainant's mortgage.

There was evidence that the Breed contract was the subject of frequent conversation and correspondence, between

Breed and his agents, and some of the first mortgage bond-holders and directors of the company, during the years 1866 and 1867. Some of them, (including Amy,) opposed the contract, but afterwards consented not to interfere, and await the result of Breed's efforts.

### DEED OF TRUST TO LAMAR AND HALLETT.

The Alabama and Tennessee River Railroad Company made to Gazaway B. Lamar and William R. Hallett, a deed of trust or mortgage, dated July 1st, 1852, to secure an issue of bonds amounting to $500,000, maturing July 1st, 1872.

This deed after referring to the original charter and the amendatory act approved February 10th, 1852, recites that the Alabama and Tennessee River Railroad Company is engaged in constructing a railroad in the State of Alabama, on the route authorized by the acts aforesaid; that is to say from the Alabama river, at or near the city of Selma, northward through a portion of the counties of Dallas, Autauga, Perry, Bibb, Shelby, Talladega, Benton and Cherokee, in the direction of the Tennessee river, the route of which railroad has been surveyed and duly located," by the Alabama and Tennessee River Railroad Company.

After describing the bonds, which the deed secures, with particularity, it "grants, conveys, sets over and transfers" unto the trustees or the survivor of them, for that purpose, "the railroad constructed, and to be constructed, by the parties of the first part, with all the appertenances thereof, *including all lands*, houses, structures, fixtures, machinery, piers, and wharves, and franchises and privileges and rights, and all other property, real and personal, now owned or which may hereafter be owned by the parties of the first part, and also all subscriptions to their capital stock, together with all the tolls, incomes, issues and profits, which may accrue from said railroad or from any other source whatever, including also the proceeds and avails of all bonds which may be issued or disposed of by the parties of the first part."

This deed also secures $338,450 of other bonds, upon like terms of the first issue, but it was provided, that these should not be issued until at least one hundred miles of road shall be in actual operation.

The mortgage also contains the following covenant:

"That the said company further covenants and agrees, that all moneys or other things of value which may be received by said parties of the first part for said bonds, or any of them,

shall be faithfully used and appropriated in the construction of said railroad, and equipping the same, and in procuring and paying for materials required in the construction of said railroad, and to no other purpose whatsoever, and the parties of the first part by this indenture futher covenant and agree to make, execute and deliver, all such other assurances, and instruments, and conveyances, as shall from time to time be necessary, and that the party of the second part may reasonably desire, or their counsel learned in the law may reasonably advise, for the better carrying into effect the object and purposes of this indenture, and of making the lien hereby intended to be created more effectual, and to embrace the said railroad, and the future construction thereof, together with all the other property, means, and effects, intended hereby to be mortgaged, as shall hereafter be required, so as to make the security and lien aforesaid, and by this indenture to be conveyed, at all times, as perfect, complete, and effectual, as practicable.

Mr. Lapsley, the president of the railroad company, was absent in New York, when the board of directors met and passed the resolutions directing the execution of this mortgage, but ten of the directors were present. The deed was signed by the president pro tem. and the secretary, and had the corporate seal attached. Its execution was proved by Goodwin, the secretary, before a justice of the peace on the 6th day of September, 1852, and on the next day it was recorded in Dallas county, and shortly thereafter in each of the other counties through which the road was to be built. After being thus recorded, the deed never having been out of the possession of the railroad company, it was sent to New York for delivery to the trustees.

None of the records of the Alabama and Tennessee River Railroad Company were introduced, showing the exact date of the execution of the deed; they having been destroyed by fire. Goodwin testifies, however, that the deed, although dated on July 1st, 1852, was not in fact signed until September, as he made the affidavit proving the execution of the deed, shortly after it was signed.

This deed of trust was assailed because of the absence of the president of the company, at the meeting of the directors which ordered its execution; it being insisted that under the charter and amendments, he was an "integral part" of the corporation, without whose presence a corporate act could not be performed.

The portions of the original charter and amendments bearing on this point are as follows:

17

[Meyer v. Johnston.]

The fifth section of the original charter provides that at the first meeting, after the organization provided for, the subscribers to the capital stock, or stock-holders or a majority of the min value, shall elect nine directors by ballot to manage the affairs of the company    *    *    *    and the directors thus chosen shall elect among themselves a president of such company, &c.

Its sixth section declares that the president and directors shall be chosen annually, and in event any vacancy shall occur, by death, resignation, or otherwise, before the year for which they were elected, such vacancy shall be filled by the president and directors, or a majority of them, &c.

The 7th section provides among other things that said president and directors, or a majority of them, are empowered to borrow money to carry into effect the objects of this act; to issue certificates or other evidences of such loan, and to pledge the property of said company for the payment of the same.

Afterwards, by an act of the General Assembly of Alabama, passed in 1852, the charter was amended, and section 2 of the amendatory act provides that "hereafter two directors may be added to the board of directors as now constituted, so as to make eleven directors including the president of the company, instead of nine as heretofore. At any time before the next annual meeting of stockholders the two additional directors may be chosen by the present board of directors from among the stockholders.    *    *    *    At the next annual, and all subsequent elections by the stockholders of directors, instead of nine directors, as authorized by the present charter, including the president, the stockholders shall elect in the manner provided by the existing charter eleven directors, including the president of the company, who shall have all the powers, rights and privileges, and be subject to all the regulations, provisions and restrictions which apply to the board of directors, under the present charter, and which may be authorized and provided for in any amendment to the charter—provided, that six directors, including the president, shall constitute a quorum for all business."

Lamar insisted that the terms of this deed were such that it included the public lands granted to the company by the act of Congress in 1856. The facts with regard to these lands are fully set forth in the statement of the mortgage executed to Fellows in 1865, to secure the Reynold's debt.

On the 17th of January, 1855, the Alabama and Tennessee

River Railroad Company executed another mortgage to Charles G. Edwards, to secure another series of bonds. This mortgage was duly proved and recorded, on the 11th of February, of the same year. It conveys "one hundred miles of the railroad of said company, constructed, commencing at the commencement of the railroad of said company in the city of Selma, with all the appurtenances thereof, including all the lands, houses, structures, fixtures, now owned or which may hereafter be owned by said company, attached or pertaining to, or which may be attached, or pertaining to, the said one hundred miles of said railroad, with the franchises of said company, so far as the same may relate, or extend to the use, occupation, or ownership, of the said first one hundred miles of said railroad, together with all implements and machinery, and appurtenances, now owned by said company, and pertain to, and in and about the work and business of said company, in the said first one hundred miles of said railroad," &c.

### MORTGAGE TO FELLOWS ON PUBLIC LANDS.

On the 20th day of July, 1865, the Alabama and Tennessee River Railroad Company executed a mortgage or deed of trust to Fellows, as trustee for Walker Reynolds, to secure an indebtedness to Reynolds, which conveyed "all the lands," set out in an exhibit, "being the lands granted in trust to the State of Alabama, to aid in the construction of certain railroads in the State, by act of Congress approved June 3d, 1856," &c.

This act granted one hundred and twenty sections of public lands for every twenty miles of completed road built continuously, and provided among other things that it might be sold whenever the Governor certified to the Secretary of the Interior the building of that number of miles, and so on, until the road is completed, and if the road was not completed in ten years, the lands which remained unsold should revert to the United States. Another section of the act provides that the proceeds of the sale shall be applied exclusively to the construction of the road.

The State, by an act approved January 20th, 1858, accepted the grant, and it declared among other things, that the "lands, rights, interests and franchises" granted by said act of Congress, to aid in the construction of a railroad from Selma to Gadsden  *     *     *     are hereby disposed of, granted to, and conferred upon, and vested in the Alabama and Tennessee River Railroad Company," &c. Under this grant about 440,000 acres of land were cer-

tified to the State of Alabama, for the benefit of the Alabama and Tennessee River Railroad Company. By an act approved May 23d, 1872, congress "confirmed to the State for the use of the Selma Rome & Dalton Railroad Company, the successors of the Alabama and Tennessee River Railroad Company," the land certified under act of June 3d 1856.

The Alabama and Tennessee River Railroad Company had built some sixty miles of its road in June, 1856, when the lands were granted to the Company.

The several sections of the original charter of the Alabama and Tennessee River Railroad Company, and its amendments, which relate to the power of the company to accept a grant of lands, and to mortgage property, are as follows :

The fourth section of the original charter provides among other things that the company "shall be capable in law of purchasing, holding, leasing, selling and conveying personal and mixed property, so far as shall be necessary for the purposes of this corporation."

The tenth section provided, "that the president and directors of said company are hereby authorized to contract for and receive conveyances of land, stone, timber, and wood, which may be necessary or required in the construction of said railroad ;" and if they could not agree with the owner, a condemnation, for the use of the road, is provided for.

The 5th section of an amendment to the charter, adopted 10th of February, 1852, recites that, "whereas, doubts have arisen as to the rights, powers and duties of said company, under the 10th section of the original charter, in relation to the procurement of the right of way, depot grounds, &c., the following is hereby substituted in lieu of said tenth section :" The said company acting by its board of directors is hereby authorized "to contract for and purchase such timber, stone, and other material, as may be needed in the construction of their railroad, and to purchase, receive, and hold in fee simple such quantities of lands and appurtenances as may be necessary and convenient, in accomplishing the purposes of its incorporation and organization—that is to say, such lands as may be required by the company for right of way for single or double track railroad, and such lands and appurtenances as may be required at different places for stations, turnouts, and ample depots and warehouses, workshops, machine shops, and other necessary purposes in connection with said railroad.

In the 6th section of its amended charter, approved Feb-

[Meyer v. Johnston.]

ruary 10th, 1852, it is declared, that *full power and authority* is hereby given to the board of directors of said company to pledge *in such form as the board of directors think proper*, by resolution or *mortgage*, or deed of trust, *or otherwise, all the means, property and effects* of said company, or any part thereof, including subscriptions to the capital stock of said company ; and any pledge so made by said board of directors, whether by resolution, or *mortgage*, or deed of trust *or other form of contract, shall be valid and effectual to all intents and purposes.*"

MORTGAGE TO JOHNSTON AND STEWART.

On the 1st day of October, 1867, the Selma, Rome and Dalton Railroad Company executed the mortgage or deed of trust to complainants, to secure bonds to the extent of five million of dollars.

This deed recites the various steps taken in the consolidation, the giving of the three mortgages by the Alabama and Tennessee River Railroad Company as above stated, together with other indebtedness ; the making of the contract with Breed on the 26th of May, 1866, for completing the unfinished portion of the road from Blue Mountain by way of Rome to Dalton, and that the bonds secured by the mortgage were issued to provide means to fund or pay up the old indebtedness 'and remove prior mortgages, and to pay the expense of finishing the road.

This mortgage conveyed the lands and all other property of the company, in the States of Alabama and Georgia, to secure the bonds issued under it, including "the branch railroad heretofore begun and partly constructed, commencing at the station on the above described railroad, called Ashby, in the county of Bibb, extending so far as the same is graded in a northwesterly direction, \* \* \* \* \* through the counties of Bibb and Shelby, and in such directions and to such point or points as may hereafter be determined."

The resolution authorizing the issue of these bonds provided, that 2,000 bonds, of $1,000 dollars each, should be delivered to Uriel A. Murdoch, "as special trustee for the purpose of paying, satisfying or funding the existing bonds, debts, and liabilities of the company, and removing all liens on its property" prior to October 1st, 1867 ; and the mortgage itself states that 1,600 of these bonds were to be used in retiring those secured by prior mortgages on the property covered by the trust deed, and the remaining 400

[Meyer v. Johnston.]

bonds were to be used in taking up other indebtedness, according to the direction of the board of directors.

### MORTGAGE TO WALLACE.

On the 1st day of July, 1870, the Selma, Rome and Dalton Railroad Company executed another mortgage to James P. Wallace to secure an issue of $6,000,000 of bonds known as second mortgage bonds, conveying for that purpose all the property of the company.

### ORDERS AS TO APPOINTMENT OF RECEIVERS, AND THE ISSUE OF RECEIVER'S CERTIFICATES, ETC.

On the 19th day of March, 1873, the day the bill was filed, the complainants gave notice to the Selma, Rome and Dalton Railroad Company, that a motion would be heard at chambers on the 31st of March, for the appointment of a receiver. Service of the notice was accepted by the secretary and treasurer of the company on the same day. The Selma, Rome and Dalton Railroad Company filed on that day an answer, and consented to the appointment of the receiver.

The chancellor made an order appointing a receiver, which recites that complainants appeared by their solicitors, and that Hannah E. Reynolds appeared by her solicitor, and that "other creditors" of the company also appeared, and all consented to the appointment of the receiver. The decree directs the receiver to take possession of all the property of the company in the State of Alabama, to use and operate the said railroad advantageously and to take care of and keep the same in repair, &c.

On the 1st day of April, 1873, the receiver (Thos. A. Walker) filed a sworn petition which, after reciting that the State and county taxes to the amount of sixteen thousand dollars were due and unpaid; that the condition of the road was such that it was necessary to have new iron to the amount required to lay five miles; that two of the bridges were in an unsafe condition; that the rolling stock on the road belonged mostly to third parties and that a lease of the same was necessary to the operation of the road; that in consequence of the want of money certain agencies for the solicitation of business and contracts with connecting roads would have to be abandoned; that the earnings of the road would be insufficient to meet the necessary outlay,---prayed authority to borrow money for these purposes to the amount of $90,000 00, or such other amount as the court might pre-

scribe. At the time of the filing of this petition the railroad company, Mrs. Reynolds and Mr. Barrett had appeared. The chancellor, on the same day, authorized the receiver to borrow not exceeding $150,000 00 for these purposes, and to issue therefor "his certificates of indebtedness, redeemable and payable with interest at eight per cent. per annum, at such bank or banking house in the city of New York as he might therein indicate, which said certificates shall be redeemable and paid out of the net earnings of said road, or out of the proceeds of the sale of the same, &c., and in preference to and before any other claim against or lien upon the franchises, rolling stock and other property of the company. In event money could not be borrowed on better terms, the receiver was authorized to dispose of the certificates at a rate not less than ninety cents on the dollar.

Nothing was done under this order, and on the 7th day of May, 1873, the complainants filed a petition asking the appointment of a co-receiver, and suggesting John Tucker as a suitable person. This petition was accompanied by the written consent of Walker, receiver, and the affidavits of several of the largest creditors of the company, and on the next day the chancellor appointed him accordingly, and vested in Walker and Tucker all the powers and privileges which had been vested in said Walker as sole receiver.

On the 29th day of May, 1873, in vacation, Walker and Tucker, as receivers, filed a sworn petition in which, after showing that no certificates had been issued under the former order, they prayed that the amount authorized to be borrowed might be increased to seven hundred thuosand dollars. Attached to this petition was a list of all the engines and cars which had come into the possession of the receivers, which belonged to the Selma, Rome and Dalton Railroad company, and a schedule of the rolling stock in its possession which belonged to other parties. The petition alleged that the rolling stock which belonged to the railroad company was utterly insufficient for the proper operation of the road; that the leases with the owners of the other rolling stock had been forfeited or had expired, and that it was absolutely necessary that some arrangement be made to procure the rolling stock necessary to run the road. It also recited that a conditional contract had been made with the owners of the rolling stock for its purchase, and that the amount asked ($420,000 00) was a fair and reasonable valuation therefor. The petition further recited that certain repairs were necessary to render the operation of the road safe and profitable, and that a large

[Meyer v. Johnston.]

amount was due the operatives of said road.  The amounts needed were thus itemized:

"1. For engines and other rolling stock............$420,000
2. Sums required by immediate necessities and
    allowed to be borrowed..........................  96,000
3. For unpaid wages due employees, and material
    purchased before this bill was filed.............  50,000
4. For the purchase of iron and other materials to
    repair said road, and for contingent expenses..  50,000
5. For payment of rent of rolling stock from
    April 1st to July 1st, 1873.....................  8,400
                                                    ————————
    Total....................................$624,400"

On the 2d day of June, 1873, in vacation, the chancellor, in an order reciting "that it appeared that sufficient notice of the time and place of hearing said petition has been given to the parties who have appeared in this cause," authorized the receivers to borrow the sum of seven hundred thousand dollars and to issue therefor certificates of indebtedness bearing eight per cent. interest, and payable two years after date at the office of the New York Guaranty and Indemnity Company in the City of New York, such certificates to be signed by both receivers and countersigned by the register of the chancery court.  The receivers were authorized to sell such certificates at a rate not less than ninety cents on the dollar, to carry out the objects set forth in the petition.  The decree provides that "the sum so borrowed is and shall be a charge upon the Selma, Rome and Dalton Railroad, and all the equipments, property and appurtenances thereof, that may have come or may hereafter come into the possession of said receivers, to be first enforced against any and all rolling stock which may have been or may be acquired under any order of this court, and that from the income thereof, not required for current expenses, and from the proceeds of the sale of said property or any part thereof, made under an order or decree of this court, the sum so borrowed shall be first paid."  This decree further authorized the receivers "to put in sidings and switches and to erect depots and platforms along the line of said railroad in Alabama, for the convenience of persons engaged in mining and manufacturing, whenever said receivers are satisfied that it will be advantageous to the property in their hands," &c., having due regard for economy.

On the 7th day of June, 1873, the chancellor made an interlocutory order in vacation, without notice, except to the

[Meyer *v.* Johnston.]

complainants, and Hannah E. Reynolds, upon the affidavit of one of the receivers, ordering payment to connecting lines, of unsecured balances due them, before suit brought, by the defendant corporation in its dealings with them, amounting to nearly seven thousand dollars, and also confirming the receivers' report, wherein they made known to the court that they had purchased from the New York Guaranty and Indemnity Company, rolling stock to the amount of $173,-340 00; and from the same company, as assignees of S. and W. Welsh, fifteen "Welsh locomotives," at $160,550 00; and from T. J. S. Flint, as trustee for the "Equipment Associates," rolling stock to the amount of $128,661 00. This property, as stated in the receivers' report, was on the road when the receivers were appointed, but under mortgage to the parties named above.

In the same order, authority was given the receivers to sell the timber lands granted by the government, at private sale, for the purpose of developing the business of the road, and assisting in the establishment or enlargement of iron works, provided that said lands shall not be sold in less quantities than one thousand acres or more than ten thousand acres to one person, the aggregate sales not to exceed fifty thousand acres. The receivers were also directed to pay off with the money thus obtained the balance due on the Reynolds debt and secured by the mortgage to Fellows.

### FINAL DECREE.

When the cause was called for trial at a special term in February, 1874, Lamar filed his petition, affidavit and bond for removal of the cause to the circuit court of the United States, but the chancellor overruled it. A final decree was rendered in the cause on the 5th day of April, 1874. By this decree the equities of the parties were settled and decreed as follows:

1. The mortgage to Lamar and Hallett was decreed to be valid, and to constitute a first lien on the railroad and its appurtenances, from Selma to Blue Mountain, including the depot building, and real estate appurtenant to, and used in connection with that portion of said road, together with the right of way and chartered privileges, and corporate franchises included in said mortgage, and upon all the rolling stock and other personal property owned by the Alabama and Tennessee River Railroad Company, on the 8th day of August, 1866. It was further decreed that the mortgage did not create any lien upon the branch railway, known as the

"Ashby Branch," nor on the public lands donated by Congress.

2. The mortgage to Edwards was declared to constitute a second lien on the first hundred miles of road and appurtenances lying north of Selma.

3. The mortgage to Fellows was declared to constitute a first lien upon the public lands.

4. The mortgage to Johnston and Stewart is declared to constitute a first lien on the road from Blue Mountain to Dalton and upon the "Ashby Branch," and a lien upon the public lands, subject only to the mortgage to Fellows. It was also declared a lien upon the road from Blue Mountain to Selma, subject to the liens of the mortgages to Lamar and Hallett, and to Edwards; that it was a lien upon the rolling stock and other personal property owned by the Alabama and Tennessee River Railroad Company, on the 8th day of August, 1866, subject to mortgage to Lamar and the second mortgage to Edwards, and declared to be a first lien upon all other property, real and personal, belonging to the Selma, Rome and Dalton Railroad Company.

5. The mortgage to Wallace was declared to be a lien upon all the property of the company subject to all of the other mortgages.

This decree declares that liens of judgment creditors are postponed to the mortgages, except as to one who was declared to have a priority over Wallace's mortgage.

This decree directs that the entire railroad in the State of Alabama, including the "Ashby Branch," and station houses, shops and depots, and real estate appurtenant to the railroad, and all branch railways, "and all and singular the chartered rights and corporate franchises and privileges appertaining to said railroad in the State of Alabama, included in either of said mortgages," —— be sold together. The rolling stock and personal property which belonged to the Alabama and Tennessee River Railroad Company, on the 8th day of August, 1866, is ordered to be sold together, but separate from other property. The rolling stock and other property purchased by the receivers is directed to be sold together. The public lands, and all right to any other lands not certified to the company, are ordered sold in a body.

The decree appoints three commissioners to make the sale and fixed a minimum price. It also directed a reference to the register to ascertain and report, among other things, an account of the expenses incurred by the trustees in each of the mortgages about the execution of their respective trusts, including a reasonable allowance to their solicitors, and the

[Meyer v. Johnston.]

sum thus ascertained is decreed to be a charge upon the gross sum, which shall be decreed to be payable to holders of bonds secured by each of said mortgages respectively.

It was further decreed, that "the costs to be taxed in the cause, including the costs, commissions and expenses of sale, the expenses incurred, or which may be incurred, by the receivers in operating the railroad, and in the performance of their duties as such receivers, shall be a charge upon and first paid out of the gross proceeds of the sale of all the property herein authorized to be sold, and the balance, after the payment of costs and expenses shall be divided and distributed," to creditors, according to their respective rights and priorities.

This decree declares that the receiver's certificates are a first lien on the rolling stock purchased by them, and in event a sufficient amount is not realized from a sale of it, any balance remaining is decreed to be a prior charge upon the road and its appurtenances, in preference to all other liens, &c.

All persons whatsoever are enjoined from prosecuting any suit against the defendant corporation.

Lamar prayed an appeal, and superseded the decree. He died pending his appeal, and Louis H. Myer was appointed by the chancery court of Dallas, his successor in the trust, and the appeal was revived in his name.

Johnston & Stewart, Mrs. Hannah E. Reynolds, and Bradley, McAllister & Co., and other judgment creditors also appealed.

There was a severance in this court, errors being separately assigned, and also cross assignments of error under the rules.

Lamar assigned forty-five errors. Some of these assignments were directed to the refusal of the court to declare his mortgage a first and prior lien upon all the property of the defendant corporation, including the public lands and the "Ashby Branch." Others called in question the various interlocutory decrees in the appointment of a receiver, the order of the receiver to pay for the rolling stock, &c., and particularly in authorizing the issue of receivers' certificates especially without notice to him. Others were based on the order allowing the receivers' certificates to be sold at less than par, and others were predicated upon the manner in which the sale was directed to be made, and the costs to be taxed.

Johnston & Stewart assigned eight grounds of error, which assailed the decree allowing any operation or effect to Lamar's mortgage, and in allowing it a lien on the rolling

[Meyer v. Johnston.]

stock owned by the defendant corporation at the time of the consolidation.

The judgment creditors assigned for error, that the decree allowed the several mortgages a priority over their judgments.

Mrs. Reynolds assigned, among other things for error, that the court did not decree the mortgage to Lamar constituted a prior lien (on all the property in Alabama, including public lands, and the Ashby branch,) to the mortgage to Johnston & Stewart; that it authorized the issue of receivers' certificates, making them a prior lien on the road and property; that the road was ordered to be sold together; and that the public lands should be sold in a body.

Messrs. PETTUS, DAWSON & TILLMAN, R. H. SMITH and E. H. GRANDIN, appeared for the appellant, and for appellees on the cross appeal.

*Messrs. BROOKS, HARALSON & ROY appeared for Johnston & Stewart and assigned errors in their behalf on the cross appeal.

Messrs. FELLOWS & JOHNS appeared on behalf of the judgment creditors.

Mr. H. A. HARALSON appeared for Mrs. Reynolds.

Messrs. MORGAN, LAPSLEY & NELSON, appeared for the appellees in the original appeal.


PETTUS, DAWSON & TILLMAN, for appellant.—I.   In the *Ohio and Mississippi Railroad Co.* v. *Wheeler,* 1 Black 286, it is asserted that two States cannnot make one corporation, but this is overruled in the *Railroad Company* v. *Harris,* 12 Wall. 65.   In that case the court says: "The question is always one of legislative intent and not of legislative power."   In this case it is evident that both States intended to create but one corporation.

---

*NOTE.—It has not been practicable. without unduly lengthening the report of the case, to set out separately the argument of each of the counsel; all of them have therefore been blended into one.   The main brief for appellees was submitted by Messrs. Brooks, Haralson & Roy; Messrs. Morgan, Lapsley & Nelson, submitting the brief as to the power of the court to issue receiver's certificates, &c.

[Meyer v. Johnston.]

The contract of consolidation was for the purpose of "uniting together so as to form one consolidated company;" the company thus formed having the rights of the others.

The acts of Georgia and Alabama show the legislative intent with equal clearness. "The consolidation" of the three companies "as agreed on by and between said companies, so as to form one consolidated railroad company * * is hereby ratified and approved."

The acts of the legislatures of the two States, providing for and ratifying the consolidation, and the contract of the three companies, indicate the purpose to continue the Alabama corporation extended into Georgia.

The amended charter of the Alabama company, passed before the agreement to consolidate, provides that the company "shall have power to purchase and own the stock and railroad and appurtenances and franchises, or any portion thereof, of any company existing in this State, or any other State."

Again, in the contract made by the Alabama company and A. D. Breed for the extension of the old road into Georgia, it is declared that the contract is based "on the supposition and expectation," that the railroad of the Alabama company will be united or consolidated with the railroad of the two Georgia companies, or one of them; "and that arrangements will be made * * whereby all the chartered rights and privileges of the said Georgia and Alabama Railroad Company and the said Dalton and Jacksonville Railroad Company will be transferred to and vested in this company."

The contract also provides for the stockholders in the Georgia companies voting in the next meeting of the stockholders of the Alabama company. Stockholders in the Georgia companies who had not paid, were released; but stockholders in the Alabama company were not released.

The board of directors of the Alabama company are authorized to mortgage all the property and franchises of the consolidated company, from Selma to Dalton; and it is made their duty to extend the railroad from Blue Mountain, by way of Rome to Dalton; and the power to mortgage was given for that purpose. The acts of the two States ratify and confirm the consolidation of the Georgia companies "with" the Alabama company.

The case of Clearwater v. Meredith, 1 Wall. 25, is unlike this in many important points, and this is also true of the cases cited from Indiana.

Whatever may be the construction given to this contract of consolidation, the fifth item of this contract deprives the

[Meyer *v.* Johnston.]

question of much of its importance, for it is provided that all the debts, contracts, obligations and liabilities of each one of the parties to this contract and agreement, are hereby assumed by the consolidated company formed under this agreement.

II. The appellees contend that ten of the eleven directors did not constitute a quorum, because the president was absent. They say that the president was an integral part of the corporation.

"Private corporations as they exist in this country, are to be distinguished from municipal corporations of England, in this, that they are not, in general, composed of integral parts." Angel & Ames on Cor. 2d ed., p. 655.

The objection is based on the second section of the amended charter af February 10th, 1852. That section declares that two directors may' be added to the board, "so as to make eleven directors, (including the president,) instead of nine as heretofore." And it is provided that at their next meeting the stockholders "shall elect *    * eleven directors including the president,    *    * instead of nine directors, including the president."    *    * Provided, that six directors, including the president, shall constitute a quorum for all business." The words "including the president," are repeated four times in that section ; and the manifest meaning of the words in every place, is that the president must be counted as one of the directors, and that six of the eleven shall constitute a quorum. By the original charter it is declared that the subscribers shall elect "nine directors"; "and the directors thus chosen, shall elect among themselves a president of said company."

The 6th section of the original charter is still in force ; and it provides : "And if any vacancy shall occur by death, resignation, or otherwise, of any president or director, *    * such vacancy shall be filled by the president and directors, or a majority of them." ·

The 7th section of the original charter provides : "That the president and directors, or a majority of them, may appoint all officers ;"    *    * "and a majority of them shall determine the compensation of all officers."    *    * "And said president and directors, or a majority of them, are empowered to borrow money    *    *."

It is clear that the intent in every section of the orignal charter and the amended charter of 1852, is that a majority of the directors should exercise the corporate powers.

III. If the first mortgage had been executed without any authority from the board of directors of the Alabama and

[Meyer *v.* Johnston.]

Tennessee River Railroad Company, that company has ratified it, and the company and all who claim under it, are estopped to deny the execution of the first mortgage, or its validity as a security.

1. This mortgage and the resolution directing its execution were entered on the minutes of the company in September, 1852, and there remained ever since without objection.

2. The company received the money on these bonds and used it in constructing this road.

3. The company paid the interest on all bonds issued under this mortgage from 1852 to 1861, without any question.

4. In 1866, the contract of consolidation was made, by which all the property of the Alabama and Tennessee River Railroad Company became the property of the successor company, which assumed all the debts and obligations of the Alabama company. So that the present company, as owner of the property, and as debtor to the bondholders of the first mortgage, had the same power to ratify this first mortgage, as the original grantor ever did have. The present company executed the mortgage to Johnston & Stewart and in that deed the first mortgage is expressly described and recognized as a valid lien.

IV. These facts prove the ratification and the estoppel. *Mobile and Cedar Point R. Co.* v. *Talman*, 15 Ala. 489; Herman's L. of Estop. p. 512, sec. 542; *Ottawa R. Co.* v. *Murray*, 15 Ill. 336; *Bronson* v. *LaCrosse R. Co.*, 2 Wall. 283; *Lexington* v. *Butler*, 14 Wall. 282; *Grand Chute* v. *Winegar*, 15 Wall. 355; *Moran* v. *Commissioners*, 2 Black 722; *Rodgers* v. *Burlington*, 3 Wall. 654; *Meyer* v. *Muscatine*, 1 Wall. 384; *Kennicott* v. *Supervisors*, 16 Wall. 452.

And the following decisions of our own court show that the grantor in the first mortgage is estopped to deny its execution : *Ala. and Tenn. R. R. Co.* v. *Kidd*, 29 Ala. 221; *Bean* v *Welsh.* 17 Ala. 770; *Cravey* v. *Remson*, 19 Ala. 430; Broom's L. Max., 4th Ed., m. p. 676; *Blecker* v. *U. S. Bank*, 8 Wheat. 363; *Supervisors* v. *Schenck*, 5 Wall. 781; *Knox County* v. *Aspinwall*, 21 How. 299.

V. It is objected that the mortgage to Lamar and Hallett does not cover after acquired property; because it is said, "that a man cannot grant a thing he hath not."

This maxim of the law courts, even at law, was subject to limitations and exceptions, and was applied more especially to grants in *presenti.* See *Pinnock* v. *Coe*, 23 How. 128.

In the *Galveston Railroad* v. *Cowdery*, 11 Wall. 481, the court says :

[Meyer v. Johnston.]

"Had there been but one deed of trust and had that been given before a shovel had been put into the ground towards constructing the railroad, yet, if it assumed to convey and mortgage the railroad which the company was authorized by law to build, together with its superstructure, appurtenances, fixtures and rolling stock, these several items of property as they came into existence, would become instantly attached to and covered by the deed, and would have fed the estoppel created thereby."

See also *Miller* v. *Rutland & W. R. R. Co.*, 36 Vermont, 294; *Morrel* v *Noyes*, 56 Maine, 471.

The power of a railroad corporation in this country, to mortgage its road, constructed and to be constructed, with all its present and future appurtenances, and all its present and future property, real and personal, in any way connected with, or incident to the road, and all accessions to, or extensions of the thing granted, and without any statutory aid, ought at this day to be considered as forever settled. *Whitehead* v. *Whitehead*, 5 Mo. 33; *Willink* v. *Morris Canal*, 3 Green's Ch. 402; *Pierce* v. *Milwaukie R. R.*, 24 Wis. 551; *Dunham* v. *Railway*, 1 Wall. 266; *Mitchell* v. *Winslow*, 2 Story's Rep. 639.

The power of a railroad corporation to mortgage its franchises, unaided by statute, was for many years a question of doubt and difficulty, and though it may not be entirely settled, the decided weight of authority seems to be in favor of the power. In Alabama this power seems to be conceded by our courts, in *Pollard* v. *Maddox*, 28 Ala., on page 325.

This question is ably discussed in *Morrell* v. *Noyes*, 56 Maine, page 469. But as we are satisfied that this point must be decided in favor of the lien of the first mortgage, on another and distinct principle, we will not pause further to insist on this power, apart from statutory aid.

The power to mortgage, given by the charter, is so broad and comprehensive that it is difficult to name a power in that regard, that it does not give. All the means, all the property, and all the effects of the company may be mortgaged. To do this, the company had full power and full anthority and by any form of contract. And when made, the mortgage is valid and effectual to all intents and to all purposes.

Prior to 1852, large grants of lands had been made by Congress to aid in the construction of other railroads. See the act granting lands to Illinois, Missssippi and Alabama, approved September 20th, 1850, 9 U. S. Statutes, p. 466, to aid in constructing a railroad from Mobile by mouth of the

Ohio River, to Lake Michigan, with branches; and an act of March 2d, 1827, granting lands to the State of Indiana, 4 U. S. Statutes, p. 234; and various other acts, to which the court will find a general index in the back part of 8th U. S. Statutes, at page 96 of the index.

When this railroad company was chartered in Alabama, it had become the policy of the United States to aid in the construction of railroads and canals, by land grants. And section 4 of the charter may reasonably be supposed to have been intended to enable this company to accept such a grant.

This company most certainly had the power from the day it was organized to accept and hold a grant of land from the State of Alabama; for the grant from the State would carry with it the power to accept and hold the land. All the lands in controversy in this case, apart from the road, were granted by the State to the company.

The State (see acts 1859–6, p. 223) validated the first mortgage, if there were any want of power on the part of the company to grant all or any of the rights or property which that deed professes to grant. We do not mean by this that the State has or could validate a mortgage never executed by this company. But the company having duly executed this mortgage, the State has validated the deed and made it effectual and operative as a security, according to the tenor and stipulations of the deed itself.

When it is objected that an act of a corporation is *ultra vires*, the meaning is that it is against the policy of the State. The very objections we are considering, which deny the power of this corporation to grant its franchises or its after acquired lands, are based on this doctrine of *ultra vires*. They say that such a grant is against the policy of the State, or against the will of the State; or to put it in the strongest words that such grants are illegal. We have shown that these objections are not well taken; but suppose these objections were well taken, when the deed was made, the State can change its policy, or will, or law. The company executed the deed as it is, and granted all its franchises and railroad and all real and personal property appurtenant to the road, "and all other property, real and personal now owned and which may hereafter be owned." The company made that contract, and the State has validated and made it what it purports to be; and made it cover what it purports to cover. See Cooley Con. Lim. 369–75; 2 Redfield on Railways, 516–517; 5 Gray, 179; 8 Gray, 577; 36 Vermont 452; 15 Conn. 495; 21 Howard (U. S.) 425.

18

[Meyer v. Johnston.]

The particular attention of the court is invited to the broad covenant for further assurance contained in the first (Lamar and Hallett) mortgage.

In the *Philadelphia, Wil. and Balt. R. Co.* v. *Woelepper,* 64 Penn. St. Rep. 366, the court, construing a railroad mortgage, says: "It is a plain corollary from these principles, that a court of equity will treat a mortgage of property to be subsequently acquired, whether it be real or personal, as a binding contract, which attaches to the thing when acquired. Equity considers that as actually done which a chancellor would decree to be done. If, then, upon every acquisition of property within the description contained in the mortgage, a chancellor would decree the mortgagor to execute a mortgage of such subject, it will be considered as though it had been done, and, of every article of property as acquired, there was an actual mortgage then executed."

If this is true where a mortgage is made of property to be subsequently acquired, and without any special covenant, how much more would it be the duty of a chancellor to decree the mortgagor to convey, in mortgage, every article of property as acquired, when he had specifically covenanted that he would so convey it.

In Fonblanque's Equity, m. p. 419, § 9, book I, chap. 6, the author says: "And as this court is to enforce the execution of agreements, and regards the substance only, and not forms and circumstances, it therefore looks upon things. agreed to be done as actually performed."

This is one of the fundamental maxims of courts of equity. 4 Bouvier's Institutes, p. 106, § 3729; 1 Story's Eq. Juris., 57; *Craig* v. *Leslie,* 3 Wheat. 573.

And this covenant for further assurance was, in legal effect, performed by the Ala. and Tenn. R. R. Co. after it had acquired all the franchises and all the lands in controversy in this cause, and before the Selma, Rome and Dalton Company (if it is a new company) had any existence, by the contract with Breed.

This contract gives Breed a lien on all the franchises, lands, railroad constructed and to be constructed under the contract, and on all other real and personal property; and it makes Breed' slien "subject and subordinate to existing liens," and these existing liens are clearly indicated to be "mortgage bonds of the party of .the first part." See *Seymour* v. *Canandaigua & N. F. R. R. Co.,* 25 Barb. 307 and 308.

"When the legislature relieves a contract from the imputation of illegality, neither of the parties are in a condition to insist on this objection." (21´How. 425-6.) So that the

estoppel created by this deed has its full power.

In the *Galveston Railroad* v. *Cowdrey*, 2 Wall. pp. 480–1, the court say: "Without attempting to review the many authorities on the subject, it is sufficient to state that, in our judgment, the first, second, and third deeds of trust, or mortgages, given by the Galveston Railroad Company to the trustees, estop the company, and all persons claiming under it and in privity with it, from asserting that those deeds do not cover all the property and rights which they profess to cover."

In *Douglass* v. *Scott*, 5 Ohio, 198, speaking of estoppel by deed, the court say: "It adheres to the land, is transmitted with the estate; it becomes a muniment of title, and all who afterwards acquire the title, take it subject to the burden which the existence of the fact imposes on it." In this State an estoppel by deed operates to pass the title. *Bean* v. *Welsh*, 17 Ala. 770.

"Deeds defeasible by way of mortgage are as much within the rule as if they were absolute, and after-acquired title enures to the mortgagor." Herman's Law of Estop. p. 288, § 269; *De Wolf* v. *Hayden*, 24 Ill. 525; Herman's Law of Estop. p. 280, § 260.

"So a subsequent title enures under a covenant for further assurance, in a quit-claim deed, as well as under a covenant of warranty." Herman's Law of Estop. p. 296, § 278; *Bennett* v. *Walker*, 23 Ill., 97; *Fairbanks* v. *Williamson*, 1 Greenl., 96; *Phelps* v. *Kellogg*, 15 Ill., 137.

V. The mortgage to Lamar and Hallett, when considered in connection with the act of February 21st, 1860, and the amended charter of February 23d, 1866, is most strikingly like the railroad mortgage which was construed in the case of *Pierce* v. *Emery*, 32d New Hamp. 484. That case was elaborately argued, and the questions decided are discussed with great ability by the court. The deed here, as there, was broad in its terms, and it is past the ingenuity of man to conceive of any property franchise or right, which this company did then own, or ever could own, not named in this mortgage

The court say: "The directors then had power under the act to name in their mortgage, and to convey in mortgage to trustees, all the property, and all the rights, franchises, powers, and privileges of the corporation. If they made such a mortgage, it would convey to the mortgagees all the right and power which the corporation had to acquire and hold property, for the power to acquire and hold property is one of the rights and franchises of the corporation.

[Meyer v. Johnston.]

That right would be conveyed and transferred from the road to the trustees by the mortgage deed, in the same way that the property was conveyed and transferred, subject to the conditions of the mortgage ; and the subsequently acquired property would pass under the mortgage as an incident to the right of acquiring and holding it, which would be vested in the trustees by the mortgage."

\* \* \* \* "If, then, the purchasers under the trustees' sale take what was originally mortgaged, and take all the property, rights and franchises of the corporation, to hold and enjoy as the corporation held and · enjoyed them, they take substantially the corporation itself; and the corporation itself was the thing originally mortgaged."

The difference between the case cited and the present, on the point we are discussing, is that in the New Hampshire case, the statute preceded the deed, and here it was enacted after the mortgage. But this difference does not affect the principle, if, as we have shown, where "the contract is one which the legislature might originally have authorized, \* \* the right of the legislature to confirm it, must be recognized." Cooley's Con. Lim., 2d ed., p. 379, m. p. 417.

But in the *Galveston Railroad* v. *Cowdrey*, 11 Wall., p. 475, even that seeming difference does not exist. That was where a confirmatory statute declared that a purchaser under a mortgage of a railroad granting them, "shall be entitled to have all the powers, privileges and franchises granted to said company by its charter."

The principle on which the case of *Pierce* v. *Emery* was decided, is old and well settled. It is that where property *in esse* can be lawfully granted in mortgage, the owner has an interest (or the foundation of an interest) in the future incidents and accessions to that property, sufficient to sustain a mortgage of such future incidents and accessions, along with the property itself.

This is really nothing more than the extension in equity of the old common law rule, that "a bare possibility of an interest which is incertain, is not grantable ; but such a possibility being coupled with some present interest is grantable over. Shep. Touch. 239.

In the case of *Pierce* v. *Emery*, the corporation owned the franchise to be a corporation, and the franchise to take and hold property, and to construct a railroad, and take tolls, and other franchises. In all of these franchises, that corporation had a present property ; and as that company could lawfully grant in mortgage all of its franchises, it

[Meyer v. Johnston.]

could also lawfully mortgage all the future incidents or accessions to that property, along with its franchises; and these incidents and accessions included all after-acquired property of every kind, whether real or personal, or connected with or apart from the railroad. For all the property which the company could acquire, including all enlargements of its corporate powers, must of necessity be connected with and incident to the franchises of the corporation.

The same principle applies with equal force to the first mortgage in this case. And this deed should be held to grant all the franchises, rights and property, present and future (connected with or apart from the railroad) which the company, in their deed, declare to be granted.

When the first mortgage was executed, the company had authority to construct, and had in part surveyed and located, a railroad from Selma by way of Blue Mountain to Jacksonville, and thence to Gadsden, and had, before the first mortgage was executed, commenced the construction of this located line at Selma and at various other points along the route. The company then owned a line of railroad from Selma, by way of Blue Mountain and Jacksonville, to Gadsden—not completed as a railroad, but in process of construction. The money obtained on the first mortgage bonds was used for the purpose of constructing and equipping that line.

Under these facts, and the well settled principles established by the authorities heretofore cited, how can it be possible that the road from Blue Mountain to Jacksonville, and from Jacksonville to Gadsden, is not covered by the first mortgage? *Pinnock* v. *Coe*, 23 How., 128 ; *Galveston Railroad* v. *Cowdrey*, 11 Wall., 481 ; *Dunham* v. *Railway Co.*, 1 Wall., 266 ; *Miller* v. *Rutland & W. R. Co.*, 36 Vermont, 294 ; *Morrill* v. *Noyes*, 56 Maine, 471 ; *Willink* v. *Morris Canal*, 3 Green's Ch., 402 ; *Mitchell* v. *Winslow*, 2 Story's Rep., 629 ; *Pierce* v. *Milwaukee R. Co.*, 24 Wis., 551 ; *Whitehead* v. *Vineyard*, 50 Mo., 30 ; 2 Story's Eq. Juris., secs. 1040 and 1055, and notes ; *Pierce* v. *Emery*, 32 New Hamp., 484.

The complainants deny the lien on that part of the line between Blue Mountain and Jacksonville, on the ground that it was not constructed by the old company. This objection is unsound, even if the old company had done nothing towards constructing this part of the line. For the line of road was mortgaged from Selma, by way of Blue Mountain, to Jacksonville and Gadsden in 1852, and this mortgage was

then recorded, and all the world had notice of it; and whoever after constructed the road from Blue Mountain to Jacksonville could acquire no lien thereby superior to the mortgage.

The complainants mainly rely on *Collins* v. *The Central Bank*, 1 Kelly (Ga.) 435, to sustain this point. That case is unsupported by reason or authority, and is in direct conflict with the long list of adjudged cases last above quoted, and has been, at least twice, directly overruled by the supreme court of the United States.

In looking into this case from Georgia, the court will see that it makes the lien of a second mortgage superior to a first mortgage, for exactly the same reason which this court would give for sustaining the superiority of the first. In that case the "bond-holders" had a statutory first mortgage on a railroad, and were confronted by a contractor with a second mortgage, for constructing (whilst he held under lease the entire road) one end of it. The learned judge says: "Certainly the billholders, who are the creditors of the company, can not be considered as standing, at least in a court of equity, in better condition than the company under whom they claim. If the company could not appropriate the road built by the contractors, to their own use and benefit, until payment for the work and materials, on what principle is it the billholders, claiming under and through the company, can justly claim in a court of equity to have exclusively appropriated to their benefit the proceeds of the sale of such portion of the road and materials?"

On the 23d of February, 1866, when the amendment authorizing a change of route was passed, the company owned the franchise to extend their road from Jacksonville to the Georgia line, and had that line already lawfully surveyed, located, and in part graded.

Now, at that time, was not this extension of the franchise and this located and partly constructed line covered by the first mortgage? We have already shown that the franchise of this company to be a corporation; and all other franchises owned by the company, in 1852, were covered by the first mortgage. This new power was merely an incident or accession to the old franchises, and they were in mortgage when this new power was added to them. And it became blended with and part of them. And we have shown that all of the old chartered line was covered by the first mortgage, as well as all the rights, powers, privileges, and franchises of the company. And this new line is, in law and in fact, only an extension of, and an incident and accession to,

the old line. This new line, as well as the new franchise, is clearly embraced in the terms of the Lamar and Hallett deed. If it was lawful to grant this after-acquired right and property, or if it was made lawful, they are both granted in the first mortgage. *Seymour* v. *Canandaigua & N. F. R. Co.*, 25 Barb., 308 ; *Pierce* v. *Emery*, 32 N. H., 484.

The unfinished branch (Ashby) was authorized by an act of the legislature, approved December 8th, 1863. This road was laid out and located, and was graded for six miles, in 1864. The old company owned this branch line and the franchise to own and operate it as a railroad in 1864 ; and both are incidents and accessions to and connected with the old railroad ; and both, under the authorities *supra*, are covered by the first and second mortgages. See also 28 Ala., 321.

The original grant of lands vested the title in fee simple in the State to all of these lands at the time when the act was approved. For at that time the entire line of railroad had been surveyed and located ; and being then located, nothing was wanting to designate with certainty the particular lands granted. This question was decided in reference to a grant made to the States of Arkansas and Missouri, by act approved February 9th, 1853, on the identical terms and conditions as in the present grant. 9th volume Opinions of Att'ys Gen., p. 41.

"This act vests the fee simple title in the States to which the lands are given." And so on page 42, the Attorney General says : "The definite location of the road will locate the grant upon the proper number of even sections on each side."   *   *   And the authorities there cited sustain this opinion.

The title being in the State, the lands were granted by the State to the company by the act of January 20th, 1858.

And when the title to these lands vested in the company, they were covered by the first mortgage on the principles already stated. The evident purpose of this deed was to embrace, not only the lands connected with the railroad, but all real property which the company then owned, or should own in the future. Any other construction would make the words "all other property real" to mean nothing ; for everything connected with the railroad, "including all lands," were already conveyed.

The appellees object that these lands are not covered by the first mortgage, because the company did not then have power to own the lands. And we insist that the company by its original charter did have power to accept a grant of them.

[Meyer v. Johnston.]

But if it did not, it did mortgage all of its property, real and personal, present and future, along with all its franchises and rights, and the State validated the deed, before any third person acquired any interest in these lands.

In *White* v. *Vineyard*, 50 Mo. 30, the State of Missouri obtained a statutory mortgage upon "the road and property" of a railroad company. There were no other words to describe the property which was covered by the mortgage. After this statutory mortgage became operative, the company, having authority to do so, purchased lands apart from the railroad, and it was held that these lands were covered by the mortgage.

Similar objections were raised there as here, as to the trust upon which the lands were granted.

The court say: * * The provisions of that act show that the grantors intended that one hundred and twenty sections should be sold to construct the first twenty miles, and then another one hundred and twenty sections should be sold to construct the second twenty miles, and so on. So that when twenty miles were completed, the State might lawfully grant the first one hundred and twenty sections to the company, and so on, as each twenty-mile section of the road was completed.

There is another answer. The United States, the donor, alone can object to the use to which the lands are put. 1 Wall. 333–37; 12 How. 77.

If the Selma, Rome and Dalton Railroad Company be a new company, its position is that of successor to, rather than a purchaser from, the old Alabama company. And as successor it takes all the property, and all the duties, and all the obligations of the old Alabama company. It can deny no right at law or in equity, which could be lawfully asserted against the old company. Every covenant of the old company is a covenant of the new company. 27 Ala. 586.

In the *Philadelphia & W. R. Co.* v. *Maryland*, 10 How. 393, the court, construing a statute of Maryland under which, and acts of other States, railroad companies, chartered respectively by these States, were united into one company, and which provided that the consolidated company should be "responsible for the contracts, debts, obligations, engagements and liabilities, at law and in equity, of the several companies,"—say : "The evident meaning of the statute is that the new company "should stand in their place."

If the new company took these lands, not as successor, but as purchaser, the purchase money has never been paid or secured, and there has been no waiver of the vendor's

[Meyer v. Johnston.]

lien, and the complainants had notice of the lien, for the contract of consolidation is stated in their mortgage.

VII. By the "Breed contract," the old company leased its railroad and all its property to Breed, for an agreed rent, and it was provided, among other things, that "The party of the second part, his associates and assigns, and his or their authorized agents, shall have the right, pending said lease, to make such additions to the locomotives, cars, and machinery and tools, and implements, and appurtenances, as may be necessary and required from time to time for the business of the road, which will be taken into account in the schedule of leased property provided for on the termination of the lease."    *    *

Here is a plain contract for the purchase of all locomotives, cars, etc., brought on the road by Breed, during his lease, and they are properly called "additions." Breed having thus made this contract of sale, the company had a right to this property, and when brought on the road it belonged to the company—subject, of course, to the lien of Breed for all sums which the company owed him under that contract. But we have shown that Breed agreed when he took his lien, that it should be "subject and subordinate to existing liens"; which liens are shown in the same paragraph to mean "mortgage bonds of the party of the first part"; and this meaning is made more manifest by the succeeding paragraph of this contract, numbered 13.

So that the first mortgage attached to and covered all locomotives, cars, etc., as fast as they were brought on to the road by Breed during his lease.

VIII. The interlocutory decrees objected to were all made in vacation, and without any legal evidence, and before the trustee in the first mortgage had any notice that the suit had been commenced.

Generally, any order of the chancellor, prejudicial to the rights of a party, can be reviewed on appeal without saving the point either by objection or exception. But the rule is generally reversed when error is assigned on the rulings of the register; for the party ought to have the errors of the register corrected by the chancellor.

In *Bobe's Heirs* v. *Stickney*, 36 Ala. 491, it is said: "It was not necessary to except to that part of the proceedings before the register, because that officer conformed to the directions contained in the decree of the chancellor. The error, if any, is patent on the face of the decree, without resort to the report of the register. In such cases, exceptions to the report would be supererogatory." *Lang* v. *Bowen*, 21 Ala. 191.

[Meyer *v.* Johnston.]

We insist that these extraordinary orders, if tolerated, would prove that the stern prejudices of the old common law judges against courts of chancery were well founded. They demonstrate "the necessity of providing somewhere a limit" to the power of a chancellor to confer authority upon receivers without notice or evidence. The only limit to that power which these orders indicate, is the one contained in the great promise—"ask and ye shall receive."

IX. Murdock took the bonds held by him and became the owner of them, in special trust for the benefit of the holders of first and second mortgage bonds. He had, and still has the right, and it is his duty as trustee, to enforce the payment of the bonds he holds. And, as trustee, he is entitled to have the fund arising from sales under the complainant's mortgage applied to the payment of the bonds thus held by him, equally and pro rata with other bonds issued under the complainant's mortgage.

Why should not the new company have given this additional security for these debts which it justly owed and had expressly promised to pay? And having given it, and provided in the deed that bonds should be issued under it to Murdock, as special trustee, and that bonds issued under that deed, "each and all are secured equally and alike," why is it that a court of equity should inject into that deed a new proviso, foreign to its meaning, to the effect that the bonds issued "are secured equally and alike," provided, the bonds issued to the special trustee shall not be so secured until they are exchanged for other bonds? The intent of the new company in creating this special trust to secure the payment of the prior mortgage bonds of the old company, is made more manifest when the complainants' mortgage is considered in connection with the Breed contract.

X. It is insisted that the repairs made by Breed, for which the new company covenanted to pay Breed, entitled it to a lien on the old road for $1,000,000, superior to all mortgages executed by the old company, which the new company also promised to pay. And it is further insisted by complainants, that as the old company gave them a third mortgage on the old road, before the repairs were made, this lien for $1,000,000 was thereby assigned to the appellees.

Thus, the maritime rule of a first lien for "last repairs" is dragged on shore, with the copper bottom above the sails, and otherwise so disfigured that no sailor would know it.

The owner claims a first lien for last repairs, made by himself on his own vessel, against his creditor, who holds a mortgage. *Galveston Railroad* v. *Cowdrey,* 11 Wall. 482;

*Pierce* v. *Emery,,* 32 New Hamp. 520.

XI. The court ordered that all the railroad, including branch railways, should be "sold together." It is a contract right of a first mortgagee, that the property conveyed to him shall be sold to pay the debt—not with other property. He has a right to pay for the property sold under his mortgage with the money due him, and cannot be required to buy other property, as a condition of being allowed to purchase that covered by his mortgage. This exact point has been decided. *Eaton & H. R. R. Co.* v. *Hunt,* 20 Ind., 457; *Scoby* v. *Gibson,* 17 Ind., 572.

XII. The first mortgagee ought not to be required to contribute to the costs of this suit. It is the suit of a third mortgagee, brought to have the first mortgage declared void and to have all other mortgages foreclosed by a sale. It is, as against the first mortgagee, strictly an adversary suit, between hostile parties, one seeking the destruction of all claims asserted by his opponent, and the other using only defensive armor to shield his liens from destruction. *Titus* v. *Velie,* 6 Johns, Ch. Rep. 434–5; 2 Mad. Ch. 554.

Suppose the trustee in the first mortgage had brought this suit, he would have been entitled to his debt and costs, out of the proceeds of the sale of property covered by his mortgage, before any other costs were paid; and the other defendants would then have had to pay their own costs and the costs of the plaintiff also, if the fund was insufficient. *Cranston* v. *Johnston,* 3 Ves. (Sum. Ed. and note on page 184); *Kinebel* v. *Scrafton,* 13 Ves. (Sum. Ed.) 370; *Hepworth* v. *Haslop,* 3 Hare, 485; 2 Spence's Eq. Juris. m. p. 675, and note; 3 Dan. C. Pl. & P., (Sum. Ed.) pp. 1525–2829, and notes.

Receivers' expenses stand very much in the same position as costs. This was the appellees' suit; and the trustee in the first mortgage is made defendant, not for his benefit, but to destroy his liens. He did not, in any sense, adopt the suit. The trustee in the first mortgage was entitled to possession of all the property covered by his mortgage, and he had a power of sale; and, but for the bringing of this suit, he could have sold under that power without any receivers' expenses.

As between the mortgagor and the mortgagee, when the latter is in possession, the expenses about the property must be confined to necessary repairs and protecting the title. In *Sandon* v. *Hooper,* 6 Beavan, 246, this rule is well stated in these words: "Such repairs as are necessary for the support of the property, he will be allowed for. He will not

[Meyer *v.* Johnston.]

only be allowed for repairs, but he will also be allowed for doing that which is essential for the protection of the title of the mortgagor. \* \* \* But he has no right to lay out money in what he calls increasing the value of the property, which may be done in such a way as to make it utterly impossible for the mortgagor, with his means, ever to redeem. This is what has been termed improving a mortgagor out of his estate—an expression which has been used both in this argument and on former occasions. The mortgagee has not a right to make it more expensive for the mortgagor to redeem, than may be required for the purpose of keeping the property in a proper state of repair, and for protecting the title to the property."

The mortgagor can make whatever repairs or improvements he may see fit, not as a charge against the property mortgaged, but out of his own means not mortgaged; if the mortgagor grant to a second mortgagee, he cannot grant any larger estate or any larger powers over the estate than he has. Having no power to create any lien for repairs or improvements on the property, or for protecting the title, he cannot confer such a power on a second mortgagee, as against the first mortgagee. So that repairs and improvements, and expenditures to protect the title, when made by a second mortgagee, stand on no greater but the same equity, as against the first mortgagee, as though they had been made by the mortgagor.

Lord Langdale, in a late case where the subject was fully discussed, held that the money arising from the sale of each estate separately incumbered, ought to be treated in the same manner as the estate itself would have been, and that the mortgagees ought to be paid their principal, interest, and costs, according to their respective priorities, and that the costs of sale ought not to be paid, in the first place, out of the general fund. *Wild* v. *Lockhart*, 10 Beavan, 323. And see to the same effect the following authorities: 3 Daniel Ch. P. & P., m. p. 1228–9 and notes, (Perkins' Ed., 2d Am.) *Hepworth* v. *Haslop*, 3 Hare, 485, (25 Eng. Ch.); in which Vice-Chan. Wigram says: "That a mortgagee is entitled to his principal, interest and costs, as against the mortgagor, and *puisne* incumbrances claiming under the mortgagor, cannot, as a general proposition, be disputed:" *Upperton* v. *Harrison*, 7 Simons, 444 (10 Eng. Ch.); *Belchier* v. *Renforth*, 1 Eden, 523; *Hylton* v. *Hylton*, 7 DeGex, Mc. & G., 30; *Martin* v. *Somerville Co.*, 3 Wallace, Jr., 206.

The costs and expenses of sale should not have been charged on the gross proceeds of the sale. The authorities

[Meyer *v.* Johnston.]

cited before show that in a case like this, the first mortgagee is entitled to have his principal, interest and costs first paid out of the proceeds of the sale of the property covered by his mortgage before it is diminished by any other cost or expense. Even in cases where the first mortgagee assents to the sale, the better opinion seems to be, that he must be paid in full, debt and costs, before the fund is diminished. Much more would he be so entitled, where, as in this case, the first mortgagee gave no such assent, directly or indirectly.

XIII. The power claimed for a court of chancery to grant, in mortgage, all the property and all the franchises of a railroad corporation, for the purpose of securing the payment of its commercial paper, and to make its mortgage superior to all antecedent mortgages, without the consent of the prior mortgagees, is without any foundation in reason or justice; and, so far as we have heard, is not sustained by one case, adjudged in any court of last resort in any State or nation.

This asserted power is so new, that so far as our learned adversaries have been able to inform the court, it was never claimed prior to our great civil war.

The history of such receivers' certificates, short as it is, is only one of disaster and of ruin to mortgage securities. Mortgagees under them have been improved out of their estates.

The receivers' certificates issued in this case impair the obligation of the contract contained in the first mortgage. The question, whether the obligation of a contract is impaired, does not depend on the extent of the charge made in the contract. The degree to which contract rights are impaired, is not to be considered; for they must not be impaired to any degree. *Green* v. *Biddle*, 8 Wheat. 751; *Bronson* v. *Kinzie*, 1 How. 316.

In *Gantly's Lessees* v. *Ewing*, 3 How., pp. 716–17, the court say: "The contract of mortgage was a vested interest, and its main incident a right to have the land applied in discharge of the debt, either by an execution executed, as on a judgment at law, or in some form of remedy substantially equal. See *Ex parte* Pollard, 40 Ala. 88; 16 Wall. 318; 4 Wall. 533.

In *Martin* v. *The Sommerville Company*, 3 Wallace, Jr., (Cir. C Rep.) on page 214, Grier, justice, says: "The obligation of this contract is moreover impaired by this act, in that it gives a precedence to certain indefinite costs and charges (not costs of sale merely,) to be paid out of the proceeds of the property, before the. mortgage debt." And on

[Meyer v. Johnston.]

the preceding page that judge, speaking of a mortgage after condition broken, says: "It is an estate in fee simple, defeasible only by the payment of the mortgage debt."

From the foregoing authorities, it is clear that the trustee in the first mortgage, when this suit was commenced, had a contract right to have all the property covered by his mortgage applied first to satisfy the bonds secured thereby. But the court decreed that this first lien should be only a second lien; and that the receivers' certificates for money borrowed at usurious interest, "to be used in equipping, repairing and operating" the railroad, should be a first lien on the railroad and all the equipments, property and appurtenances thereof. By the decree, no condition or restriction is placed on this new mortgage, except as to the amount and the borrowing of the money by the receivers, at a discount not greater than ten cents on the dollar. If the receivers borrowed the money on the terms stated, and issued their certificates therefor, then this new first lien is forever fastened on all this property, and made superior to all other liens; and no use that the receivers may make of the money, after it is borrowed, can change the result. In other words, a court of equity delegates to the receivers the power to grant in mortgage all of this property, for money to be borrowed, and to make this last mortgage a first lien. This is evidently an impairment of the obligation of the first mortgage.

The decree in the Alabama and Chattanooga Railroad case was in fact a consent decree. There is nothing in the history of that case, or the other case referred to, which should encourage the exercise of this power.

The facts in *Sutherland* v. *Ship Canal Co.* illustrate in the most forcible way, the miserable absurdities to which this new power will lead a court, when it is carried out to its legitimate and logical consequences. For the court issues certificates for $500,000 00, bearing ten per cent. interest, and sells the certificates for $375,000 00; the certificates are dated June 17th, 1872, and are payable at the National Park Bank, July 1st, 1873. So that the court, in fact, borrows money at over forty-six per cent. per annum; and gives its mortgage as a first lien, paramount to all other mortgages! And then the court abdicates its power to decree the sale of all this property to its mortgagee, under the power of sale contained in the court's mortgage! And then the court repudiates its own contract, by saying to its own mortgagee, after the law day, you must wait until I can hear from the supreme court! And all this is done in a court of equity.

Again, the court's mortgage in this case violates the 1st

[Meyer v. Johnston.]

section of the 14th amendment of the Constitution of the United States, which declares: "Nor shall any State deprive any person of life, liberty, or property, without due process of law." And it also violates the 8th section of the 1st article of the Constitution of this State, which contains the same prohibition, copied, in substance, from *Magna Charta*, granted by King John to the rebel Barons at Runemede, in 1215.

Appellants have had no day in court.

*Taylor* v. *Porter*, 4 Hill, (N. Y.) on page 147; *Hoke* v. *Henderson*, 4 Dev., (N. C.) p. 15.

The court will observe that this decree is founded upon the petition of the receivers alone. No party to the suit asked for the decree. "A receiver ought not to present a petition or originate any proceedings in the cause." Kerr on Receivers, 206, and authorities there cited.

Judge Story states certain cases where courts of equity will appoint a receiver at the instance of subsequent mortgagees; and then declares the cautious and true rule, applicable not only to the appointment of receivers, but also to the powers to be given them in cases of that kind: "But in all cases of this sort, where the court acts in favor of subsequent incumbrancers, it is cautious in thus interfering, not to disturb any prior rights or equities." 2 Story's Eq. Juris., § 837. From this clear statement of the doctrine of equity, "in all cases of this sort," it is manifest that, learned as he was in civil and English and American jurisprudence, that great judge never heard of such a thing as a mortgage, made by a court of equity, to secure the payment of receivers' certificates, and to be a lien, paramount to all "prior rights and equities." This baleful credit-destroying doctrine, by which a first mortgage is debased into a second lien, is now before this court, to receive the judgment it deserves.

BROOKS, HARALSON & ROY, *contra.*—The effect of the consolidation, under the facts alleged in the bill and admitted in the answers, was "a dissolution of the three corporations, and, at the same instant, the creation of a new corporation, with property, stockholders, rights and privileges derived from those passing out of existence." *Clearwater,* v. *Meredith,* 1 Wallace, p. 25; *McMahon* v. *Morrison,* 16 Indiana Rep., 172; *Railroad Company* v. *Harris,* 12 Wallace, p. 65; *Phil. Wil. & Balt. R. Co.* v. *Maryland,* 10 How., 392.

It was not to merge the two Georgia companies in the Alabama company, as argued by counsel, but to dissolve and destroy each of the three previously existing corporations,

[*Meyer v. Johnston.*]

and to create a new and independent corporation, invested with all the property, rights and franchises of the three; and with different and more extensive rights, powers and franchises than any one or two of the three.

This is shown to have been the intent of the parties by the articles of consolidation; by the acts of the legislatures of their respective States, and by the action of the consolidated company. If the purpose had been to merge the two Georgia corporations into the Alabama and Tennessee River Railroad Company, the articles of consolidation would not have provided, as they did, that that company, as well as others, should by proper deed convey all its rights, franchises and property to the consolidated company; nor would the company have executed such a deed; yet it is averred in the bill and admitted in the answers of the defendants, not only that the three previously existing corporations were merged into one consolidated corporation, but that they executed, respectively, deeds conveying all their property and franchises to the Selma, Rome and Dalton Railroad Company.

Neither would it have been provided, as it was, that the consolidated corporation should assume the debts of the Alabama and Tennessee River Railroad Company, as well as the debts of the other companies.

If the Selma, Rome and Dalton Railroad Company is merely the Alabama and Tennessee River Railroad Company, under a new name, with authority derived from the State of Georgia to extend its road into that State, as argued, the acts of the legislature of Alabama, first authorizing and afterwards ratifying the consolidation would be entirely nugatory; since the license to extend a road in Georgia could only be obtained from the State of Georgia; and the several provisions for the consolidation contained in the agreement of the companies and the acts of the legislatures, would be utterly without meaning or effect.

The purchasers of a railroad at execution sale, although acting under the name and charter of the old company, were nevertheless held to be a new company, with the right to complete and extend the road which they constructed, to the mortgages executed by the old company in *Galveston Railroad* v. *Cowdrey,* 11 Wallace, p. 459; *Pollard* v. *Maddox,* 28 Ala., 321; 17 Wisconsin Rep., p. 497; 18 Wisconsin, p. 17.

II. The mortgage to Lamar and Hallett was not the act of the company, and is therefore void as to the company. The company did not in fact execute the mortgage, because the

[Meyer *v.* Johnston.]

meeting of the members of the board of directors who undertook to authorize its execution, was without a lawful quorum. Under the language of the original charter, a majority of the directors might do a corporate act, but under the amendment the president must be present and act.

Natural persons may do whatever is not forbidden by law. Corporations are creatures of limited powers, and can do only what is authorized by their charters, and in the mode prescribed by their charters. *Head & Amery* v. *Prov. Ins. Co.,* 2 Cranch, p. 150; *Beatty* v. *Mc. Ins. Co.,* 2 Johns (N. Y.) Rep., p. 109; *Railroad Company* v. *Harris,* 12 Wall., p. 81; *City Coun. Mont'y* v. *Plankroad Company,* 31 Ala., p. 76.

Accordingly it is well settled that where the charter requires the presence of a certain number of a board of directors at the doing of a corporate act, a less number will not answer; and that the power must be exercised by the particular body or bodies in which it is vested: If vested in the directors, the stockholders cannot exercise it, and *vice versa;* if vested in the president and directors, neither can exercise it without the participation of the other; and if vested in several integral parts, each part must be present and participating in order to do a corporate act. *Pres. Turn Pike Co.* v. *Meyer,* 6 Serg. & Rawle, 12; *Corp. St. Mary's ch.,* 7 Serg & Rawle, 517; *Cammeyer* v. *United L. Churches,* 2d Sandford Ch., 186; *Conro. et al.,* v. *Port Henry Iron Co. et al.,* 12 Bar., 27; *Marsh* v. *Fulton Co.,* 10 Wallace, 676, 683; *Beatty* v. *Marine Ins. Co.,* 2 Johns, (N. Y.) 109; *Ex parte* Willcocks, 7th Cowan, 402; *Hosack* v. *College of Physicians,* 5 Wendell, 552; *Wheelock* v. *Moulton,* 15th Vermont, 519.

It follows that the action of the members of the board of directors, taken in the absence and without the participation of the president elected by the stockholders, who was the head of the corporation and an integral part of the governmental power, did not constitute, and was not a corporate act. *D'Arcy* v. *Tamar, &c., R. Co.,* (L. Rep.) 2 Exch'r, 138.

The first mortgage has not been ratified. If none but a competent board of directors, lawfully assembled, could authorize its execution, it follows that none but a competent board, so assembled, could ratify a mortgage that has no binding existence. Otherwise any corporation might be bound by a deed, the execution of which it never authorized; and the will of its directors, and not its charter, would be the rule of its conduct; or in the language of Chief Justice Marshall: "It would be to dispense with the formalities required

**19**

by law, for valuable purposes, and to enable these artificial bodies to act and to contract in a manner essentially different from that prescribed for them by the legislature."

To have constituted a ratification of this deed, it is essential not only that a competent board should have acted in the premises ; but the board must have known that the instrument they were about to ratify was void, and that the act they were about to do was necessary to give it validity ; that act must have been done with intent to make that valid and binding which was before inoperative ; and the deed must then have been re-delivered ; or something done equivalent to a re-delivery  Shackleford  v.  Smith,  5 Dana, 232 ; Smith v. Shackleford, 8th Dana, 452, 478.

It is not pretended that the corporation knew that this deed was invalid, or that it ever re-delivered it ; or that it ever did any act whatever with intent to make the said deed valid.

The reference to the "first mortgage," contained in the mortgage made by the Selma, Rome and Dalton Railroad Company, not only falls short of the essentials of ratification in all other particulars, but the act relied upon, is the act of the Selma, Rome and Dalton Railroad Company, and not that of the Alabama and Tennessee River Railroad Company, which had, long before, been dissolved and ceased to exist.

The authorities relied on  to show the contrary, relate exclusively to simple contracts, as to which it has always been held that very slight circumstances will amount to a ratification , or to commercial paper in the hands of innocent holders, where the decisions  turn upon  the peculiar principles of law governing that class of cases.   They have no application whatever to what  purports  to be a solemn deed, disposing of all the franchises and  property of a large corporation.

It is claimed that the  first mortgage  was validated by an act of the legislature of Alabama, entitled "an act to authorize railroad companies to execute mortgages, approved 21st February, 1850."    Acts 1859-60, page 223.

This act was passed to  set at rest the  question raised in this State and many others, as to whether  a railroad company could mortgage or alienate its road-bed, franchises and income, without express legislative authority.   The act accordingly expressly authorizes railroad companies to mortgage and alienate their road-bed, franchises, income and other property ; and  provides that a purchaser shall have and possess all the rights and franchises conferred by the

charter upon the company; and further provides "that all such mortgages and deeds of trust, heretofore made, be hereby legalized." The object of the act was clearly to legalize mortgages on a certain class of property, by giving them effect according to their terms ; and not to validate or ratify any defectively executed mortgage; it was to legalize acts which were *ultra vires*, not to cure the defective exercise of powers possessed. The act of the legislature of Texas, construed in the *Galveston Railroad Company* v. *Cowdrey*, 11 Wallace, was to the same effect. It was held to have ratified the mortgage of rights and franchises, where the prior mortgage embraced those items in terms.

The Alabama and Tennessee River Railroad Company, itself, would not have been estopped by the first mortgage from setting up its invalidity. An estoppel by deed can only arise where the deed was executed. Here the very question is whether the deed was executed. It would be absurd to set up a corporate act as an estoppel, in an issue as to whether there was such a corporate act.

An essential element of estoppel by deed is that the deed itself should be a valid instrument. (Bigelow on Estoppel, 283.) This is the case as to natural persons, much more so as to artificial bodies, limited in powers and in the mode of exercising them. The doctrine of estoppel cannot be applied to give validity to what would have been an illegal or unauthorized act of the corporation ; still less to what was not its act ; and the corporation itself, or any one interested, may set up its invalidity. *N. P. & N. J. R. R.*, v. *Schuyler*, 38 Bar. 534 ; *Madison Plank-road* v. *Watertown Plank-road*, 7 Wis. 59 ; 2 Redfield on Railways (3d Ed.) 502, 595, and notes ; *Commonwealth* v. *Smith*, 10 Allen (Mass.) 448 ; Bigelow on Estoppel 283–6; *Fairtitle* v. *Gilbert*, 2 Term. 169.

Neither was the company estopped from denying the validity of the mortgage by the issue of the mortgage bonds, whatever effect that might have upon the bonded debt. The bonded debt may be a valid and subsisting obligation independent of the mortgage, and notwithstanding irregularities in their issue, because they are commercial paper in the hands of *bona fide* holders without notice, and because the company has received value for them ; but there is a wide distinction between the liability of the company on bonds so issued and held as a debt, and the validity of an alleged mortgage to secure them. Besides, persons dealing with a corporation are chargeable with knowledge, not perhaps of every irregularity in the mode of action of the proper officers or agents, but certainly of the want of authority in the per-

sons pretending to act as a board of directors.

Neither does the Breed contract operate any estoppel. That contract and the lien created thereby, were, it is conceded, made subject to prior liens then existing. But as other mortgages and liens existed upon portions of the property, what were in fact existing liens, was left an open question ; and Breed was at liberty to contest any alleged lien. His lien was only subject to such as should be established to be prior existing liens. Such a recital lacked an essential of an estoppel, viz: "That estoppels must be certain to every intent, and are not to be taken by argument or inference."

The mortgage to Johnston and Stewart lacks every essential ingredient of an estoppel as to the first mortgage. There is no mutuality in it. It is not pretended that the first mortgagees ever acted upon it, or that their conduct has in any way been influenced by it; and it was, besides, made by the Selma, Rome and Dalton Railroad Company, and not by the Alabama and Tennessee River Railroad Company.

But the doctrine of estoppel has no application here. There is no question of title or estate involved. The appellees claim as creditors of the Selma, Rome and Dalton Railroad Company—their mortgage is a lien or security for debt—a mere chose in action, especially in this State, where by operation of law it passes to the person who by assignment or otherwise becomes entitled to the debt which it secures. Their relative positions are those of debtor and creditor, a relation not of privity, but of antagonism. (Water's Appeal, 35 Penn. St. 520; Bigelow on Estoppel, 280.) The company is insolvent, and its estate is being administered ; and the appellees are at liberty to question any debt alleged to have been contracted, or any security alleged to have been given by it.

III. No preference, express or implied, is secured to the old mortgage bonds by the deed to appellees. Five thousand bonds of the company, of the denomination of $1000 00 each, are secured by the deed " equally and alike ; " and pursuant to the resolutions of the board of directors, it is expressed on the face of the bonds "that each and all of them are alike and equally secured by said mortgage."

This language is too clear and emphatic for controversy. But 1600 of said bonds were by the provisions of the deed placed in the hands of Murdock, special trustee, and Lamar's counsel draws an inference favorable to his claim for preference from this provision. The facts are that, as the deed provides, 2000 of the bonds were placed in the hands of

Murdock, special trustee; 400 of which were to be used in paying general creditors, and 1600 to "remove mortgage liens and incumbrances" upon the property of the company. And the 3000 other bonds were to be used in repairing, constructing, completing and equipping the entire road to Dalton. But no preference in payment is secured to the 1600 bonds; "each and all are secured equally and alike." And they are to be used by Murdock "for the purpose of removing all mortgage liens and incumbrances," and for no other purpose. These liens and incumbrances were to be removed by exchanging the new bonds for the old ones. This was the purpose of the deed; and if it had been done, those creditors would now hold the bonds of the Selma, Rome and Dalton Railroad Company, in the place of their old bonds; and for their security would necessarily rely on the mortgage to complainants, and not upon any prior mortgage. All prior liens and incumbrances being removed, each of all the 5000 bonds, including the 1600, would stand upon an equality, or the clearly expressed objects of the deed must be defeated. See 18 Ala. 500.

IV. The mortgage to Lamar & Hallett does not include the public lands, because, 1st, those lands were not in the contemplation of the parties at the time the mortgage was made, and it was not their intention to include them therein; 2d, the mortgage as to these lands would have been an act *ultra vires;* 3d, to subject the lands to that mortgage would be a subversion of the purposes of the grant; 4th, at the date of the mortgage the mortgagor had no such right or title to said lands as could be made the subject of a mortgage, to take effect *in presenti* or *in futuro.*

This contract, like others, must be interpreted in the light of surrounding circumstances. 28 Ala. 321.

In interpreting this mortgage in the light of surrounding circumstances, we should first refer to the charter of the company, to ascertain what property it had the right to acquire. For it is well settled that, while a corporation may mortgage after-acquired property, yet it cannot sell or mortgage property which, by its charter, it cannot lawfully acquire. 2 Redfield on Railways, note p. 513; *Taber* v. *Cincinnati & C. Railway,* 15 Ind. 459.

Under its charter the Alabama and Tennessee River Railroad Company had no right to acquire any other lands than such as it had the power to condemn by writ of *ad quod damnum* for its road-bed and appurtenances.

And no railroad company has a right to acquire lands for

[Meyer v. Johnston.]

any other purpose, unless authorized by its charter.    14
Wis. 575.

The original charter of the Alabama and Tennessee River
Railroad Company, section 4, renders said company "capa-
ble in law of purchasing, holding, selling, leasing, and con-
veying real, personal and mixed property, so far as shall be
necessary for the purposes of this incorporation," and the
amendments only gave it power to hold such lands as were
necessary to carry out the objects of the corporation. Pamp.
Act of Ala. 1851-2, p. 344, sec. 5.

The "public lands" granted in 1856 to the State of Ala-
bama, for the benefit of this company, were not owned by
the company at the time said mortgage was made, and were
not necessary for any of the purposes mentioned in the char-
ter, and therefore the company could not lawfully acquire
title to, or mortgage the same.

The lands were granted for a specific purpose, and the
proceeds were to be applied to build the road.   Title could
be derived only as the road was completed in sections of 20
miles.    11 U. S. Statutes, 17.

To hold that these lands are included in and subject to
the provisions of a mortgage, executed four years before by
the said railroad company, to secure a debt existing at the
time the mortgage was made, would place it in the power of
the company to violate the act of Congress, and defeat the
objects of the grant with impunity.

But it is said that although the company had no title to
these lands at the time said mortgage was made, and no right
to acquire title thereto that, yet the legislature, by an act
approved January 20, 1858, (Acts 1850-60 p. 3.) granted to
and vested said lands in said company ; and thereby gave
the company the power to receive and hold the title.

The act of the legislature, vesting these lands in the com-
pany, was "for the purposes and under the restrictions spec-
ified in said act of Congress," &c., &c.

It needs no argument to show that as the company did
not acquire title to these lands until 1858, and had no right
to dispose of them then, otherwise than pursuant to, and un-
der the restrictions imposed by said act of Congress, it was
not the intent of the parties to include said lands in a mort-
gage made in 1852, to secure the payment of a then exist-
ing debt.

If it had been the intent of the company to include in the
mortgage these, or any lands which it was prohibited at the
time by its charter from acquiring or owning, and the mort-
gage had purported in terms to convey them, the act would
.. Vol. LIII.

have been clearly *ultra vires* and void ; and the subequent acquisition of the property would not have made the void act valid ; nothing short of an express legislative. ratification, with the consent of the parties, could have had that effect. Redfield on Railways, 579, and cases there cited.

But the words in the mortgage, "all other property, real and personal, now owned, and which may hereafter be owned by the parties of the first part," must be deemed to refer to the charter of the company ; and by that the company has no power to acquire or own lands disconnected with its road and unnecessary for its construction and operation ; but did have power to acquire and own lands for right of way and for stations. At the date of the mortgage the construction of the railroad was merely begun ; the lands for road-bed, depots, warehouses, &c., had not yet been condemned, and were not yet owned by the company. As fast as they were condemned and acquired by the company, in the progress of constructing the road, they became included in the mortgage under the term "real property hereafter owned." This is the necessary and natural construction, and it gives full scope, meaning and effect to the words in question.

In the case of *Seymour* v. *Canandagua and Niagara Falls R. R. Co.*, 25 Barbour, 284, the description of the property granted was precisely the same as in the case at bar. The court held that "the description in the mortgage of the lands acquired and to be acquired must be deemed to refer to the charter ; that lands acquired by the railroad company, and not used or employed for railroad puposes, would not come within the description of the mortgage," and accordingly, that the mortgage created no legal or equitable lien on such lands, and that these lots—except the strip actually used and employed for railroad purposes, were "liable to the legal claims of the other creditors of the corporation."

Again, at the time the mortgage was made the company had no power to dispose of these after-acquired lands, for the reason that it had no right or title thereto which could be made the subject of a mortgage.

"Rights in remainder and reversion, possibilities coupled with an interest, rents, franchises and choses in action, are capable of being mortgaged ; but a mere naked possibility or expectancy, such as that of an heir, is not." 2 Story's Eq. Juris., § 1021 ; 4 Kent's Com. 144 ; *Robertson and Caldwell* v. *Maulden, Montague & Co.*, 11 Ala. 967.

While the property having a potential existence, or which

[Meyer v. Johnston.]

may be in expectancy, or contingent, may be the subject of a mortgage or assignment, yet the same "must be based upon a right *in esse*." Authorities *supra*.

Now the company, by its charter, not only had no right to acquire these lands, nor to convey them, at the time of making said mortgage—but in the face of a prohibitory statute there did not even exist a naked possibility, contingency or expectancy, that it ever would acquire them, much less a possibility, contingency or expectancy, "based upon a right *in esse*." The company, therefore, did not intend to include, could not have included, and did not include said lands in the mortgage.

In *Wilson* v. *Bryce*, 2 Dillon, 539, the right of the corporation to own lands was not involved.

In *Whitehead* v. *Vineyard*, 50 Mo. 30, the mortgage was statutory, and covered the "road and property of the company." The company purchased land away from the road, and not necessary to its use; but it was authorized under its charter to do so, and under the terms of the statute the land was held subject to the mortgage.

It is not questioned that a railroad company may mortgage a railroad "to be constructed;" or that as fast as it is constructed it will be covered by and included in the mortgage; but it must be actually constructed and brought into existence as a railroad, before it can be so covered and included; it must be constructed on the chartered route and under the charter of the company making the mortgage; and it must be constructed by the mortgagor and not by some other person or body with different and adverse powers and rights.

It is evident that the mortgage in this case includes and was designed to include only the road which the company had constructed and was engaged in constructing, and that the route on this road has been "surveyed and duly located." This surveyed and located route, as the evidence shows, was from Selma to Gadsden. The company was authorized by its charter to construct a road on that route from Selma to Gadsden, and it was not authorized to construct a road from Blue Mountain to the Georgia State line, or to Dalton in that State. It is thus clear that the road from Blue Mountain to the Georgia State line is not included in said mortgage, or in any description therein contained. It is not to be presumed that the grantor intended to convey what it had no right to convey, and what was neither in being nor in expectancy.

Again, the railroad mortgaged was one "to be constructed

[Meyer v. Johnston.]

by the parties of the first part." The company had no purpose or authority at that time to construct a road from Blue Mountain to the Georgia line; and never did in fact construct it.

V. By virtue of the articles of consolidation the Alabama and Tennessee River Railroad Company ceased to exist on the 8th day of August, 1866. The subsequent acts of the legislature confirming those articles, did not effect the consolidation. That had been perfected by the act of the parties, done in pursuance of previous acts of the same legislatures authorizing the same. And the 8th of August is the date at which the Alabama and Tennessee River Railroad Company ceased to exist, and the Selma, Rome and Dalton Railroad Company came into existence.

The road from Blue Mountain to the Georgia State line was not constructed until long after this; no part of it was constructed and equipped until the 20th September, 1867, the date when the Selma, Rome and Dalton Railroad Company modified the Breed contract. The route was not finally adopted until March, 1868; and the right of way was mostly procured in the years 1868–9.

It is true that a small portion of this road (that between Blue Mountain and Jacksonville) was constructed on the line of the survey; but it was not constructed by the Alabama and Tennessee River Railroad Company, nor under its charter nor with its means; it was constructed by the Selma, Rome and Dalton River Railroad Company after the dissolution of the old corporation and after the execution of the mortgage to the complainants; and by means of the bonds therein provided for.

The first mortgage must therefore yield to the mortgage to appellees, even as to that portion of the road. *Collins* v. *The Central Bank,* 1 Kelly, 435.

To the same effect is the *Galveston Railroad* v. *Cowdrey,* 11 Wallace, 459.

This decision clearly establishes the principle, that the portion of the road of the new company built upon the line which the old company was authorized under its charter to select, was not liable to the mortgages or the debts of the old company. Whether the new portion of the road was constructed by the new company, upon a line which had been previously surveyed and located by the old company, or not, can make no difference. The old company acquired no rights which would subject a mere surveyed or located line, upon which no road was built, to the provisions of the mortgage.

[Meyer *v.* Johnston.]

A railroad mortgage covers "the railroad which the company was authorized by law to build, together with its superstructure, appurtenances and rolling-stock; and these several items of property, as they come into existence, would become instantly attached to and covered by the deed."

A mere surveyed and located line, even though a portion of it should be partly graded, is not a railroad with its superstructure; and until it assumes the shape and form of a railroad constructed by the mortgagor, it does not become subject to the mortgage. It is not one of those several items of property which, "as they come into existence, would become instantly attached to and covered by the deed." In the language of the court, "no other rational or equitable rule can be adopted in such cases."

So far as the road from Jacksonville to the Georgia State line is concerned, it was never in a condition to be made subject to any mortgage until the Selma, Rome and Dalton Railroad Company located, established and constructed it. Up to the dissolution of the Alabama and Tennessee Company, no line, or route even, had ever been surveyed between these points under any lawful authority or for any lawful purpose. It is true that the old company, during the war, made a survey of that route and did a small amount of grading, under a contract with the Confederate States, and as a war measure, but it will not be contended that this constituted a lawful authorization or that any rights whatever accrued therefrom.

But it is said that the act of February 20, 1866, enlarged the franchise so as to authorize the Alabama and Tennessee River Railroad Company to extend the road from Blue Mountain to the State line; but that is the identical act authorizing the consolidation, and inured to the benefit of the Selma, Rome and Dalton Railroad Company, which it brought into existence, and not to the Alabama and Tennessee River Railroad Company which it put out of existence. Besides it is not pretended that the Alabama and Tennessee Railroad Company ever surveyed or located any line, or ever did any work whatever between Blue Mountain and the Georgia State line under that act; and can it be seriously claimed that a mere naked franchise to build a railroad, which was never exercised or acted upon by the corporation to which it was granted, and which, upon the dissolution of the old corporation, was legally vested in a new and independent corporation, has such potency that it will attach to it, and crystalize around it, a railroad built by the new

corporation, and subject it to the debts and liabilities of the old one ?

In every case cited by the defendant, on this head, the railroad in question was constructed on the route authorized by the charter of the mortgagor, and was constructed by the mortgagor itself.

The case at bar is totally different.   Here, the road mortgaged, was one to be constructed by the Alabama and Tennessee River Railroad Company under its charter, and with its funds, on a route surveyed and located, from Selma to Gadsden, in Alabama; while the road actually built, was constructed by the Selma, Rome and Dalton Railroad Company, under its charter, and with its funds, from Blue Mountain to Dalton, in the State of Georgia—that is, by a new and independent corporation, under a different charter, with different franchises and stockholders, over a different route, and to a different terminus.

VI. Before the consolidation of the several corporations into the Selma, Rome and Dalton Railroad Company, the "old road" which had been constructed from Blue Mountain, with its bridges and appurtenances, was, from the results of the then late war, and other causes, in a broken up and ruinous condition.   It could not be operated with safety to the public, or with profit to its owners.   Its total value was greatly inadequate to satisfy its then bonded debt ; and it was daily diminishing in value.   The Alabama and Tennessee River Railroad Company, its then owner, was insolvent, and had not the means or the credit wherewith to reconstruct or repair it.   The old mortgage bondholders stood by and declined to furnish the means for that purpose.

At this juncture, and in this condition of affairs, the Selma, Rome and Dalton Railroad Company, by the articles of consolidation, acquired and came into possession of the old road.   This company, in addition to ordinary repairs, made substantial and permanent improvements on the old road, consisting, among other things, of new bridges, depots, and the like, to the amount and value of about one million dollars.   These improvements and repairs were absolutely essential to the operation of that portion of the road.

The old mortgage bondholders were fully advised of all these facts and circumstances ; and the Breed contract was entered into, and carried out, and the repairs and improvements were made with their knowledge, consent and encouragement.

With a full knowledge of all the circumstances these bondholders encouraged and induced others to furnish the funds

[Meyer v. Johnston.]

whereby the Selma, Rome and Dalton Railroad Company was enabled to repair, rebuild and restore the old road. The mortgage to Johnston and Stewart was made to secure the payment of the funds thus furnished; and well established principles of equity require that the persons who furnished these funds, under these circumstances should be protected.

All that the old bondholders can equitably claim is the value of the old railroad and its appurtenances in the condition they were at the time the old company ceased to exist. *Collins* v. *Central Bank,* 1 Kelly (Ga.) Rep. 433; *Pierce* v. *Emery,* 32 N. H. Rep. 485; *Williamson* v. *New Albany R. R. Co.* 1 Bissell (U. S. Ct. Ct.) 207; Decree of Justice McLean (in MS,) in case of *Carlisle* v. *The Cincinnati & Chicago R. R. Co.; Haven* v. *Emery,* 33 New Hampshire Rep. 66; 1 Hill's (S. C.) Ch. Rep.; 2 Story's Eq. Juris. § 1237; *Thatcher, Burt & Co.* v. *Coe,* Fed. Court for Ohio; *Southall* v. *McKean,* Wash. C. C. Rep.

As a general rule, subsequent improvements of the mortgaged property, by the mortgagor, are held subject to the prior lien of an antecedent mortgage, as in the case of Pulsford's Iron, in *Cowdry* v. *The Galveston Railroad Company,* 11th Wallace, and *Pierce* v. *Emery,* 32 N. H.

In those cases it was held that the mortgage created a prior lien on the iron in controversy; but it appears that the iron was the property of the mortgagor in both cases, and was placed on the road by the mortgagor; and that no lien thereon had been retained by the claimants who were the vendors of the iron to the company.

To this general rule, however, there are important exceptions, depending upon the contract between the parties, and the circumstances of the case; of which 1st Kelly, *supra,* furnishes a striking illustration.

To the same effect is the case of *Thatcher, Burt & Co.* v. *Coe,* in the Federal Court for Ohio (MS. quoted by counsel, 1 Wallace, 261.)

Again, in *Pierce* v. *Emery,* 32 N. H. *supra,* the iron was the property of the railroad company, and was placed upon the road by the company, and was not subject to any lien. Yet the court held that "if the trustees had notice of it (a contract with the vendor that he should have a lien upon the iron for the payment of the duties to the government) and assented to it, the contract would be binding in equity on the trustees and bondholders."

And so in 1st Hill (S. C.) Rep. the purchaser of a lot of land which was subject to a prior mortgage, was held entitled

to the benefit of the improvements made by him upon the lot; the circumstances tending to show that the improvements were made with the knowledge and acquiesence of the mortgagor; and the principle of equity was fully declared that the mortgagor was not thereby injured; all that he was fairly entitled to being the value of the lot without the improvements.

And in *Southall* v. *McKean*, Wash. C. C. Rep., it was held that where the equitable owner of land stands by and sees another occupy and improve the property, he must be satisfied to recover the value of the land independent of the improvements; and that such acquiescence was little short of fraud.

In *Cowdrey* v. *Galveston Railroad Company* the purchasers of the road acquired property, erected buildings and made improvements without the knowledge or acquiescence of the prior mortgagors. Yet the property so acquired, and placed upon, and used in connection with, the road, was held not subject to the prior mortgages.

To give appellees a prior lien on the old road to the extent of the value of said improvements, would be but a just recognition of their superior equity and would work no wrong or injustice to the old bond-holders.

If the trustees under the old mortgage had seized the road, at the time when the Selma, Rome and Dalton Railroad Company acquired it, as they were authorized to do, they must either have sold it, in its then condition, or have operated it; and to do this, they would have been obliged to make the repairs which were afterwards made by the Selma, Rome and Dalton Railroad Company, and the charges for such repairs would have been a first lien on the entire road. And in the language of Justice McLean: "Had the road been in the hands of a receiver, no chancellor fit to deal with these subjects, it appears to me, could have hesitated to order the receiver to do in this respect what the company has done." *Williamson* v. *N. A. R. R.*, 1st Bissell, 206–7.

In no event could the old bondholders have realized more than the value of the road in its then condition.

The debt incurred to the complainants for the reconstruction of the old road, was for the preservation and life of the road; a court of equity would not have hesitated to authorize it in the first instance, and will not now hesitate to approve and ratify it; of this the old bondholders have no right to complain; as it is, their fragment of a road, without any assistance from them, has been extended and completed so as to form connections and establish a business, and the

[Meyer v. Johnston.]

value of their portion has thus been enormously increased without reference to the improvements.

VII. The pendancy of the suit in the U. S. circuit court was not a bar. It abounds in defects too glaring to escape observation or to require any particular notice. Amongst other things it shows that the complainants in this suit are not parties to the former suit; and that this suit embraces the whole subject more completely than the first; and therefore the plea is bad. 2 Daniel Ch. Pl. and Pr. 721–2; Buck v. Colbath, 3d Wallace, 345; Mitchell v. Bunch, 2d Paige, 606; Salmon v. Wooten, 9 Dana, 623.

If the plea were good in form, it has been waived by making full defence. 1st Brickell's Dig. 9.

MORGAN, LAPSLEY & NELSON, for appellees.—In order to supply "the defects of the law," chancery has a large field of jurisdiction, through which it supplies to the rights and equities of the parties its powers, by rendering decrees to meet the emergency of the case, to prevent wrong and injury, and to administer an estate drawn within its reach. Macon and Western R. R. v. Parker, 9 Geo. 394.

This case was approved and commented upon in Covington Drawbridge Co. v. Shepherd, 21 How. 125.

This jurisdiction is very old, and the protective and administrative powers of chancery courts have been applied to a great number and variety of cases. See Spence's Equitable Jurisdiction of the Court of Chancery, Vol. 1, 377 u. (g) and 381, additional note to chap. 6; Daniel's Chancery Practice, Vol. 2, 1731, (4th edition) and notes.

These powers of courts of chancery were not generally applied to the management of railways in England, through the reluctance of the courts to engage in such matters; and because the omnipotence of Parliament was a ready source of relief, where it became necessary to take the property from the hands of the company, in order to preserve it for the creditors. But the Parliament remedied this refusal of the courts to act, by providing a statute, 1867, for the appointment of a manager of a railway company, at the suit of a creditor who has obtained a judgment.

These powers are also exercised with reluctance, and are sometimes refused between partners and corporators, for the purpose of carrying on the business, until conflicting rights between them can be settled; but in such cases, where the jurisdiction is denied, it is upon the ground that the court cannot be used for the purpose of doing that which the parties could readily provide for by agreement. In Waters v.

[Meyer v. Johnston.]

*Taylor,* 17 Vesey, 10, the Lord Chancellor says: "If these two parties only were interested, and representing that they could not carry on the concern (an opera house), and desired a sale, this court would, for the purpose of regulation in the intermediate time, with a view to relief ultimately to be given, appoint a person to manage; but this application is made upon a deed, under which it is absolutely impossible that this concern can proceed, desiring that, during these reversionary terms, this court shall be the manager; which may, with equal reason, be desired by every brewery, and all the joint concerns in the country."

In this case and in the cases cited from 2 Vesey and Beam, 329, and 4 Madd. 143, the court recognizes the jurisdiction of chancery courts to appoint receivers to manage, where the bill is to sell the property, or wind up the concern and divide, and where the relief prayed as to receivers, &c., is incidental and necessary to the main relief in the cause.

This doctrine is further established in *Gardner* v. *L. C. & D. Railway Co.* 2 Law Rep. Chancery Appeal Cases, 201. The court refused to become the permanent manager of a railway, but stated the power of the court in very explicit terms.

The complainants below came into the chancery court with the strongest claim to the assistance of the court in the administration of the trust.

Entering into this litigation as dry trustees, and solely for the benefit of the bondholders, secured in the deed to them, they were compelled to put in issue by appropriate pleadings, every claim of prior lien or incumbrance on the trust estate of which they had notice. They had no right to admit that any lien was prior to that of the deed under which they hold. These complainants are not, therefore, to be justly regarded as the persons who have instituted a litigation for their personal gain or advantage. Ins. Co. 22 How. 380; 25 Ala. 81; 3 Johns' Chy. 48; 1 Paige 17; 1 Paige, 298; 13 Vesey, 269; Anonymous, 12 Vesey, 5, and cases cited on other points, *infra.*

The appointment of a receiver before answer is common and fully authorized. 1 Ball and Beatty, 75; 18 Vesey, Jr. 283; 6 Vesey, 738, and note 3; 3d. Bland's Chy. 63; 4 Price, 346; 1 Vesey and Beames, 180; Daniel's Chy. Pl. and Pr. 1974 and 5, and note (1).

"The ground for refusing the appointment of a receiver before a party has been served with process, is that the court has not jurisdiction to deprive a man who is not present to

[Meyer v. Johnston.]

defend himself, of the possession of his estate." *Tanfield* v. *Irvine*, 2 Russ. Ch. R. 151.

If the party whose possession is to be taken by the receiver is wilfully absent from the State, or resides out of the jurisdiction, notice of the appointment of a receiver is waived. Kerr on Receivers, 138, and note (Z.) citing cases.

And so when the exigency is great for the appointment of a receiver, the court may proceed without notice. Daniel's Ch. Pl. and Prac. 1975.

It is always competent for the party against whose possession a receiver has been appointed, to apply for relief from the order. It is a proceeding that only affects the possession, and is designed to preserve the property. Hence a court may appoint a receiver in its discretion, in the absence of the defendant. *The People* v. *Norton*, 1 Paige, 17.

The defendant, Lamar, had never taken possession of this property in any character, and the appointment of a receiver took nothing from him, nor did it abridge his rights in any respect. *Walker* v. *Jones*, 23 Ala. 448; Brickell's Dig. Vol. 1, 776, § 31.

This court does not accept the theory that chancery suits on appeal are to be tried strictly *de novo*. *Phillips* v. *Phillips, Admr.* 39 Ala. 63; *Gordon* v. *Jones*, 42 Ala. 147.

It has been often decided that a matter is not available on appeal, or error, which the party, by his silence, waived in the court below. *Bryan* v. *Wilson*, 27 Ala. 208; *Stewart* v. *Goode and Ulrich*, 29 Ala. 476; *Stallings* v. *Newman*, 26 Ala. 300; *Ortez* v. *Jewett & Co.*, 23 Ala. 662.

"A receiver appointed by the court of chancery is to every extent an officer of that court." *Magee* v. *Copperthwaite*, 10 Ala. 966.

The court creates the office and appoints the incumbent, who, on accepting the office, becomes subject to its orders in the strictest sense, and he is amenable to almost discretionary punishment for disobedience of the orders of the court.

It is certainly due to the court and to the officer thus appointed, that a party objecting to an appointment, or to an order or direction given to an appointee, should make known his objection, and the ground of it in due time. The receiver cannot object to directions given him, and must incur the penalties of disobedience, if he refuses to comply with the orders of the court. If a receiver has been improvidently appointed, in a case where the court has jurisdiction to make the appointment, the proper practice is to move to discharge him, or for leave to be examined *pro interesse suo*.

[Meyer v. Johnston.]

A party claiming an estate against a receiver cannot stand by and watch for his chance to gain an advantage, by his silence, over the receiver or the party who asked for his appointment, and then complain, on appeal, of matters which could have been rectified on his motion. Daniel's Ch. Pl. and Pr. 1982; *Wiswall* v. *Simpson*, 14 How. 61.

The chancellor had jurisdiction to appoint the receivers, and, having exercised it, the receivers became lawful officers of court; and the subsequent directions to them are valid, and cannot be assailed, for the first time, on this appeal, when the effect of the reversal on this ground would be to deprive the holders of these certificates of the security pledged to them by the court for their payment.

The power to seize property by an interlocutory order or decree, is given for the purpose of preserving it *pendente lite*, and this power is worse than useless if the court, after causing the property to be seized, must, for want of power to preserve it, stand by and see it perish. Property placed in charge of a receiver is in the possession of the court. Daniel's Chy. Pl. and Pr. 1983; *Peale* v. *Phipps*, 14 How. 368; *Wiswall* v. *Simpson*, 14 How. 52.

This latter case is a very full decision on many of the points above stated in this brief. "It is the court itself which has the care of the property in dispute." *Booth* v. *Clark*, 17 How. 528.

The question as to the power of the court to authorize the loan seems to be based on the idea that the decree, giving a prior lien on the property of the railroad company for the repayment of the loan, violates the contract rights of the first mortgage bondholders. Lamar, in order to support this view, assumes to occupy the ground of a legal mortgagee— the first mortgagee, under a legal mortgage. The deed under which he holds is a deed of trust, to secure a debt due to others, under which he has no authority to take possession of the trust estate *sponte suâ;* nor can he become the owner of the property under any of the powers conferred on him. He neither has a title to the property, nor can he acquire it by entry for condition broken. If the deed to him, as trustee, was a legal mortgage, it does not, in terms, cover all the property which was placed in the charge of the receiver, but only a part of it. If he has a right to all said property, it is an equitable right, not conveyed by the deed, but to be worked out through the assistance of a court of equity. He holds a mere power over the property, not any legal title to it. If he had a legal mortgage on all the property placed in the hands of the receivers, he had never taken

possession of the mortgaged estate; on the contrary, he had abandoned his right to do so. "If the person holding the legal interest is not in possession, the equitable claimant against the property is entitled to the interference of the court, not only for the purpose of preserving it from waste, but for the purpose of obtaining the rents and profits accruing, as a fund in court, to abide the litigation. For, until the person holding the legal interest takes possession, or asserts his right to the possession, the accruing rents and profits present a question simply between the parties to the litigation." *Wiswall* v. *Simpson,* 14 How. 65; *Aberdeen* v. *Chitty,* 3 Y. and C. 379; *Holmes* v. *Bell,* 2 Beav. 298; Fisher on the Law of Mortgage, 3, pages 233 to 238, §§ 402, 407, 408, 410, 416.

The chancery court not being obstructed in its procedure by any legal estate in the possession of Lamar, but finding the entire property in the hands of the railroad company, took it all into possession. If the court had the power to order the expenditure of any money for the benefit of this estate, or that any debt should be incurred for its benefit, then a sound, judicial discretion is the only guide to the court as to the amount of such expenditure. The question of impairing the obligation of any contract, couched in any of the mortgages, does not arise. When the first mortgage deed of trust was made, this railroad property, including its franchises, became a trust estate, and each succeeding mortgage added to this quality. Much of the property was not in existence when the first mortgage was made. Much of the property now claimed to be covered by the first mortgage is claimed on the grounds of estoppel and relation, and not because it was really intended by the parties to be included in that mortgage. The interests of all the mortgagees in the property were equitable, rather than legal. They were so blended together, and so intermingled with the rights of the public, that none of the mortgagees could claim the entire estate. The court, in taking this property, and in dealing with it, was acting on behalf of all the parties concerned, and only the chancery court could deal with it, because the estate is equitable. It could not act otherwise. And its action was binding on all concerned, because, whatever was done for the advantage of the property, must benefit all those who claim liens upon it.

Whatever may be the English rule, it is settled law in the United States, that the courts of chancery will appoint receivers to take charge of and operate railways upon bills of foreclosure, and in a great many other cases. The argument

*ab inconvenienti* has no longer any weight here. When the point was made in *Gardner* v. *L. C. and D. Railroad Company* (2 Law Rep. Chancery Appeals, 201), Parliament provided for the appointment of receivers, to meet an indispensable public necessity. Kerr on Receivers, 259.

Having no means of providing a general law to control such matters where railroad lines reach through several States, we can only look to the courts of chancery for the power adequate to the emergency.

In *Gardner* v. *L. C. and D. Railroad Company*, the doctrine is stated as follows : "Now, I apprehend that nothing is better settled than that this court does not assume the management of a business or undertaking, except with a view to the winding up and sale of the business or undertaking. The management is an *interim* management ; its necessity and its justification spring out of the jurisdiction to liquidate and sell ; the business or undertaking is managed and continued in order that it may be sold as a going concern, and with the sale the management ends." *The Shrewbury Railway Co.* v. *The Chester Railway Co.*, 14 Law Times Rep. 217–433 ; *The Midland Railroad Co.* v. *The Ambergate Railroad Co.*, 10 Hare, 359 ; *Waters* v. *Taylor*, 15 Vesey 10.

The principles stated in the English cases (of which there are a great many that touch the subject), are, that courts of chancery have the power to appoint receivers to manage any corporation which is proceeded against in such manner that its virtual dissolution will be the result of the decree ; where the management is necessary to preserve the property, or the business, or the rents, or income, for the benefit of creditors. The reluctance of the English courts of chancery to appoint managers of railways is not shared by the American courts. 18 Grattan, 819 ; *M. and W. R. R.* v. *Parker*, 9 Ga. 377 ; 21 How. 112 ; 21 N. J. Equity, 283 ; 10 Ohio State, 37 ; 20 Ohio State, 137 ; 18 Maryland, 193.

A receiver to manage and operate a railway pending the litigation must have authority to do what is necessary to the safe and economical administration of the trust, otherwise he will be a disadvantage to the property and all concerned. The offices of sequestrator, receiver, manager and trustee, are all of the same nature, and courts of chancery have always given to such officers the powers necessary to the proper management of the estates committed to them. Kerr on Receivers, 256–65 ; Redfield on Railways, Vol. 2, 363–66, and cases cited ; Hill on Trustees, 429 ; *Morris* v. *Elme*, 1 Vesey, Jr. 139 ; 14 Sim. 600.; 2 John's Ch. 252 ; 5 Ala. 308; 12 Gill & Johnson. See also *Galveston Railroad* v. *Cowdrey*,

[Meyer *v.* Johnston.]

11 Wallace, 459. This latter case is full authority for all that has been done in this case.

Here is the direct exercise of the power by the supreme court, to declare a debt made by receivers, under the orders of court, a prior lien on all the property in the hands of the court. It also establishes the power of the court to cause its receiver to take property and pay rent for it, pending an appeal, after a final decree, and to create a lien on the property in his hands, for the payment of such debt. This power extends to all property of every party which is the subject of litigation, and has, by order of the court, been seized and placed within the power of the court.

This case settles the question of the power of a court of equity to create a charge upon an estate in the hands of its receiver, which is paramount to any other lien on that estate (though created by contract), whenever it is necessary to do so to preserve the property, or to realize its rents, issues, or profits. The purpose of such orders is to benefit and improve the estate, and the greatest advantage must enure to the party who has the prior claim upon it.

However the courts may be restricted in the exercise of this power, in cases where the owner of the legal estate or legal mortgage may be in possession, or may have been deprived of possession by one claiming an equitable interest in, or lien upon, the property, or where the legal owner is not a party to the suit, in a case like this, where all the claims against the estate are equitable, and the right of no one of the claimants is clear (to the exclusion of the rest) as to the priority upon the whole estate, or upon certain indivisible interests in it, anything that is done to preserve, or make productive, or even to improve the entire estate, must be regarded as being done for the benefit of all concerned.

No party to this suit, except the railroad company, had the right to the possession of this property. If the trustees in any of the deeds had become possessed of the property, their powers conferred in the deeds, united with the powers of the railroad company, would have enabled them to manage, preserve, restore, and use the property, and, as incidental to these powers, they could have borrowed money, and could have given the same pledges and security for it that the railroad company could have done.

As none of the parties to these mortgages could, or would, or did take possession of the property under their deeds, and as the railroad company was insolvent, had lost its credit, and could not preserve the property, a receiver became an indispensable agent of the court, to take and manage it, and

[Meyer *v.* Johnston.]

the court had at least all the powers that any and every party to these mortgages had, to secure and preserve the property for those who should be found entitled when the suit was finally decided.

Many cases have been decided where receivers and managers of estates have been appointed and invested with large powers in the management. It is not believed that, in any case where the property has been taken out of the possession of an insolvent corporation, the chancery courts have been limited to the income, rents or profits of the property, as the only means they should employ to preserve, manage, use, repair, or improve the estate. The mortgaged property of insolvent corporations, placed in charge of receivers when (as in this case) the deeds of trust include every conceivable property and right which the corporation can own, is treated as an estate under administration, and the courts of chancery have a firmly established jurisdiction to charge all such estates with every necessary expense of the administration and management of them. *State* v. *Northern Railway Co.*, 18 Maryland Ch. 193; *Meara* v. *Holbrook*, 20 Ohio St. R. 137; *Paye* v. *Smith*, 99 Mass. 395; *Crane* v. *Ford*, Hopkins' Chy. Rep. 14; *Osgood* v. *Ogden*, 43 N. H. 70; *Porter* v. *Williams*, 7 N. Y. 142; *Slenwer's Appeal*, 38 Penn. State Rep. 168; *Sprague* v. *Smith*, 29 Vermont, 402; *Covington Drawbridge Co.* v. *Shepard*, 21 How. 112; *Whitewater Valley Railroad Co.* v. *Willett*, 21 How. 422; *Harper* v. *Winston, Trustee*, 24 Ill. 253; *Adams and Haskell* v. *Wood*, 6 Cal. 475; *Sturgess* v. *Knapp*, 31 Vermont, 1; *Huffman* v. *Horner*, 2 Green N. J. Eq. Rep. 17, p. 268; *Wiswall* v. *Simpson*, 14 How. 65; *Ohio Railroad Co.* v. *Fitch*, 20 Ind. 498; *Booth* v. *Clark*, 17 How. 322, and the English authorities cited *supra*.

The case of *Seth Adams* v. *the Alabama and Chattanooga Railroad* is a case clearly in point. Judge Bradley, who made the order in that case, makes no reference in his decree to any agreement defining the authority of the receivers to borrow money. He rests his decree in that matter upon affidavits and proofs submitted to him and the laws sustaining such orders. He had written the opinion of the court in *Cowdrey* v. *the Galveston Railroad Company*, and must have given very full consideration to the subject in that case.

The facts show an imperative need for the receivers' loan.

Over sixteen thousand dollars of taxes were due to the State. The employees, to whom the company was largely in arrears, could not be paid, or retained without pay. The track and bridges were in a dangerous condition.

[Meyer v. Johnston.]

In this condition of affairs debts must have been created in order to begin to operate the railroad.

A loss amounting to at least as much as half the value of the railroad must have resulted from allowing it to remain idle until a final decree could be rendered in this cause. Besides, the public convenience, the transportation of the mails, the carrying on the commercial business of a great body of the people, demanded that the road should be operated. If this company had voluntarily, or for want of means, ceased to run trains over its road for public accommodation, the courts would speedily have declared its charter forfeited, and would have seized it for the State. If the company had attempted to remove the track and machinery, or if the mortgagees had attempted to do so, the interest of the public in this highway would have been quite sufficient to have called in aid the restraining power of the courts, to have prevented such a destructive measure to the general welfare. Railroads are not chartered for temporary purposes. They are built with a view to the permanent advantage of the country. A court, having a railroad in its charge lawfully, would be inexcusable, should it fail to provide, as far as possible, for its proper operation; certainly, because mortgagees may, by statute, or otherwise, have a lien for a debt upon a railroad, that does not empower them to stop the running of trains for the convenience of the public.

We now proceed to notice some of the points made by the learned counsel of the appellants.

A proposition, advanced as axiomatic, is thus stated by them: "The power claimed for a court of chancery to grant, in mortgage, all the property and franchises of a railroad corporation, for the purpose of securing the payment of its commercial paper, and to make its mortgage superior to all antecedent mortgages, without the consent of the prior mortgagees, is without any foundation in reason or justice; and, so far as we have heard, is not sustained by one case adjudged in any court of last resort, in any State or nation."

With the declamation omitted, this axiom would, if true, read thus: A court of chancery has no jurisdiction to create a debt or charge upon any property, against the consent of the owner, to defray the expenses of its preservation, although it is compelled to seize it and hold it until it can lawfully ascertain who is the owner.

We have seen, by reference to the many cases above cited, that there is much authority in the adjudications of courts of last resort, which explodes this theory of the law. It would, perhaps, be an unusual means of exercising this power if a

[Meyer *v.* Johnston.]

court should make a "mortgage" of any sequestered estate, to secure "its commercial paper."

A court of chancery could scarcely make a dead pledge of an estate, and thereby lose its control over it by the forfeiture of the conditions of the mortgage. But a court can decree that the proceeds of the property lawfully in its custody, when sold, or the rents and income of it, shall be disposed of as justice and equity require, especially so as to provide how the necessary burthens of the costs and expenses of the litigation about the property shall be apportioned and paid.

This undoubted power of the courts of chancery is supposed to be in conflict with the provisions of the Constitution of the United States, prohibiting any State from passing a law impairing the obligations of contracts, and the learned counsel devote much argumentation to this view of the matter.

The courts, as exercising the highest power over such questions, stand as arbiters between the Constitution of the United States and the laws enacted by the States, and decide whether or not the Constitution is violated by a particular law. In different States, these decisions made by courts of last resort are frequently in direct opposition, yet the parties to whose rights these contradictory decisions are applied are bound by them. No man has the right to assume that the decree of a court violates the Constitution of the United States, and therefore that he may disregard it; but any man may disregard a law as being unconstitutional, and escape all responsibility, provided he can get the court which determines his right to concur in his opinions.

Whenever, therefore, a court having jurisdiction to decide upon any matter, makes a decree, its order is not void, but can only be reversed by a higher court. These undeniable propositions lead to the conclusion that the chancellor had the power to decide whether the obtaining a loan of money on the credit of the property in its charge violated the constitutional rights of anybody, and if a higher court should reverse his decree, his order, so made, would not be void *ab initio*.

If his order was not void when made, then, by a line of authorities almost without exception, it stands as a sufficient support to the rights of third persons, acquired under it (especially such as are not parties to the suit), to the full extent that it has been executed, and to the full extent and scope of every right secured or provided for in the decree. An error of judgment in a court having jurisdiction to decide a question, has never been even supposed to make the

[Meyer *v.* Johnston.]

decree void, so as to affect injuriously the rights of persons not parties to the suit, acquired under such decree.   Powell on Appellate Proceedings, 289; 2 Bacon's Abridgment, 505 (*m.*) 3; Bouv. Inst. 555; *Weir* v. *Clayton*, 19 Ala. 132; *Ware* v. *Bradford*, 2 Ala. 267; *Smith* v. *Houston*, 16 Ala. 111; *Stimson* v. *Ross*, 51 Me. 56; *Guittena* v. *Wisely*, 47 Ill. 433; *McLean* v. *Brown*, 11 Ill. 519; *Clark* v. *Pinney*, 6 Cow. 297; *Hubbell* v. *Bradwell*, 8 Ohio, 120; *Godrin* v. *Mix*, 38 Ill. 115; *Voorhees* v. *The Bank*, 10 Peters, 449.

The law of the case is fixed by the decree of the court, and is not at all to be likened to an act of the legislature, which may be held to be unconstitutional.   The law of the case, as fixed by the court, is beyond all power of reversal, except by an appellate court.

To make a valid appointment of a receiver, or to give him directions, or to enable him to preserve the property confided to him, or to create debts for such purpose, it was not essential that the court should first decide who was the first mortgagee, or any other matter touching the rights of the respective parties, except that they all claimed to be interested in the property, and that it was in such condition as to require that the court should take it in charge and preserve it until it could make a final decree to dispose of it.   The final decree could alone determine who was entitled to the property, and upon whom the burthen of these necessary expenses should fall, if upon any particular persons.

As these matters could not be finally determined *in limine*, it follows that the right of the court was perfect, when these orders were made, to declare that the loan should stand as a debt to be first satisfied out of the proceeds of the entire estate.   It was either this, or else the court had no power to create any debt for the purpose of preserving the estate.

That part of the argument of the learned counsel for the appellants which asserts that Lamar's property has been taken "without due process of law," seems to ignore the powers of courts of chancery to institute due process of law.

Lamar's absence from court, when the order making the loan was made, gives no color to the assumption that "his property" has been taken "without due process of law." Every fact touching his conduct in this case, is at war with this pretension.   The chancery court found this trust estate a stranded waif, abandoned by the trustee, and by him committed unlawfully to the custody of trespassers.   It took care of what he had thrown away and had nearly destroyed. This is the "pernicious power" which the court exercised.

[Meyer *v.* Johnston.]

MANNING, J.—In this cause there is a severance, and errors are separately assigned by several of the parties appellant; and there is a cross-assignment of errors by the appellees, under the rule. The amount involved is large ; the questions discussed are numerous, and some of them very important. They have been argued by eminent counsel, with great ability, and ably discussed in the opinion of the chancellor.

I. We overrule the objection to the jurisdiction of the chancery court of Dallas county to hear and decide this cause, founded on the pendency of the prior suit of Amy and Moran against some of the parties hereto, in the court of the United States. The complainants in this cause are not parties at all to the suit in the Federal court, the plaintiffs in it having voluntarily dismissed their bill as against them, and that court having set aside, and vacated its order appointing receivers. Besides, the trust deed to the complainants in this cause, is more comprehensive than that under which Amy and Moran claim, which operates on a portion only of the property of the defendant corporation, while that to the complainants embraces it all.

II. An important question to be decided at the outset, is this : What effect did the agreement of August 8th, 1866, between the two Georgia railroad companies and the Alabama and Tennessee River Railroad Company, and the acts of Alabama and Georgia authorizing and ratifying that agreement, have upon the Alabama company? Did this company become thereby dissolved, and a new one constituted under the title of the Selma, Rome and Dalton Railroad Company, or, did the Alabama and Tennessee River Railroad Company continue to exist, with privileges enlarged and resources increased perhaps, but still continue to exist, under the new name ?

A correct solution of this question requires that we somewhat closely examine into the history, condition, and objects of the companies, parties to that agreement, and the circumstances tending to explain it.

By the act of 1848, incorporating the Alabama and Tennessee River Railroad Company, it was authorized to construct a railroad from the Alabama river at Selma, "to some convenient point on the Tennessee and Coosa railroad." This latter road was not then in existence, nor has it since been built ; but an act of the General Assembly was passed in January, 1844, for the incorporation of a company to build it—between Guntersville, on the Tennessee river, and some point on the Coosa river. And to this latter point, pre-

[Meyer v. Johnston.]

sumed to be Gadsden, the Alabama and Tennessee River Railroad Company undertook and began to construct its road from the other *terminus*, Selma. The company, whose charter had been amended in particulars which need not now be noticed, completed its railroad 135 miles, from Selma to Blue Mountain, in Calhoun county, (formerly called Benton,) and had done much work on the road-bed in the direction towards Gadsden, which was west of north from Blue Mountain.

After this an act of the General Assembly was passed, (February 20, 1866,) authorizing the company to extend its railroad from Blue Mountain, (eastwardly of north,) to "such point on the Georgia State line, as the company might select." And by the same statute, the object of which was declared to be, "to promote and facilitate as far as practicable, connections between the railroads and system of roads in this State and the railroads and system of roads in adjacent States, constructed and to be constructed,"—the Alabama and Tennessee River Railroad Company, was authorized "to unite and consolidate their railroad, or any portion thereof    *    *    *    and their stock and franchise, or any portion thereof, with the road, or roads, and stock and franchise of any other railroad company, or companies, in this or any other State, on such terms as may be agreed on by and with the interested and contracting parties,"—or, "to purchase and own the stock and railroad and appurtenances and franchise, or any portion thereof, of any other company existing in this State or any other State "    *
*    *    "with whose roads, the road of this said company, or any portion thereof    *    *    *    may become united or connected, on such terms and conditions as may be agreed on, by and with the interested and contracting parties." By section 6, it was "further enacted—that said company shall have power to change " their name "for one less inconvenient in length ;    *    *    *    and under the new name which may be selected and adopted, shall continue and exist, in all respects with all rights, privileges, liabilities and obligations, as under the present name." And by section 7, it is enacted,—"that change in the name of said company, should the name be changed as authorized by this act, nor anything in this act contained, shall have the effect to release said company from any legal or equitable obligation whatever, of said company, but all such obligations shall be and remain in full force after as before the passage of this act."

About three months afterwards, (May, 1866,) in expecta-

tion of making some such arrangement with the Georgia companies, as was subsequently made, the Alabama and Tennessee River Railroad Company made a contract with Mr. A. D. Breed for the repair of their railroad from Selma to Blue Mountain, and for the extension and completion of it thence to Dalton, in Georgia. And on the 8th of August, in the same year, the agreement between the Georgia and Alabama Railroad Company, and Dalton and Jacksonville Railroad Company, of the State of Georgia, and the Alabama and Tennessee River Railroad Company, of Alabama, was entered into by them.

In the contract of this company, (The Alabama and Tennessee River Railroad Company,) with Mr. Breed, this arrangement with the Georgia companies, then in anticipation only, was spoken of as follows:—

"11. The parties of the first and second parts base their agreement upon the supposition and expectation that the railroad of the party of the first part will be consolidated or united with the railroad, authorized to be constructed in the State of Georgia, by the Georgia and Alabama Railroad Company, of Rome, Georgia, and the Dalton and Jacksonville Railroad Company, of Dalton, in the same State, or with one of them, so as to constitute a continuous and consolidated line of railway from the city of Selma, in Alabama, to Dalton, in Georgia; and that arrangements will be made by the party of the first part, whereby all the chartered rights and privileges of the said Georgia and Alabama Railroad Company, and the said Dalton and Jacksonville Railroad Company, will be transferred to and invested in this company; or that arrangements to this effect will be made with one of said Georgia companies, so that the plan for a consolidated line of road from Selma to Dalton may be carried into effect by the party of the first part; the said Dalton and Jacksonville Railroad Company, which possesses the right under its charter to construct a road from Dalton to the Alabama State line, in the direction of Jacksonville, Alabama, having signified to the party of the first part its willingness to enter into any arrangement with the party of the first part, and desired on the part of the latter to carry into effect the plans and wishes of the party of the first part, for a consolidated and continuous line of railway from Selma to Dalton, under the ownership and control of the party of the first part."

The Alabama company had a complete road from Selma to Blue Mountain, 135 miles; the mason work and grading of ten miles more were completed to Jacksonville, and some

[Meyer *v.* Johnston.]

like work was done to the extent of five miles further toward the Georgia line, and to a still greater distance along the line from Jacksonville to Gadsden, which route was, at this time, abandoned; and it owned about 375,000 acres of land along its road in Alabama. The Alabama company had also made a survey, or preliminary examination, of the country from Jacksonville to the Georgia State line, in the direction toward Rome and Dalton, and had entered into the contract with Breed, for the construction and equipment of the road all the way to Dalton. The completed part of the road was a good deal out of repair. Such was the Alabama and Tennessee River Railroad Company, and the work it had accomplished and was engaged in doing.

How at this time stood the Georgia companies? Their charters are not produced, except so much of that of the Dalton and Jacksonville company, as is contained in the amendatory act of the State of Georgia, approved February 23rd, 1866; which shows that it had become, if not dissolved, wholly disorganized; wherefore the act authorized its stockholders to reassemble and elect directors, and also allowed it to unite or consolidate its stock and road and franchises with those of any other railroad company of that or any adjacent State. But neither of these Georgia companies had, (so far as this record shows,) built any part of any railroad at all. It does not appear that they had located any proposed road. There is no evidence that they had any money or property, or that they were indebted—except that one of them owed a debt for $36,000 in Confederate currency, which it had borrowed and executed a mortgage for. Little is known of either of these companies, except that they had been incorporated under the laws of Georgia for the purpose of building railroads from Dalton, or some other point in the western part of that State, to or toward the Alabama line.

Such were the parties to the agreement of August 8th, 1866. That agreement sets forth that in order "to complete and own and use one continuous railroad from Selma, by way of Rome to Dalton, under the authority and control of one set of officers:" (1st), The three companies are "united together and consolidated into one company, with all the rights, powers, privileges and franchises which now belong to either one, or all of said companies: (2d), "That all the property, real and personal, and mixed, and all franchises belonging to either one of the parties to the contract," are vested in the consolidated company: (3rd), "That each and every stockholder in either of said companies, who had paid

his or her subscription of stock," shall be, to that extent, a stockholder in the consolidated company : (4th), "That the president and directors of the *Alabama company* shall have and exercise full power and control over all the property of all of said companies," which is thereby made the property of the consolidated company, and "shall cause the railroad, which is now completed from Selma to Blue Mountain, to be extended and completed, by way of Rome to Dalton, over the best and most practical route ; " to which end, it might issue bonds and mortgage the whole route : (5th), "That all the debts, contracts, obligations and liabilities of each one of the parties" are assumed by the consolidated company : (6th), "That all acts, contracts and obligations done, made or assumed," or that "hereafter may be done, made or assumed by or under the president and directors of *The Alabama and Tennessee River Railroad Company*," be valid and binding on all the companies thereby consolidated into one : (7th), That at the next annual meeting of the stockholders of the Alabama company, the stockholders of each one of the companies shall have the right to vote in person, or by proxy, according to the amount of his or her stock : (8th), That each of the companies should procure legislative acts, of their respective States, ratifying the agreement: *       *       *       (10th), That until a common name shall be lawfully given, under which the franchises of each of the companies shall be united, the Alabama company shall be the acting and controlling company, and the organization of the others be continued, "for the purpose only of preserving and enabling the acting and controlling company to exercise the franchises hereby consolidated or united with the franchises of the said acting and controlling company. And all the contracts and obligations which may be entered into or made for said consolidated company, shall be done, until a common name shall be lawfully given as aforesaid, in the name and in accordance with the franchises of the Alabama and Tennessee River Railroad Company : " and (11th), "That no further payments shall be required on the subscription of stock" of the Georgia companies, but subscribers to the stock of either, may, at any time within three years, pay in the whole or any part of their subscriptions, respectively, and become thereby stockholders to that extent, in the consolidated company.

Georgia and Alabama, by a separate act of each, in the same form, and almost the same words, ratified the agreement for the consolidation of the two Georgia companies, by name, *with* the Alabama and Tennessee River Railroad

[Meyer v. Johnston.]

Company,    *    *    *    for the construction and use
of a railroad to be constructed from Blue Mountain, in the
State of Alabama, as a continuation of the Alabama and
Tennessee River Railroad, by way of Rome to Dalton, in
the State of Georgia, "and authorized the (so-called) con-
solidated company to adopt the name of the Selma. Rome
and Dalton Railroad Company, and "to adopt as its charter
the charter of the Alabama and Tennessee River Railroad
Company as now existing, with all its amendments," &c.
The name, "Selma, Rome and Dalton Railroad Company"
was not agreed on or prescribed in the contract of August
8th, but was authorized by the ratifying acts last referred
to, perhaps, because the "Alabama and Tennessee River
Railroad Company" desired it as more descriptive than this
latter name, and because, although it had applied for and
obtained authority to adopt a new name for itself, it was of
importance that this name should be recognized and author-
ized in the public statutes which constituted its charter.

Now, what was the substance of all this? The intended
Tennessee and Coosa Railroad not having been built, and
there being no prospect of an advantageous connection at
Gadsden, in that direction, the Alabama and Tennessee
River Railroad Company perceived, and acted upon the
idea, that its best policy was to abandon that part of the
route, and make a connection with the railroads of north-
western Georgia instead; and it got authority to do this
from Alabama, by the act of February 20th, 1866. But it
still needed the assent of Georgia to the extension and op-
eration of its railroad into that State, and as Georgia had
granted authority to other companies to build railroads be-
tween points within her borders, which the Alabama Com-
pany desired that its road should occupy, negotiations were
opened with them for the acquisition of their franchises, in
order to enable it to construct and operate its road in that
State. And this acquisition was almost the only result of
the proceedings, agreement and enactments, to which we
have referred.

The Georgia companies stipulated for the discharge of
their debts; for permission to their corporators, who had
not paid in their shares of stock, either to retire without do-
ing so, or pay up and become stockholders, in what was
called the consolidated company; and for the temporary
continuance of their organizations "for the purpose only of
preserving and enabling the acting and controlling compa-
ny," which was declared in the agreement to be the Alabama
company, "to exercise the franchises thereby consolidated or

[Meyer *v.* Johnston.]

united *with* the franchises of said acting and controlling company ; " and they expressly agreed "that the president and directors of the Alabama and Tennessee River Railroad Company should have and exercise full power and control   *   *   and cause the railroad which was then completed from Selma to Blue Mountain, to be extended and completed by way of Rome to Dalton," &c. All which action was ratified and made valid by acts of Georgia and Alabama, by virtue of which, the (so-called) consolidated company was authorized to operate under the charter of the Alabama and Tennessee River Railroad Company, and no other.

Everything in the contract of August 8th is consistent with the idea and purpose set forth in the Breed contract,— that the franchises by which the Georgia companies were authorized to build railroads in Georgia, were united with those of the Alabama company and vested in it, so as to enable it, (*called* in the contract the consolidated company, because their franchises were consolidated *with* its,) to continue its road into Georgia, by way of Rome to Dalton.

The organization of the Alabama company continued ; none of its corporators were permitted to withdraw ; its authority and powers were not in any respect impaired ; its charter remained unaltered ; it was not deprived of the road it had built ; there was no change, so far as is shown, in the list of its stockholders, or, if there was any, it consisted of the addition to it of a few other names, and the object to be accomplished, and which was afterwards accomplished, was one which the Alabama company was, by its charter and the amendment thereto, authorized to carry into effect, so far as Alabama could confer such authority ; and to this was now added the chartered authority of Georgia.

In short, the result of all the negotiations and proceedings which have passed under review, was, that by this circumlocutory process, the Georgia companies were dissolved, and their franchises transferred according to the "plan and wishes" explained in the contract with Breed, to the Alabama company ; and it was thereby merely authorized, under a new and more appropriate name, to complete and operate its road, already 135 miles long, by way of Rome to Dalton, in Georgia.

If such a mere accession of authority and change of name be allowed to operate a dissolution of one corporation, and the creation of another in its stead, there would be danger that such changes, by a process little different from that of simple development, would become not unfrequent devices,

by which bodies politic would contrive to cast off the "legal and equitable obligations," from which the statute, under which the arrangement in this instance was made, expressly declared that not anything in it contained should "have the effect to release said company."

The fact that the three companies severally executed (as it is said) deeds conveying what belonged to each, to the Selma, Rome and Dalton Railroad Company, does not affect the identity of the latter with the Alabama and Tennessee River Railroad Company. Its deed was a conveyance from itself, by one name, to itself by another name, and so, was an unnecessary ceremony, however useful in allaying apprehensions in regard to titles. And it does not appear that the other companies had any property to be conveyed. The case of *McMahon* v. *Morrison*, (16 Indiana, 172) and *Clearwater* v. *Meredith*, (1 Wal. 25) arose out of statutes and proceedings which are not set forth in the reports. That of the *Philadelphia, Wilmington and Baltimore Railroad Company* (10 How.) is wholly unlike the one before us ; and neither they nor the other cases referred to on this point, are authorities adverse to our views in this case.

A case that seems to approach it somewhat nearly, in this respect, is that of *The Galveston, Houston and Henderson Railroad Company et al* v. *Cowdrey et al.* (11 Wal. 481). But in this, the property of the original company, consisting of a railroad from Galveston to Houston, with its appurtenances, and lands granted to it, was actually sold under judgments and executions against the company, (subject, however, to the prior liens created by its mortgages, or trust deeds) and the company thus deprived of the road, its franchises and equipments. And the purchasers, or their assignees, consisting chiefly of natural persons who were stockholders in the original company, constituted themselves, by virtue of a special statute of Texas, into a new corporation under the same title (called the successor company) to enable them to operate and employ the property purchased,— and also by another special statute, constituted themselves into the Galveston and Houston Junction Railroad Company, to build and operate a road from Houston, about two miles long, that would connect the original road with the Texas Central Railroad, by a route different from that by which said original road was to have been extended from Houston to Henderson. The original company was thus, by judicial sales, broken down, and its property and estates transferred to others. And the chief question in the case, was whether those others were not accountable as trus-

[Meyer v. Johnston.]

tees to the mortgagees, for the profits and income they had received from the road; and whether the property and structures which they bought and built with that income, could not be subjected to payment of the mortgagees,—which question the courts decided in the negative, on the ground that until demand made of the income by the mortgagees or their trustees, they were not entitled to the income.

The chancellor, therefore, erred in considering the Alabama and Tennessee River Railroad Company defunct, and thus relieved of its obligations and responsibilities, and that another and different company had succeeded to its property and effects. The identical person in law, the same body politic, which under one name, built the road from Selma to Blue Mountain, under another name, and with the chartered assent of Georgia, extended and constructed it by way of Rome to Dalton, and afterwards owned and operated it from Selma to Dalton, and is now before this court. *Railroad Company* v. *Harris*, 12 Wal. 65.

III. The next question presented is, whether or not the deed of the Alabama and Tennessee River Railroad Company, or what purports to be its deed, to Gazaway B. Lamar and Wm. R. Hallett, bearing date July 1st, 1852, in trust to secure the bonds of that company, was validly executed according to its charter. This (appellants insist) was the first mortgage of the company, and the bonds it was made to secure, are called the first mortgage bonds.

On behalf of appellees—complainants below—it is contended that under the amendatory act of February 10th, 1852, this trust deed or first mortgage is not valid, because the president of the company was not present at, and did not participate in, the execution of it, or the passage of the resolution authorizing it. The president, Mr. Lapsley, was then in New York, arranging for the raising of money for the company, and Mr. Phillips acted in his place as president *pro tem.*

This amendatory act must be construed in conjunction with the original act of incorporation. They are *in pari materia.* By the original act, the board of directors consisted of nine persons, including the president, and by section 7 it is expressly provided that "the president and directors, or a majority of them," shall appoint all officers, engineers, agents, &c., and dismiss them at pleasure, and shall pass all by-laws, &c., and that "said president and directors, *or a majority of them,* are empowered to borrow money to carry into effect the objects of this act, to issue certificates or other evidences of such loan, and to pledge the property of

21

said company for the payment of the same with interest."
By section 2 of the amendatory act of February 10th, 1852,
it is enacted that "two directors may be added to the board
of directors as now constituted, so as to make eleven direc-
tors (including the president of the company) instead of nine
as heretofore," &c., and that "at the next annual and all sub-
sequent elections by the stockholders of directors, instead of
nine directors, as authorized by the present charter, includ-
ing the president, the stockholders shall elect in the manner
provided by the existing charter, eleven directors, including
the president of the company, who shall have all the powers,
rights and privileges, and be subject to all the regulations,
provisions and restrictions which apply to the board of di-
rectors under the present charter; . . . . *provided*, that six
directors, including the president, shall constitute a quorum
for all business." This last clause is insisted on as a provis-
ion which makes the presence of the president essential to
constitute a quorum for the transaction of any business.

In the original charter, when speaking of the powers of
the directory, the phrase "the president and directors, or a
majority of them," was used and frequently repeated in the
body of the statute; and five persons constituted "a major-
ity of them," the whole number being then nine. In sec-
tion 2 of the amendatory act, the expression "a majority of
them," was entirely omitted. And because this might sug-
gest the idea that the board of directors could not act by a
less number than the whole, it seems probable that to ex-
clude such a construction, the proviso was added expressly
declaring that "six directors" (a majority of the eleven)
should compose a quorum. And we concur with the chan-
cellor in the opinion that the words, "including the presi-
dent," were added (as they had been used before throughout
that section) to indicate that on such occasions he was to be
regarded when present as one of the "six directors" neces-
sary to constitute a quorum.

Nowhere else in either of these two acts is any prominence
given to the president, or any duty devolved, or authority
conferred upon, or mention made of him, except in conjunc-
tion with the other directors. All the powers granted are to
be exercised by the board of directors, of whom he is men-
tioned as one. Indeed, it would be difficult to write a char-
ter that should more distinctly preclude the idea that the
president was an integral part of the corporation, or had any
independent authority therein. In view of these facts, it
would be a very strained interpretation, to hold that while
six of the directors, if the president be one of them, "shall

constitute a *quorum* for all business," all of the other ten directors could not constitute a *quorum* to do any business if he were absent. We think, it being shown that a majority of the directors were present and ordered the execution of the trust deed, and that it was executed according to the directions of the board, it was quite as valid as if the president, Lapsley, had been there and participated in the proceedings.

IV. We come next to the inquiry, What rights and property does the mortgage or trust deed so executed embrace? After referring to the original charter of the company of March 4th, 1848, and the act amending it, approved February 10th, 1852, the deed recites that the company is "now engaged in constructing a railroad in the State of Alabama, on the route authorized by the acts aforesaid, that is to say from the Alabama river at or near the city of Selma, northward through the counties of Dallas, Autauga, Perry, Bibb, Shelby, Talladega, Benton and Cherokee, in the direction of the Tennessee river, the route of which railroad has been surveyed and duly located by the parties of the first part, or their authorized board of directors;" and then, after describing at length the bonds with coupons for interest to be issued by the company, which were made payable July 1st, 1872, the trust deed grants, conveys, transfers and sets over to the trustees and the survivors of them, and their successors in the trust, to secure payment of said bonds, "the railroad constructed and to be constructed by the parties of the first part as aforesaid, with all the appurtenances thereof, including all lands, houses, structures, fixtures, machinery, piers and wharves and franchises, privileges and rights, and all other property real and personal now owned, and which may hereafter be owned by the parties of the first part, and also all subscriptions to their capital stock, together with all the tolls, income, issues and profits which may accrue from the said railroad or from any other source whatsoever to the parties of the first part, and including also the proceeds and avails of all bonds which may be issued or disposed of by the parties of the first part." The deed contains also an ample covenant for further assurances.

This deed bears date July 1st, 1852. Its execution was proved by A. M. Goodwin, the secretary of the company and a subscribing witness, September 6th, 1852; and it was recorded the next day in Dallas county, and, immediately afterwards, in all the other counties through which the road was to be built, without the company having before this time in any way parted with the possession of it; and hav-

[Meyer v. Johnston.]

ing been thus executed by authority of a resolution of the board of directors, and recorded, it was sent to Lapsley, the president, at New York, to be delivered or handed to the trustees. The deed was in fact, as Lapsley testifies, prepared in New York, by counsel selected by Mr. Moran, who had been engaged to negotiate a sale of the bonds, and who was, therefore, naturally desirous to make the security for their payment as complete as possible. The evident object was to create a lien for that purpose, as comprehensive as the company could create, upon its property and effects, either then in possession, or afterwards to be acquired.

Nevertheless, a corporation being a creature of legislative enactment, has only such powers and capacity as it is endowed with by its charter. Persons who deal with it, are presumed and required to know what its powers and capacities are; and they contract with it in reference to the extent of these, and with the understanding that the language of their contract is be limited and construed accordingly.

1. It is well settled that the mortgage of a railroad *to be constructed,* and of its appurtenances *to be acquired,* by the company chartered to build and operate such road, is valid. In the language of the supreme court of the United States, —"Had there been but one deed of trust, and had that been given before a shovel had been put into the ground towards constructing the railroad, yet if it assumed to convey and mortgage the railroad which the company was authorized by law to build, together with its superstructure, appurtenances, fixtures and rolling stock, these several items of property, as they came into existence, would become instantly attached and covered by the deed, and would have fed the estoppel created thereby." *Galveston Railroad* v. *Cowdrey,* 11 Wal. R. 481.

2. In regard to the franchises of the corporation, the instrument under consideration also embraces them so far as necessary to make the other property and effects conveyed by it, productive and profitable. *Allen et al.* v. *Montgomery Railroad Company,* 11 Ala. 254; *Pollard et al.* v. *Maddox,* 21 *Id.* 325.

If this were not so—if, for instance, the franchises or privileges of occupying with the railroad covered by such deed, the lands of other persons, over which it was constructed, and of operating thereon over the same lands, the cars and locomotives pertaining to the road, and of taking tolls, fares and freights for transportation of persons and chattels, did not pass with the road and its appurtenances and equipments, to the mortgagee or trustee, the deed would fail of the

object for which it was made, and the security be illusory.

When, therefore, as in this case, a railroad corporation is authorized by its charter to borrow money by a sale of its bonds, and for the payment of them, is empowered to "pledge in such form as the board of directors may think proper, by resolution, or mortgage, or deed of trust, or otherwise, "all the *means, property and effects* of said company, or any part thereof,"—a trust deed of "the railroad constructed and to be constructed, . . . . with all the appurtenances thereof, including . . . . . structures, fixtures, machinery, . . . . franchises, . . . tolls, income," &c.—undoubtedly embraces all the franchises of the company necessary to make the security available; and this, without the aid of the subsequent act of February 21, 1860, (p. 223) authorizing railroad corporations "to execute any mortgage, deed of trust, or other security, on its road bed, franchises, income or any other property," &c.

3. But we do not agree with the chancellor, that it is settled by the decisions above cited, or by this statute, that among the franchises so transferable, "the franchise to exist as a corporation," is necessarily comprehended. If it is, and if the chancellor was correct in the idea that the Alabama and Tennessee River Railroad Company has ceased to exist, or exists only in conjunction and consolidation with the other companies mentioned, where would this franchise of the former company now be found? If, as insisted upon in the argument, it was surrendered to the State, it would be extinguished. If it exists in an union formed with the other companies, by what method of divorce shall it be wrested from them, and committed to the mortgagees, or purchasers, under the first trust deed?

Strictly, "the franchise to exist as a corporation," is not a corporate franchise, "or franchise of the corporation," at all. It is a franchise of the individual corporators, of the natural persons who are shareholders of the capital stock, and pertains to them as such corporators; whereby they are endowed with the privilege and capacity of being constituted into, and co-operating together, as a body politic, with power of succession, and without individual liability. And the corporation as such in its collective capacity, or by its board of directors, has no more power to sell this franchise thus pertaining to the corporators individually, than it has to sell their paid up shares of the capital stock. The interest of each of these in this franchise is transferred with his shares of stock, and passes with them from one individual to another; and this is the proper mode of parting with and ac-

[Meyer *v.* Johnston.]

quiring this particular privilege.

A railroad company may continue to exist as a corporation, after its railroad with all its appurtenances has been sold away from it. There may be other property to dispose of, or credits to get in, or obligations to be discharged, or interests to be protected, which require its continued existence, and which may not belong to, or be chargeable upon the persons who were purchasers of its railroad and the franchises necessary for the maintenance and operation of it. —And on the other hand, those purchasers might not desire to be constituted into a corporation at all. Or, if they did, it might be very inconvenient to find themselves composing the same body politic, whose property had just been sold to them for the payment of *some* of its debts. For, it would seem that if with the railroad they acquired also the company's "franchise to be a corporation," with the same faculties and name, by virtue of and with which the former body existed, they acquired it to be assumed and used, and so must themselves become that corporation, and be bound to perform its obligations.

In the case of *Eldridge* v. *Smith*, (34 Verm. 484) the mortgage of a railroad company described the property it conveyed as "the railroad and *franchise* of said party of the first part," and it was insisted by counsel "that this mortgage being of the franchise of the corporation, therefore all property owned by them [it], whether connected with the railroad or not, passes under the deed; . . . . that inasmuch as a corporation cannot hold property, except by virtue of, and in the exercise of its franchises, a conveyance of its franchise passes all its right to hold property. To this the court by Poland, C. J., among other things answered: —"If it were held that all the corporate franchises, including the power of corporate existence, were conveyed by the mortgage, the conclusion would seem to be logical, that on breach and foreclosure, the mortgagees would step into the shoes of the company, and merely succeed to their [its] rights of property, and also to their [its] corporate liabilities; a result by no means favorable to their interest. Or, if it were held that the mortgagees did not succeed to the corporate existence and functions of the railroad company, and that they did not remain in the company, then it must operate as a dissolution of the company, and lands taken compulsorily for their road would revert to the owners in fee."

See also Redf. on Railways, (3d Ed.) 514, and *Hall* v. *Sullivan R. R. Co.*, note 22, to same.

A few years ago a company known as the United Railroad

[Meyer v. Johnston.]

Companies of New Jersey, conveyed their railroads and appurtenances in that State, by a lease for a long period, (perhaps 999 years) to the Pennsylvania Central Railroad Company, upon the agreement of the latter to pay annually to the former, or to the stockholders thereof, ten per cent. upon the then estimated and fixed value (or capital) of the roads and appurtenances conveyed; and to keep them in good repair. Yet the stockholders of the United Companies, periodically at times prescribed, elect a board of directors, president and secretary, and thus keep up their organization, and will probably continue to do so for centuries, although they possess no tangible property, and in fact have nothing to do except to receive their rents from the Pennsylvania company, and be prepared to take action in the event of a breach of the covenants contained in their lease to it.

Our conception is, that the franchises of a corporation which go with the railroad belonging to it and its appurtenances, upon a sale under a mortgage of them and the franchises of the corporation, are ordinarily those franchises only which are requisite to enable the purchasers, whether a body politic, a wealthy individual, or a company of individuals, to maintain and operate the railroad advantageously for the public, and to take the tolls and fares for transportation for their own use and benefit. Especially would this be the case when the charter, as in this instance, authorizes the company to mortgage only its *means*, property and effects, without express mention of franchises.

We have not overlooked the case of *Pierce* v. *Emery*, (32 N. H. 484) in which views are taken that are apparently in conflict with those above expressed by us. But we do not feel justified in protracting this opinion by further discussing the point under consideration.

Provision is now made by statute, (No. 12) approved December 17, 1873, whereby the purchasers of any railroad may constitute themselves into a body politic, which shall be endowed with all the powers and franchises that belonged to the corporation, whose railroad they have acquired. Acts of 1873, p. 56, and amendatory act of March 20, 1875, p. 132).

V. The question will now be considered, to what extent the Selma, Rome and Dalton Railroad, as now existing, or what part of it, is covered by this first trust deed, that to Lamar and Hallett, made in 1852.

1. The Alabama and Tennessee River Railroad Company was a corporation of this State, chartered originally to build a railroad in Alabama. Without authority both from this State and from Georgia,—from the latter granting to it per-

[Meyer *v.* Johnston.]

mission, and from Alabama assenting to its acceptance of permission, to extend and operate its railroad within the borders of Georgia,—the company could not have carried its work beyond the boundary line. This authority was granted to it by both States, in the year 1866. When the trust deed of 1852 was made, not only was the part of the road which is now in Georgia, not in existence, but it was not the expected product of an undertaking then begun, or within the scope of the enterprise for which the company was created. It is not brought within the boundaries, beyond which even courts of equity will not go, in treating things recently brought into existence, as conveyed or bound by instruments and agreements made long before; when, what were then not in being, were treated as if existing—because possible to be produced by means and causes belonging to the party executing such instruments or agreements. Hence, without the recital in the deed, that the company was engaged in constructing a railroad "in the State of Alabama," the lien would not reach the portion of it built by virtue of subsequent enactments within another jurisdiction.

2. But a portion of this railroad, near its northern end in this State, is not constructed upon the line which was first surveyed and defined for its location. And objection is made to that part of the decree of the chancellor which restricts the lien of the deed of 1852, to the first 135 miles of the road, from Selma to Blue Mountain.

From the latter place, a distance of ten miles to Jacksonville, the superstructure was made, not only along the route as first surveyed and located, but over culverts and upon a road bed which had been prepared for it before 1866. Of course, therefore, the Selma, Rome and Dalton Railroad Company, being the same corporation as the Alabama and Tennessee River Railroad Company, the trust deed of 1852 embraces these ten miles to Jacksonville. It is at this place that the deflection from the route, as originally designated, begins.

3. As we have seen before, the southern *terminus* of the railroad was established at the Alabama river, at or near Selma, which may justly be considered its base. Thence it was to "be extended northwardly, to some convenient point on the Tennessee and Coosa Railroad." And thus, if both roads had been built, a continuous communication by railroad would have been effected between two great and extensively navigable rivers, one in the southern part of Alabama, and the other in the northern part and in Tennessee. But the projected Tennessee and Coosa Railroad having been

[Meyer *v.* Johnston.]

abandoned, the object in view became unattainable in the way proposed. Not only was the northern *terminus* not definitively fixed by the act of incorporation, but it is not so done in the deed of 1852. Although the line had been surveyed and route located by the company, by way of Jacksonville to Gadsden, and mention is made in the deed that the route had been located, the place Gadsden is not named therein; but the route is described as that "authorized by the acts aforesaid" and as extending from the Alabama River at Selma, through the counties of "Dallas, Autauga, Perry, Bibb, Shelby, Talladega, Benton and Cherokee, *in the direction of the Tennessee river;*" as if the company did not intend to debar itself from the right to designate some other point than Gadsden, as the northern *terminus* of their road.

Whether this inference be just or not, it is certain that in the sequel, the company desired and the State consented—since a connection with the Tennessee and Coosa Railroad could not be effected—that the road should be continued in the same general course, east of north, in which it stretched from Selma to Jacksonville, on toward Dalton ; by extension to which latter place, communication would be attained by railroad then existing, with the Tennessee river, and also with other lines of railroad ramifying throughout the country. The difference was but little between the distance from Jacksonville to Gadsden and from Jacksonville to the State line, in the direction toward Dalton; and the termination either way would be in the county of Cherokee, as it existed in 1852. The change was in fact, a mere change in the direction of the road at the northern end, a deviation from and relinquishment of the old route to Gadsden for a new one toward Dalton. Accordingly, we never afterwards hear of anything being done, or proposed to be done, between Jacksonville and Gadsden. And in the very complete and comprehensive trust deed made in 1867, to the complainants in this cause, by which everything the company owned, or expected to own in the future, is devoted to the payment of its past debts and those to be created in the completion of its road, that road is described with great particularity as extending and to extend from Selma through the counties intervening to the Georgia line, a distance of 172 miles, and then on by way of Rome to Dalton, 63 miles further, and as including also when accomplished, the Ashby Branch, without any mention or allusion whatever being made to the line previously located and worked upon, from Jacksonville to Gadsden.

This deviation was thus a mere alteration of the plan of the structure, or work entered upon, and not an abandonment of the work—one of those departures from original designs which in such matters are not infrequent.   To hold that such a change in the adopted plan of a great enterprise, which the company continued to prosecute, especially when the change was allowed on the application of the company, without any participation therein by the bondholders, should deprive the latter of the lien they had bargained for upon the entire road in Alabama, would be unreasonable and unjust.   We cannot, therefore, concur in the conclusion attained in the court below.   *Seymour* v. *Canandaigua R. R. Co.*, 25 Barb. 285; *Pennock* v. *Coe*, 23 How. 117.

The chancellor erred in not holding that the lien of the deed of 1852 extended to all of the main line of road lying in Alabama.

The very interesting and well discussed case of *Collins et al* v. *Monroe Railroad Company*, (1 Kelly's R. 457) is not parallel with the one we are considering.   If Breed, who constructed the road from Blue Mountain to Dalton, were here a contestant, and having such a contract as the Georgia Railroad Company in that case made with Collins and his associates, there would be a likeness between this case and that, though still a difference.   But it would more closely resemble the case of *Dunham* v. *Railway Company* (1 Wal. 254) in which the supreme court of the United States emphatically affirmed the right of the prior mortgagee to be superior to that of a contractor, who was in possession under an agreement that he should keep it until the cost of construction was paid.   A similar ruling was made in respect to the claim of one Pulsford, in *Railway Company* v. *Cowdrey et al*, (11 Wal. 481).   However much of reason and equity, there may seem to be in the argument for the contractors against the mortgagees, the decisions of the supreme court of the United States in such cases, (involving "the obligation of contracts"), conclusively determine the law which we must administer.

4. The original line from Jacksonville to Gadsden having been relinquished for that in the direction toward Dalton, forms no part of the company's property.   Having had only a right of way, which is unused, along that route, and the fee in the lands belonging to individuals, the company has nothing there to be sold under its deed.   The objection of appellants, that this was not allowed to them, is, therefore, not well taken.

5. Nor did the trust deed of 1852 embrace what is known

[Meyer v. Johnston.]

as "the Ashby Branch." A separate charter was granted for that, approved December 8, 1863, by which other persons, especially people in the vicinity who might be benefited by it, as well as the Alabama and Tennessee River Railroad Company, might, and perhaps did, become stockholders therein, and its ownership be different from that of the main road. Only one main road was in 1852 authorized to be built; and it was only that main line in Alabama, which was then in contemplation, that became. charged with a lien by the deed of that year.

In *Pierce* v. *Emery*, (32 N. H. Rep. 484) which is relied on as authority upon this point in behalf of appellants, the court held, that "the corporation itself was the thing originally mortgaged." Whence it followed that everything it might acquire must pass with it. But as we dissent from that court in this particular and have decided differently with respect to the trust deed of 1852, that case is not authority in the present cause upon this point.

VI. The trustees, under the deed of 1852, claim as subject to it, the residue, about 375,000 acres, of the lands granted by Congress in 1856, to this State, to be used in aid of the construction of the Alabama and Tennessee River Railroad, and for no other purpose.

In 1858, the State granted these lands, situated mainly along and in the vicinity of the road, to the company. The condition on which they were granted by Congress, to wit: that the railroad should be completed in ten years, was not performed. But no proceedings having been taken asserting title on that account in the United States, the company continued to be sole owner of them; and an act confirming title to the company, having been lately passed by Congress, they are not now liable to forfeiture. The title of the company dates from 1858.

But when the deed of 1852 was executed, not only did these lands not belong to the company, but it was not then authorized to accept such a grant from the United States. By the act of that year, amending its charter, and which reenacted in part and in language modified from that of the former act, provisions contained in it, thus restating them with greater precision, the company was empowered to acquire "such quantity and parcels of lands and appurtenances as may be necessary and convenient in accomplishing the purposes of its incorporation and organization; that is to say, such lands as may be required. by the company for the right of way for single or double-track railroad, and such lands and appurtenances as may be required at different places

[*Meyer v. Johnston.*]

for stations, turnouts, ample depots, and warehouses, work-shops and machine shops, and other necessary purposes in connection with the railroad." The lands conveyed by the grant mentioned, were not intended for sites for the location of any of these things.

We do not consider the somewhat loose expressions in the act of 1848, enacted before Congress began to grant lands in aid of the construction of railroads, as conferring on the company a larger capacity to take real estate than the language above quoted allows ; but if it be thought they were previously susceptible of a more extensive meaning, the careful limitation of that power in the subsequent statute, operates as a restriction upon such an interpretation. We, therefore, hold that the deed of 1852, did not create a lien on the lands of that grant. The capacity to accept them was derived from the act of this State of January 20th, 1858, turning them over to the company. The case of *Seymour* v. *Canandaigua Railroad Company* (25 Barb. 284), referred to by the chancellor, is a direct authority on the question here involved.

VII. In respect to the cars, locomotives, and other personal movable property appertaining to the railroad, the lien of the first trust deed is not restricted to so much only as now remains of what the company owned on the 8th of August, 1866. This would be so, as the chancellor has decreed, if the Alabama and Tennessee River Railroad Company had then ceased to exist instead of having only changed its name and received an accession to its powers. This lien embraces that kind of property now owned by the company to the same extent to which it embraces the railroad itself,—the same proportion of the one as of the other.

But this decision must not be permitted to interfere with liens upon any such property, given or retained upon the purchase of it, which has been bought by the receivers, under the directions or authority of the chancellor. Property in this condition not having been bought by the company, but under the authority of the court by its officers or agents, the liens created thereon will not be allowed to be superseded by that of any prior mortgage or trust deed.

VIII. It is proper to advert here to some of the other facts of this case. We shall not consume time by going into particulars of it as developed in this large record, of nearly eleven hundred pages.

The defendant company had an extensive and valuable railroad property, which cost several millions of dollars. Men eminent for their private virtues and public spirit,

Vol. LIII.

[Meyer *v.* Johnston.]

were engaged during many years of effort and discouragement, in the great work. Delayed and damaged during the terrible war in which the country was involved, the railroad was at last finished a few years ago, without any imputation (so far as we are informed) against the integrity or honor of the company. But the impoverishment of the country prevented profitable trade and travel over the new highway; competing railroads drew off business it expected to receive; the income was barely sufficient to pay expenses; rolling stock had to be purchased and hired; debts remained unpaid; the first mortgage bonds matured in 1872; and the older portions of the road began to need repairs.

The first mortgage of the company has been before under consideration. It does not embrace the whole of the property. Another, made in 1855, embraced only the first one hundred miles of the road. One executed in 1865, covered only the lands included in the grant from Congress. All of these were made by the company in its original name of the Alabama and Tennessee River Railroad Company. In 1867, the mortgage to complainants below, was executed to them by the Selma, Rome and Dalton Railroad Company,—of the entire property of the company, to secure payment of bonds to the amount of $5,000,000, of which $2,000,000 were set apart as a trust fund with which to discharge all of the older mortgage debts. Another trust deed was made afterward to one Wallace.

In December, 1872, Messrs. Amy and Moran, of New York, holders of a large amount of the first mortgage bonds, which had matured in July before, had a bill prepared to be filed in the district court of the United States, at Montgomery, against the Selma, Rome and Dalton, and Alabama and Tennessee River Railroad Companies, and Lamar, trustee in the first mortgage deed, and the complainants in this suit—as to whom it was afterwards dismissed, (on the ground that they could not be sued by Amy and Moran in that court), and against other defendants. It alleged the matters above set forth, or some of them; exhibited the first trust deed under which they claimed; represented that the company was insolvent and without credit, and prayed that a receiver be appointed with full authority to take possession of all the property in Alabama (much of which was not embraced by this first deed) and manage it and operate the railroad, and that the court would settle the order in which the credits should be paid, and have the property sold to pay them.

It was not charged in the bill that the company or those

[*Meyer v. Johnston.*]

managing the road, were incompetent, or dishonest, or acting fraudulently. No sufficient ground—mere poverty not being such—was shown for taking from them the *interim* management,—if any weight be due to the judicious suggestions in *Gardner* v. *The London, G. & D. Railway Company*, and in *Stevens* v. *Davison*, cited *post*. But a receiver was appointed by district Judge Busteed ; a new *corps* of officials came in to displace those familiar with the complex business of a railroad 230 miles long ; rolling stock which had been hired to the company, and was much needed, was taken away from the receiver by the owners, to the great detriment of its interests, and all concerned; and the receiver was empowered to issue certificates of indebtedness to the amount of a quarter of a million dollars that should constitute a first lien on the property.

In this state of things, the circuit judge of the United States for this circuit, revoked the order appointing a receiver, and restored the property to the company. And this cause being then instituted in the chancery court of the State, at Selma, the chancellor, at the instance of the complainants, trustees under the deed of October, 1867, which embraces the entire property of the company, upon the filing of the bill, appointed a receiver in accordance with a prayer thereof, and subsequently appointed another (associate) receiver, both in vacation. The receivers seem to have been fit persons for the office, and no appeal was taken under section 4422 of the Revised Code (p. 844) from the order appointing them; nor is the appointment of them, assigned in this court as error. They perform also the duties of those who are called managers in the English court of chancery.

On the day after the appointment of the first receiver, he petitioned the chancellor for leave to borrow $90,000, or such other sum as his Honor might prescribe; and the chancellor thereupon, and in vacation, made an order authorizing him to borrow $150,000 on certificates of indebtedness, which should have priority of payment over any other claim, out of the proceeds of sales of any property in the receiver's possession. And the authority thus granted not having been used, the two receivers subsequently petitioned the chancellor for leave to borrow, instead, $700,000, to be used in purchasing rolling stock, and putting the railroad and its appurtenances in repair. The chancellor thereupon made an order authorizing them to do so, directing what portion of the amount should be expended in rolling stock (about $450,000) prescribing in accordance with sug-

[Meyer *v*. Johnston.]

gestions in the petition, the form of the certificates to be issued therefor, making them negotiable, and interest thereon payable, semi-annually at the office of the New York Guaranty and Indemnity Company, and undertaking to charge these certificates upon the railroad and its appurtenances and equipments as a prior lien thereon, having precedence of the liens created by the first and other mortgages. The receivers were also authorized to sell the certificates at ninety cents in the dollar: and it seems to have been intended that the proceeds should be used in part, to enlarge and complete the work beyond what was necessary for the preservation of the property.

IX. Counsel for the first and other early mortgage creditors, alarmed by this decree, object to and protest against having their liens on the property of the company, existing by virtue of instruments solemnly executed long before the receivers' certificates were thought of, postponed in favor of charges created by the latter; and they deny that the chancellor has rightfully the power to give such precedence to new creditors. The learned chancellor has not, in his opinion, discussed this question, or adduced any arguments or authorities in support of the disputed power. But this has been ably done by the counsel for the appellees. A claim of very large authority in the courts has been made in argument under this head; and the subject is a very important one, and sufficiently new to require an investigation at some length.

1. "The object sought by the appointment of a receiver," (says Mr. Kerr, in his work on Receivers), "may be generally described to be to provide for the safety of property, pending the litigation which is to decide the right of litigant parties," (p. 3.)

"The duty of the court, upon a motion for a receiver, is merely to protect the property in the meantime for the benefit of those persons to whom the court at the hearing of the cause, when it will have before it all evidence and materials for a determination, shall think it properly belongs." Id: p. 6. *Blakeney* v. *Dunfaur*, 15 Beav. 42.

In *Gardner* v. *L. G. & D. Railway Company*, (Law Rep. 2 ch. App. 201), an appeal was taken to the "court of appeal in chancery," from an order of the vice chancellor appointing the general manager and the secretary of the company, on the application of a creditor with a lien, managers and receivers of the company's "undertaking" or railroad enterprise. The lords justices discharged the orders, saying: "when the court appoints a manager of a business or un-

[Meyer v. Johnston.]

dertaking, it in effect assumes the management into its own hands; for the manager is the servant or officer of the court, and upon any question arising as to the character or details of the management, it is the court that must direct and decide. The circumstance that in this particular case the persons appointed were previously the managers appointed by the company," (as one of the persons appointed in the case before us, was), "is immaterial. When appointed by the court, they are responsible to the court, and no orders of the company, or of the directors, can interfere with this responsibility. Now, I apprehend, that nothing is better settled than that this court does not assume the management of a business or undertaking, except with a view to the winding up and sale of the business or undertaking. The management is an *interim* management; its necessity and its justification spring out of the jurisdiction to liquidate and to sell; the business or undertaking is managed and continued, in order that it may be sold as a going concern, and with the sale the management ends."

This is stated by his lordship as the rule in such matters. But in addition and pertinently of views to be hereafter presented, he says: "when Parliament, acting for the public interest, authorizes the construction and maintainance of a railway, both as a highway for the public, and as a road on which the company may themselves become carriers, . . . . it confers powers and imposes duties and responsibilities of the largest and most important kind, . . . . upon the company which Parliament has before it, and upon no other body of persons. . . . . . It is impossible to suppose that the court of chancery can make itself, or its officer, without any parliamentary authority, the hand to execute these powers, and all the more impossible when it is obvious there can be no real and correlative responsibility for the consequences of any imperfect management. It is said that the railway company did not object to a manager. This may well be so. But in the view I take of the case, 'the order would be improper, even if made on the express agreement and request of the company."

A court of equity in this country may, in certain cases, interpose, and appoint a receiver, when a company receiving tolls and income more than sufficient to pay the expenses of an economical administration, refuses to apply the surplus to payment of a judgment or mortgage creditor. *The Covington Drawbridge Company* v. *Shepherd* (21 How. R. 112) presents an instance of the exercise of this power. The receiver in it was also directed, out of the *tolls* and *income* of

the bridge to keep it in repair.

In *Stevens et al.* v. *Davison et al.* (18 Grattan, 819), a board of directors, some of whom "had been concerned in the fraudulent issue of a very large amount of spurious stock, greatly exceeding in amount the lawful stock of the company," on the very day when their term of office was to expire, and the annual meeting of the stockholders, which the directors failed to call, should have been regularly held, made a lease of the railroad of which they were directors, for a period of ten years, at an inadequate rent, without authority from the charter to do so, and in violation of a by-law adopted by the stockholders. Some of the lawful stockholders filed a bill to have the lease declared void and for other relief. And a receiver was appointed to take possession and control of the road and operate it under directions contained in the decree. The court of appeals of Virginia, reviewing the proceedings, said : "while for the reasons assigned in *Gardner* v. *The London, C. & D. Railway Company,* (2 Law. Rep. Ch. App. 201), a court of chancery will be reluctant to appoint a receiver, to take charge of and manage a railroad, it is competent to do so, when such a course is indispensable to secure the rights of the legitimate stockholders, and to prevent a failure of justice. And the court is of opinion that, under the circumstances of this case, it was proper for the court, to appoint a receiver to take charge of and manage the railroad until it can be ascertained by a proper inquiry to be made in this cause, who are the legitimate stockholders of said company, to whom the custody and management of said railroad should be committed."

The foregoing instances have been selected, as illustrative of the authority of courts of equity to take the charge and management of property in litigation. Their interference by receivers and managers in such cases and for such purposes is easily vindicated. In doing so, they put forth a power merely incidental and subsidiary to their function of ascertaining and enforcing the rights of the persons concerned in the subject matter in controversy. They take and preserve the property in order to uphold and maintain the rights of creditors and others therein, and the obligation of contracts. It is in the exercise of the judicial function only that a court obtains jurisdiction between litigant parties, of the cause in which it is authorized to take such control for the preservation of the property involved. And we are not aware of any principle of law or element of wise policy

22

[Meyer v. Johnston.]

which would justify such court, after so getting possession, in laying aside its judicial character, and engaging, however hopeful the scheme, in the completion of unfinished undertakings, and in raising money for this purpose, as the parties themselves could not, namely, by setting up liens which shall displace other and older liens, without the consent of the persons to whom they belong.

The objections to such transactions are, that they are necessarily, to some extent, speculative; that they arbitrarily unsettle interests founded on the most solemn contracts; and that the court in conducting them, abdicates its judicial function, and exercises another more akin to that of a bureau of an Executive Department of the Interior.

2. We have been furnished by the industry of counsel for complainants below, with imperfect manuscript reports of the cases of *Southerland, Trustee, &c.,* v. *the Lake Superior Ship Canal Railroad and Iron Company,* (before Judge Longyear, United States district judge for the eastern district of Michigan, presiding in the circuit court at Detroit), and *Hyde* v. *the Sodus Point, &c., R. R. Co.* (before a judge of the supreme court of New York at Brooklyn). In each of these cases the court seems to have authorized its receiver to raise money by certificates of indebtedness, which should constitute a first lien on the property, and to complete therewith the company's unfinished work.

In what manner, in the former case, the court obtained jurisdiction of the cause; by whom, for what purpose, and how it was brought before the court, we are not informed. It only appears by a copy of Judge Longyear's order, of June, 1872, that the receiver, Knox, was appointed . . . . under the first mortgage, and that after notice to the parties, and counsel for them had been heard, "it being made to appear to the court, that it is for the best interest of all concerned in said ship-canal and said property, real and personal, that the said canal should be finished and made ready for use as speedily as practicable, and that it is necessary and expedient that said receiver should issue certificates of indebtedness for the purpose of said speedy construction;" therefore he was authorized by the court to issue such certificates payable July 1st, 1873, and bearing interest at the rate of ten *per cent.* a year, to the amount of $500,000, which should constitute a first lien on said canal and property, and have priority of payment over any debt previously created, *and to execute and deliver a mortgage trust deed thereof and of the franchises and rights of the company, to a trustee to secure* payment of said certificates, accordingly. It was fur-

[Meyer v. Johnston.]

ther provided that, in case these should not be paid at maturity, the receiver should upon application to the court and on its order, deliver over all the property and effects embraced by said deed *to the trustee, to be by him* sold to pay said certificates. The receiver was also authorized to sell said certificates at a discount not exceeding twenty-five *per cent.* or to borrow money by hypothecation of them. The court by this conveyance to a trustee, put the property even out of its own control, and appears to have disposed of it, as if invested itself with a sort of seigneurial title that enabled it to supersede the existing rights of others therein,—and to have exercised legislative power by authorizing the borrowing of money without regard to usury laws.

The only other information which our manuscript of this case contains, is, that the first series of these certificates of indebtedness not having been paid, the trustees under the receiver's mortgage trust deed, applied to the court, in 1874, for leave to sell the property to enable him to pay them; that a contest was thereupon inaugurated with other parties interested, and that the judge declined to grant the leave applied for, until the supreme court of the United States should decide a case pending in it, which seemed to him to involve some of the questions on which his decision would depend.

Not having a full report of this case, we do not comment on it further, except to say, that as presented to us, we do not recognize in it any principle which would justify a chancellor of this State in assuming the authority (seemingly absolute) which Judge Longyear exercised on that occasion; and we do not perceive in the result any reason for desiring that a court of equity should be clothed with such authority.

In *Hyde* v. *the Sodus Point Railroad Company et al*, a judgment creditor to an amount between $500 and $600, filed his complaint in the nature of a bill, in December, 1873, against that company and the Union Trust Company, on behalf of himself and such other creditors as should join in the proceedings. He set forth, that an execution on his judgment had been returned unsatisfied; that the property of the railroad company was of great value; that it was subject to a first mortgage trust deed executed to the Union Trust Company, as trustee to secure the payment of bonds to the amount of $700,000, which had been issued; that the trustee had not taken possession of the property, as it lawfully might have done; that by reason of disputes among the officers and managers of the company, its property was being wasted and seized for taxes, and various other claims, real or alleged;

[Meyer *v.* Johnston.]

that bankrupcy proceedings against it were threatened; and that there was great danger, unless the court should take charge of the railroad, that its operations would cease and the property be wasted and the claims of plaintiff and other *bona fide* creditors be lost; wherefore, plaintiff prayed that a receiver be appointed; that the company and its officers be enjoined from interfering; that the property, profits and earnings of the railroad company properly applicable to payment of plaintiff and other creditors with liens be so applied; and that the property should be sold as the court should direct; to which last prayer, no response was made, or perhaps desired.

With the complaint and in the same cause, were filed affidavits, (sworn to before plaintiff's complaint was filed), of several persons, holders, and agents of the holders, of first mortgage bonds, to the amount of $649,000 of the $700,000 issued; in which affidavits, affiants say their bonds constitute the first existing lien on the property of the company; that the interest on them is in arrears and unpaid; that proceedings for a foreclosure have been postponed in the hope that some arrangement might be made which would prevent the sacrifice usually incident to such proceedings, and preserve the rights of the subsequent *lienors;* that in September, 1873, the Union Trust Company suspended payment, and shortly afterwards a receiver of its effects was appointed, whereby a further difficulty existed in the way of a foreclosure; that they are advised that the appointment of a receiver would not prejudice the right of the trustee to commence proceedings hereafter to a foreclosure, and that they believe it would be a benefit to all the creditors of the railroad company to have a receiver appointed, for the purposes mentioned in plaintiff's complaint.

Thereupon it seems (though our manuscript does not contain the order), Sylvanus J. Macy, one of the holders of first mortgage bonds, was appointed receiver. On the 15th to January, 1874, he made a very lucid report of the condition of the property, specifying the bridges and other parts of the road that were wretchedly out of order, and insisting on the importance of making repairs, and of constructing at one *terminus*, wharves, piers and other fixtures, to facilitate transfer of cargo to and from vessels, and at the other *terminus* connections with other railroads. And in order to do this work, and other things, he asked for authority to issue certificates of indebtedness to the amount of $125,000, which should constitute a first lien on the property of the company. This authority was granted on the 16th of January,

[Meyer *v.* Johnston.]

1874, and on the 20th confirmed, after consideration by the court of an affidavit (of which we have no copy) of the president of the Union Trust Company, and argument by Mr. Peckham, in opposition.

It is obvious that the holders of the first mortgage bonds, in their own right, or as agents, representing nearly all of them, got up this case in conjunction with Hyde, a judgment creditor, as plaintiff. And since no one opposed the motion, except (apparently) the Union Trust Company, (trustee in the mortgage deed made for their benefit), and no appeal was taken, it is probable that the opposition was *pro forma*, rather than real. At any rate, it was obvious to all parties that it would be beneficial to all to have the work completed even on those terms. And if the holders of the first mortgage bonds were willing that the certificates should create a lien prior to their own, it seemed pretty certain that the other creditors would not consider that they had any cause for opposing the transaction. We cannot regard this unreported amicable suit as an authority of weight concerning the jurisdiction of a court of equity to take upon itself the completion of unfinished enterprises, and raise money for the purpose of charging the property with liens that shall have precedence of other and older ones, without consent.

Another case to which our attention has been called on this point, is that of the Alabama and Chattanooga Railroad. Dilapidated, mismanaged, in litigation in several distinct courts, subject to independent managers deriving authority from different sources, charged with a first mortgage debt of more than $5,000,000, with interest to a large amount unpaid, which debt the entire property upon a sale thereof would not fetch money enough to pay, and daily diminishing in value, while its other large debts were daily growing larger, the trustees under the first mortgage deed, filed their bill in the circuit court of the United States at Mobile against the company and the trustees in the second mortgage deed and several other defendants, and prayed that the court would take jurisdiction of, settle and determine the various matters of dispute, and the rights of all persons concerned, and sell the property, or dispose of the same for their benefit, according to their respective rights therein; and in the meantime, take charge of, preserve, repair and operate the railroad with its appurtenances by receivers, whom it was asked to appoint "with full power to borrow money; and to render effectual the orders and directions of the court . . . . [and] to cause the property and effects of said corporation to be

properly . . . . protected, improved and administered . . . and to be put in such condition as to title and possession, as well as in every other respect, that the said railway and the property incident thereto may not be sacrificed," &c.

This bill with its exhibits and many affidavits in support of it, before being filed, was presented to Justice BRADLEY of the supreme court of the United States on the 26th of May, 1872, and application made for an injunction and the appointment of receivers according to the prayer of the bill. But he ordered that the application be heard before the circuit court of the United States sitting in equity at Mobile (of which he was circuit justice) on the 20th of June afterwards, and "that a copy of the bill and affidavits and notice of the hearing aforesaid, be served on the defendants at least ten days before the hearing."

"On the 20th of June, 1872, the motion for receivers and for injunction was duly submitted to said circuit court . . . in open court, and held for order and decree in vacation." But urgent as the case was, not until the 26th of August—and not then, until "the parties interested" consented—after an amendment of the bill bearing date August 23d, 1872, withdrawing all offensive imputations, was made—did Justice BRADLEY make the order so much relied on in this cause, and which has attracted so much attention from the legal profession.

The order recites, that the "railroad and connecting works and other property . . . . are rapidly deteriorating in value and being wasted, scattered and destroyed, whereby the security of the first mortgage bondholders, and the interest of all other persons concerned in said property are subject to great hazard and danger of entire sacrifice." And then the order proceeds as follows: "And whereas in the present condition of said property, it is impossible without great sacrifice, to dispose of the same in any manner; and whereas it has been proposed *and agreed by the parties interested* that all further opposition to the proceedings in bankruptcy against said company . . . . shall be withdrawn, and that the said proceedings shall be affirmed; and that all other proceedings for the appointment of receivers in the several State and district courts shall be discontinued, so that the proceedings in this suit shall have full effect and operation, without undue embarrassment, and that a receiver or receivers shall be appointed in this cause to take charge of said property, and *put the same into proper condition* for its preservation and disposition, for the mutual benefit of all parties interested therein:" Therefore, receivers are appointed

and "authorized to put said railroad and other property in-
repair, and to complete any incompleted portions thereof,
and to procure rolling stock, machinery and other necessary
things for operating the same, and to operate the same to the
best advantage, so as to prevent the said property from fur-
ther deteriorating, and to save and preserve the same for the
benefit and interest of the said first mortgage bondholders
and all others having an interest therein."

"It is further ordered that all moneys which may be raised
by said receivers by loan, or which may be advanced by them
for the purposes aforesaid, not exceeding the sum of $1,200,-
000, shall be a first lien, prior to all others, on the said rail-
road and other property, and to be paid before the first mort-
gage bonds out of the proceeds of said property."

It is argued for complainants below (appellees) that the
consent spoken of, was only to the appointment of receivers,
and not to their borrowing of money by giving such liens.
This was not (it seems to us) the understanding of Justice
BRADLEY.   For in going on, after making the appointment
of the receivers by virtue of the agreement, to specify their
duties, it is not to be supposed that he either did not know,
or did not regard what was the understanding and agree-
ment of the parties in that respect.  And when we note what
were the duties they were expected to perform, it is per-
ceived at once that in order to discharge them, the receivers
must have a large amount of money.   Under this idea him-
self, when he proceeds in the next paragraph to speak of the
liens to be created, Justice B. does not expressly authorize
the receivers to raise money, but assuming that they would,
of course, have that to do, he says: "all moneys which *may
be raised* by said receivers by loan, or which *may be advanced*
by them," . . . . "not exceeding," &c., "shall be a first
lien," &c.   The language seems to imply that having once
said that the appointment was made by agreement of "the
parties interested," the learned justice did not think it im-
portant to repeat this consent in the several successive para-
graphs in which he spoke of what the receivers were to do.

Besides, the prayer of the bill was for receivers "with full
power to borrow money," to have the property *improved*, &c.
And the parties, consenting to their appointment, must be
understood as consenting to their being appointed "with full
power to borrow money," according to the application :
which obviously could not be done for an insolvent corpora-
tion, except by creating liens on its property that should have
precedence of the first mortgage.

But, however this may be, Justice BRADLEY took care not

[Meyer *v.* Johnston.]

to allow any lien to the certificates of indebtedness, (which were to be issued by the receivers, payable ten years afterwards) "until the same shall be countersigned by a majority of the trustees for the first mortgage bondholders; without which countersigning, they shall not be entitled to the priority and lien aforesaid." This countersigning would itself secure such priority, even if the lien of the first mortgage bondholders should have to be displaced to that extent in favor of subsequent mortgagees,according to the case of *Pierce* v. *Emery*, (32 N. H. 521).

We have examined and analyzed these cases so particularly, because the proposition involved in the discussion is of immense importance, and they are understood as establishing it. It will be seen that in all of them, first mortgagees were the actors, and that in the one last considered, express consent was given by "the parties interested," or, if not, that it was exacted of the trustees of the first mortgagees : wherefore, this case affords no support to the proposition. Let us now return to the examination of it upon principle.

3. We presume it may be considered as settled that a railroad company which has executed a first mortgage of its railroad constructed and to be constructed, and thereby raised a large amount of money to aid in the building of it, cannot afterwards, give a security to another, even to one who is engaged to build an unfinished part of it, that shall have precedence of the older one.

In *Dunham* v. *Railway Company, supra,* this question was presented, very favorably, on behalf of a contractor, to the supreme court of the United States. "Authorities are cited," says Judge Clifford, "which seem to favor the supposed distinction, and the argument in support of it was enforced at the bar with great power of illustration, but suffice it to say that in view of this court, the argument is not sound, and we think the weight of judicial determination is greatly the other way."

And in *Galveston Railway Company* v. *Cowdrey et al,* (11 Wall. 480), the same court (by Bradley J.) says : "on the part of Robert Pulsford it is objected that the decree does not give him a priority on that portion of the road which was laid with his iron. He contends that he is entitled to this, first, because when the mortgages of complainants were executed, it was not in existence and could not have been conveyed thereby, and can only be embraced therein on the principle of equitable estoppel, which is rebutted when it comes in conflict with a superior equity; secondly, his capital applied to the road, conserved it and ren-

dered it capable of being operated, which it would not have
been otherwise ; hence on the principle adopted by the civil
and maritime laws of awarding priority to the last creditor
who furnishes necessary repairs and supplies to a vessel, he
is entitled to priority. The counsel for Pulsford has fur-
nished us with a very ingenious and learned argument on
these points ; but we cannot yield to their force." Then
follows on the first point, what we have herein before quoted
from this opinion, on the operation of a mortgage upon a
railroad *to be constructed*, after which, Justice Bradley says:
"as to the other point, giving priority to the last creditor
for aiding to conserve the thing, all that it is necessary to
say is—that the rule referred to never has been introduced
into our laws, except in maritime-cases, which stand on a
particular reason." A ship far from home, in distress and
without resource, must perish, and perhaps her crew with
her, if a bottomry bond given then for repairs and supplies,
shall not have precedence of other liens upon the vessel.
But the court does not consider a railroad on *terra firma*, so
beyond the reach of help from those who own it, or are con-
cerned in it, as to justify the adoption in such a case, of the
rule relating to a ship abroad and about to perish.

If the railroad company itself, the corporation created by
the State to build, equip and operate a work useful to the
public, though belonging to the company, cannot, when its
enterprise is about to fail, and its labor and expenditures to
be lost, give to those who shall then come to its aid,and help to
complete it, obligations which, like those given by the mas-
ter of a vessel abroad and in distress, shall have priority
over others previously contracted,—what prerogative of a
court of equity entitles the chancellor to step in, and do so
instead of the company ?

The company may not do so, because, holding that
contracts should be inviolable, the law will not permit
the obligation of them to be impaired. The constitu-
tion of the United States inhibits even a State from do-
ing an act which shall have that effect. And certainly, a
court which is a portion of the government of a State, can
not have a power which is denied to the State in convention
assembled. If, therefore, the action of a chancellor in this
cause goes to the extent of taking the property of the de-
fendant corporation into his hands for the purpose, through
his appointees, of completing an unfinished work, or of en-
larging or improving a finished one, beyond what is nec-
essary for its preservation, and to that end—of raising
money by charging the railroad and its appurtenances with

[Meyer *v.* Johnston.]

liens which are to supersede older ones, without the consent of the holders of these, he has inadvertently passed beyond the boundaries of a chancellor's jurisdiction. In our opinion no such power is vested or resides in any judicial tribunal.

Nor can we conceive how a mortgagor, by anything that might be inserted in a second or other subsequent mortgage, (as is that to complainants in this cause), could confer on a court or chancellor, the power to supersede rights created by an earlier mortgage. We may suppose that by a provision in a first, or any mortgage, it might be stipulated that upon the happening of a certain default or delinquency, the mortgagees should be entitled to apply to a court of equity and have persons, denominated receivers, appointed to manage a business, or undertaking, or to carry a work to completion under its direction. Yet how could this, though ever so amply expressed, impose on the court the duty, or clothe it, as a court, with the capacity to do so? It is within its province, in aid of its judicial function, to exercise an *"interim management"* of a "going concern," with a view to the sale of it as such, during the pendency of a controversy, in which the rights therein, of conflicting claimants are to be determined. But it is no part of the office of a court to take upon itself the execution simply of schemes or projects of either private or public utility. The provision supposed might, doubtless, create interests in the mortgagees which a court of equity would perhaps take cognizance of and protect. The persons, though, appointed by it, in consequence of such stipulation, to manage the business or undertaking, or to carry the work forward to completion, no matter by what name called, whether receivers or something else, would (we apprehend) be properly not officers of the court, acting only under its direction, but trustees for the parties having such powers and duties as were legally created by the contract, and as are recognized and imposed by the law relating to trustees.

X. But does it, therefore, follow that a chancellor, who takes property in litigation, by his receivers and managers, under the charge of the court, is incompetent to raise money when necessary for the expense *of its custody and preservation* by issuing certificates of indebtedness, that shall constitute first liens? This is a question not by any means identical with that above examined.

Of course, property, in that condition, must be taken care of by the court, and the expense of this must be paid. Generally, this is done out of the income. But if there be

[Meyer v. Johnston.]

no income, or it is inadequate, and it be necessary for the conservation of the subject matter of the suit, that money be used, the expenses thus incurred must then fall on the *corpus* of the property. This often happens when after possession taken by the court, the property is sold and becomes a money fund to be distributed among creditors,—which is then itself the *corpus* of the estate.

The receiver may also be authorized by the court to borrow money, if necessary, in anticipation of the sale, to be reimbursed with interest out of the proceeds of the property when sold. And we suppose a receiver of approved integrity and responsibility would have little difficulty in borrowing money to a moderate amount, in such a case, upon his note or due bill, as receiver. Or if a receiver has, under the direction of the court, taken moneys and used them in the performance of his duties as receiver, that should not have been so taken, and were not subject to the claim of complainants, but belonged to other parties, the court, afterwards ruling that these moneys should not have been so taken and applied, will, for rectification of the error, order the amount with interest to be returned to the parties entitled thereto, out of the proceeds of the sale of the property with which it has been identified, with priority of payment over the oldest mortgage debt. This was done by Justice SWAYNE, in *Cowdrey* v. *Railway Company*, in the circuit court of the United States, at Galveston, in respect to moneys which the district judge had erroneously ordered that the receiver should take and use,—according to a manuscript copy furnished to us, of Justice Swayne's opinion.

Matters of this nature are between the court and the receiver and the parties to the suit. The transactions are founded on the property in the hands of the court to be sold, and which will not be allowed to pass out of its power without being so sold, except upon a compromise between the parties by which all the expenses chargeable thereon, shall be paid. And in reference to the expenses, the parties have an opportunity of canvassing and objecting to any that are improper, either when the accounts of the receiver are passed upon, or if previously authorized by the court, when the application for such authority was heard and acted on. For they are entitled to be heard in respect to them.

Is this the limit beyond which a court of chancery may not go in such matters in any case? It was not necessary that the question of the power of a court to authorize the issue of first lien certificates of indebtedness to enable a receiver to raise the money he might need, should be decided

[Meyer *v.* Johnston.]

before the introduction of railroads. But these properties, with their appurtenances, vast in extent and value, yet very perishable if unused and neglected, existing as the estates of private individuals associated into corporations, but essentially public works, in whose operations the public at large and the State are concerned, when drawn into litigation, must be dealt with by the courts according to the nature and circumstances of the subject. And any one can understand that the best and cheapest mode of conserving a railroad, may be by operating trains thereon, and keeping it in repair for their use. To preserve its value, it must genererally be continued in operation, and be sold as a going concern. If it were not for the public quality belonging to them, for the injury that would be done to the interests of whole communities that have become dependent on a railroad for accommodation in a thousand things, a chancellor might say to the parties most interested—unless you furnish means for the protection of this property, which does not itself afford an adequate income for the purpose, it may become a dilapidated and useless wreck. But the inconvenience and loss, which this would inflict on the population of large districts, coupled with the benefit, to parties who perhaps are powerless to take care of themselves, of preventing the rapid diminution of value, and derangement and disorganization that would otherwise result, seem to require—not for the completion of an unfinished work, or the improvement, beyond what is necessary for its preservation, of an existing one,—but to keep it up, to conserve it as a railroad property, if the court has been obliged to take possession of it, that the court should borrow money for that purpose, if it can not otherwise do so in sufficiently large sums, by causing negotiable certificates of indebtedness to be issued constituting a first lien on the proceeds of the property, and redeemable when it is sold or disposed of by the court.

Weighty objections, we know, may be alleged against such a transaction. It may be said : the property does not belong to the court or the receiver. It is in their hands only while proceedings are pending to determine the respective rights of parties litigant. What title can any instrument made by them transfer in that which belongs to others ? Perhaps the correct reply would be : true the property is in the keeping of the court to be taken care of, but also to be sold ; and out of the proceeds the expenses of taking care of it must be paid. The certificates may not follow the property out of the court. But they constitute a charge upon it in the particular cause enforceable in this court and

must be satisfied or provided for before the property, or the proceeds of it after the sale, shall pass out of its control. The certificates are not debts of the company, but of the receivers backed by the pledged faith of the court, that the property on the proceeds of which they are charged, is in its possession, subject to be, and that it will be disposed of by it for the payment of them. This results from the fact that they are but a substitute for common methods by which money is raised for the use of a receiver in a particular cause, a mode of appropriating, in advance, a portion of the value of the property, in order to enable the court to save a greater value thereof from destruction. Hence no chancellor should permit them to be issued without the utmost circumspection; and as they are used for urgent present needs, and are to be redeemed when the litigation is ended, they should not be issued in excess of the need, or—although made negotiable that they may be the more available—be sent out of the country for circulation like mortgage bonds abroad. Such a limited scope is all that it is necessary for the certificates to have. By enlarging it, the character which their origin should stamp upon them, would be changed and it will become impossible to preserve the value of older securities.

It may also be said: such a power will be abused. Rash or facile chancellors may be persuaded to issue more certificates than are necessary for the mere conservation of the property; and when out they must all be redeemed :—else, the whole scheme of raising money in this manner fails and the court is brought into disrepute. All power may be abused. But in the first place, no receiver ought to be appointed, in any such case, except to "prevent fraud, save the subject of litigation from material injury, or rescue it from threatened destruction." *Baker* v. *Backus*, 32 Ill. R. 79; *Voshell* v. *Hynson*, 26 Md. 92.

Nor should the appointment of a receiver be made except upon a bill filed praying it, and after answer thereto, "unless the necessity be of most stringent character." *Leddell* v. *Starr*, 4 C. E. Green (N. J.) 159; *Voshell* v. *Hynson, supra; Sanford* v. *Sinclair*, 8 Paige, 372; *Gibson* v. *Martin, Id.* 481; *Blondham* v. *Moore*, 11 Md. Rep. 365.

The issue of negotiable certificates of indebtedness, is a matter of hardly any less importance, than the appointment of receivers, and should not be authorized by the court, except after full notice to the parties interested, when this can be given, and ample opportunity for them to be heard. The urgency for the issue of such certificates can rarely be so

[Meyer *v.* Johnston.]

great as is sometimes that for a receiver. A detailed statement ought also to be made out specifying the sums needed, and for what they are needed, and clear proof be adduced of the correctness of this statement, and of the necessity that the money be raised. A receiver is required in presenting his accounts to be passed, to state clearly the items. And in like manner, when he asks authority to create in advance a large debt against the property by which money is to be put into his hands, he ought to show the particulars constituting the sum before he is allowed to raise it, as well as be held to account for the proper application of it. A disregard of these rules might lead to intolerable abuse.

Finally, the case, in our opinion, ought to be one of great urgency, in which a court should appoint a receiver to manage and operate a railroad at all. It might, instead, be sometimes expedient to require the earnings of the road to be paid over to, and to be disbursed by a receiver of its appointment, and to prevent by injunction any interference of others with the management, in the meantime.

Upon the whole, however, it seems necessarily to result from the nature of such property, and the capacity and duty of courts of equity to "adapt their decrees to all varieties of circumstances which can arise, and adjust them to all the peculiar rights of all parties in interest," that if a railroad and its appurtenances are in the hands of a receiver to be preserved and operated, the court having charge thereof, must possess the power, after the notice to and hearing of the parties interested, to allow the issue even of negotiable certificates of indebtedness creating a first lien, when this is necessary to raise money for the economical management and conservation of the property, until it shall be disposed of. The pressure upon the courts in various portions of the country, to exercise such authority, and the consent or acquiescence of first mortgagees and others in the exercise of it, are persuasive that the power must exist.

XI. The order authorizing the issue of these certificates, in this cause, was made without notice to some of the parties, and without sufficient notice to any of those representing creditors, except complainants, and was otherwise irregular, The proper mode of objecting to it, was by application to the chancellor to vacate and set it aside,—the same practice that should be followed in case of like irregularity in the appointment of a receiver. (See *Gibson* v. *Martin*, 8 Paige, 480.) That not having been done, the parties may, when the cause goes back to the chancellor, have a reference to a mas-

ter, to ascertain and report whether or not the whole amount specified in said certificates was necessary, and if not, how much thereof was necessary to enable the receivers to make such repairs on the road in Alabama and its appurtenances, and buy such rolling stock and other materials, and have such other things done as were requisite and proper, to put the road in condition to be run most advantageously and economically, for the conservation of it and of the appurte nances: and so much of said amount as was necessary for those purposes, should be reimbursed with interest out of the net income of the road, and of the proceeds of the sale of the rolling stock and other things bought therewith, on which a lien was created or retained for the purchase money, and the residue with interest, should be paid out of and be a first charge upon the proceeds of any other portion of the road and its appurtenances in Alabama. And such part (if any); of said amount of the certificates, as was not necessary for the purposes aforesaid, and was borrowed, including any part thereof that may have been expended on the road or appurtenances in Georgia, should be paid out of and be a first charge upon the proceeds of the property in Alabama embraced by the trust deed to the complainants and not subject to other prior liens: that is to say, the Ashby Branch, (as it is called), of the railroad, on which complainants have a first lien, and the lands granted by Congress, subject first to a lien for the payment of the small balance due of the Reynolds debt, secured by mortgage of 1865.

This mode of discharging the certificates of indebtedness, will secure repayment to the lenders out of the property, and effect justice, as nearly as the facts of the case and the rules by which courts must be guided, will allow.

XII. We advert here to another matter which has been assigned as error. The chancellor by his order, provides that the certificates of indebtedness shall bear interest at the rate of eight *per cent.* a year, and may be sold at a discount of ten *per cent.* or for ninety cents to the dollar. By what authority can a judicial tribunal of the State disregard a statute which prohibits the charging of a higher rate of interest than eight *per centum* a year, under the penalty that the lender shall forfeit all interest for doing so? The legislature may and often does authorize a railroad company to dispose of its mortgage bonds, for what it is willing to take for them, to enable it to do its work; which is a suspension of the law against usury, as to that transaction. But this order was not made under any such statute; and the railroad charged, was already built at a cost probably seven or

eight times greater than the sum to be put as a first lien upon it. The chancellor erred in authorizing the receivers to borrow money at a rate higher than the lawful interest. Perhaps it could not be raised otherwise. Might it not have been better, then, to let an impecunious railroad, which creditors were suing to have sold, remain in the hands of the company operating it, until the decree disposing of it should be passed by the court; especially since in the language of CAIRNS, L. J., "it is obvious there can be no real and correlative responsibility for the consequences of any imperfect management."

XIII. The objection to the chancellor's decree, because he did not order a separate sale, under the second mortgage, of the first one hundred miles of the railroad, is not sustained. We agree with the supreme court of Georgia, that "To allow the road to be cut up into fragments, and separate portions sold at different sales . . . . would not only sacrifice the rights and interests of creditors, but defeat the objects and intentions of the legislature in granting the charter." *Macon and W. R. R. Co.* v. *Parker*, (9 Kelly, 378).

XIV. The sixteen hundred bonds of one thousand dollars each ($1,600,000) that were deposited with Uriel A. Murdock as special trustee, a portion of the $5,000,000, provided for by the trust deed of October 1st, 1867, were to be used in retiring those secured by prior mortgages on the property covered by that trust deed. In the language of the deed, those "sixteen hundred of said bonds so set apart shall be held and applied exclusively for the purpose of relieving and discharging the premises hereby conveyed from the aforesaid prior liens." The object was to put all the debts of the company on the same footing, and not to furnish additional security for those already provided for. The claim of appellants to have their fund for the payment of the debts to them increased by means of those bonds, is without foundation, and such of said bonds deposited with Mr. Murdock, as were not used in retiring debts with older liens, should be delivered up and cancelled.

XV. The claim of complainants below, for the value of the improvements made by Breed on the railroad from Selma to Blue Mountain, is equally without just foundation. It would be a case of charging a mortgagee with the improvements put on the mortgaged property by the mortgagor; which is wholly inadmissible.

XVI. Upon application of the receivers they were authorized by an order of June 2d, 1873, to buy a large quantity of rolling stock; and their purchase of the same was

[Meyer v. Johnston.]

confirmed by an order of the court made on the 7th of the same month. Both of these orders were made in vacation, before Lamar, trustee under the first trust deed, had been brought in as a party, and without notice to him and other parties interested. On behalf of appellants it is insisted that this rolling stock was on the road and belonged to the company under its contracts, before and when the receivers were appointed; and that when acquired by the company, whether paid for or not, any liens thereon became superseded by those of the mortgagees.

This last proposition cannot be maintained, unless the rolling stock becomes when put upon the road, fixtures thereof, and real estate, like the iron rails when they are laid down.

Although in *The Farmer's Loan Company* v. *Hendrickson,* (25 Barb. 484)—with which some other cases seem to agree —that view appears to have been taken by the court, the question arose between mortgagees and a judgment creditor whose judgment was obtained after the execution of the mortgage, and the point, therefore, was not material. If a railroad company which has executed several successive mortgages on its railroad, equipments and appurtenances, purchase and put on its road rolling stock which is then free from all liens, doubtless this so appertains to the road as to become subject to the mortgages; and the liens of these have priority according to the age of the instruments. But the rolling stock is not thereby transmuted into realty. It continues to be from its very nature, chattels personal;(*Hoyle* v. *Plattsburgh Railroad Company,*54 N.Y. 314), else how could the Pullman sleeping and palace cars, now on all the large roads in the country, belong to the Pullman company, and the respective railroad companies have no property therein? Iron rails on the contrary, when laid and fastened upon a road, are an essential part of, and become incorporated with it, and ceasing to be chattels personal, are subjected as a part of the road to the older mortgages thereon; unless perhaps, by virtue of a special agreement, and notice to the mortgagees, they are put separately from other rails, on a particular part of the road, under a contract that they may be afterwards removed therefrom. See *Haven* v. *Emery,* (33 N. H. 66). Rolling stock, therefore, as personal chattels not identified with the realty, does not become released from the liens under which the company acquires it. They remain binding upon it and superior to those of the mortgages of the company.

XVII. It is also insisted for appellants that the receivers

23

[Meyer v. Johnston.]

should not have been authorized by the order of the chancellor in June to pay (as it is put) to certain creditors without liens, a sum exceeding $6,800; and that the mortgagees are entitled to have this sum refunded. On examination, it seems that this amount was composed of sums collected by the defendant company in trust for several connecting railroad companies, to which the money belonged. To withhold the payment of these moneys from the corporations for which they were collected, would have been a breach of trust; and probably it would have been resented by the refusal of these companies to keep up business relations with the defendant company or the receivers; without which relations, the business of and receipts from the road would have been greatly diminished. It was proper, therefore, for the receivers to pay them. In *Cowdrey* v. *Galveston Railroad Company*, in the United States circuit court at Galveston, Justice BRADLEY in deciding on exceptions to a receiver's account of expenses, allowed for the reason assigned above, payments made as rebatement of freight to shippers of cotton, in order to secure their custom and increase the business of the road; this being done by other companies.

But as the allowances mentioned in this and the foregoing paragraph were made without notice, and in vacation, upon the application of the receivers, upon the reference of their accounts for confirmation, or upon a special reference to be thereupon made on the petition of defendants, they may charge the receivers with so much thereof as may be shown by evidence of the facts, not to have been justly payable out of the funds in their hands. And the ownership of said rolling stock and other things purchased by the receivers and the liens thereupon and values—are not, nor are any of them to be considered as concluded by said orders of June, 1873; but the same are opened to permit the inquiries herein authorized to be made, so that the parties interested may take part in the contestation. And in this inquiry, and also in that respecting the receiver's certificates, the burden of proof must be as much on the receivers as if said orders had not been made.

XVIII. The chancellor adjudged that "the costs to be taxed in this cause, including the costs, commissions and expenses of the sales, the expenses incurred and to be incurred by the receivers in operating said railroad and in the performance of their duties as such receivers, shall be a charge upon the gross proceeds of the sale of all the property herein authorized to be sold and the balance shall be divided and distributed to the several classes of creditors in the order

and to the extent of their respective liens and priorities as ascertained and established under this decree." This is assigned as error.

In regard to the receivers' expenditures in so managing the property as most economically to preserve it, until it shall be disposed of by the final decree of the court—we have already directed how they shall be charged; and we presume it is not expected that there will be any expenses of that sort exceeding the amount of the certificates of indebtedness to be paid.

On the subject of costs, Mr. Daniel (Chan. Pl. and Pr., p. 1390 of 4th Amer. Ed.) says: "The mortgagee is entitled to the payment of his costs before the subsequent mortgagees receive any part of their principal, interest, or costs; the practice of the court being to direct each mortgagee to be paid his principal, interest and costs, according to priority. But it has been held that where a mortgagee commences or adopts a suit for the administration and sale of the mortgagor's estate, he does not rest exclusively on his contract, but seeks something beyond it; and the costs of the suit are the first charge if the estate prove deficient. . . . . So, where a mortgagee sets up an unfounded claim, or an unjust defense . . . . he will be deprived of his costs." We quote so much only as to show the principle upon which courts of equity determine such matters.

Now, Amy and Moran, holders of a large amount of the first mortgage bonds, brought a suit in the federal court, in which Lamar, trustee, in the trust deed, afterwards joined as plaintiff with them—in which they claimed as subject to that deed, much more than it embraced, and this adversely to the complainants below in this cause, against whom, and Uriel A. Murdock, they dismissed their suit on the ground that they could not sue them in that court. And the complainants in this cause, on the other hand, trustees under the deed of 1867, in their bill denied that the first mortgage bondholders had any lien whatever, and sought to invalidate the trust deed in their favor, which was mentioned and recognized in the very deed under which they themselves claimed.

It will thus be seen that the contest was chiefly between these parties. But by operation of the chancellor's decree the costs and expenses would probably fall most heavily on the second mortgage creditors, who have not produced the litigation, and whose lien is a second one on only the first one hundred miles of the railroad. It seems to us more just, and we therefore order, that one-half of the costs and ex-

penses be paid out of the portion of the fund which shall be going to the first mortgage creditors, and the other half out of the funds which will go to the creditors under the deed of October 1st, 1867, unless the property be sufficient to pay all the mortgage creditors and their costs, in full, and that in that event the costs, &c., be paid at the expense of the defendant company. If the fund going to the creditors under the deed of October 1st, 1867, be not sufficient to pay one-half of the costs, then it must be paid out of the funds going to the first and second mortgage creditors, according to the amounts that will be divided to each class thereof. In the division of the funds the creditors will be entitled to interest upon all sums due to them from the time of their maturity whether due by bonds, or coupons for interest.

XIX. Except as hereinbefore otherwise explained as indicated, we concur in the conclusion of the chancellor expressed in his decree in respect to the liens and rights of the parties to this cause.

By Act No. 92 of the General Assembly, approved March 17, 1875, it seems that the property when ordered to be sold must be sold by the register of the court.

The costs of the appeal in this court and in the court below must be paid by the appellees, trustees in the mortgage trust deed of October 1, 1867, to be reimbursed to them out of the trust fund going to them as such trustees; and their cross appeal is dismissed at their costs, to be reimbursed out of the same fund.

NOTE BY REPORTER.—At a subsequent day of the term Messrs. Brooks, Haralson & Roy applied for a rehearing. The application did not come into the reporter's hands.

The following response was made:

MANNING, J.—We have attentively considered the vigorous argument for appellees, and the authorities cited to sustain it, on behalf of a rehearing, in respect to that part of the opinion and ruling of this court, which holds that the first trust deed embraces that portion of the Selma, Rome and Dalton Railroad, which lies between Jacksonville and the Georgia State line.

The point chiefly elaborated is, that when there is no ambiguity in the terms of a deed decribing the subject matter of it, they cannot be varied by evidence *aliunde;* that (in the language of TINDAL, C. J.), "in such case, evidence *dehors* the instrument for the purpose of explaining it according to the surmised or alleged intention of the parties to the

instrument, is utterly inadmissible." The deed (it is insisted) must convey the property described in it, according to its very terms, without any variation, or it cannot convey anything, at all: and hence, any deviation, from the surveyed route designated in a mortgage of a railroad, in the construction of it, takes the road away from the mortgagees. This is the extent to which the argument goes, and must go to entitle the appellees to a rehearing.

Numerous authorities forcibly expressed are cited in support of this argument. They all relate to transfers of specific existing things—generally of real estate—of determinate portions of the solid, immovable earth. Do not counsel perceive a difference between a mortgage deed of subjects such as these, and a mortgage deed of a great railroad *to be constructed,* executed as a security to persons who are solicited to lend their money for the purpose of aiding the mortgagors to build it?

The railroad in such a case is not yet in existence. Although there be a portion of the line which may be considered the base of the work,—(and usually the *termini* are designated,)—whereby its identity is established, yet until actually constructed, the railroad may be conceived of as, to some extent, (in the law sense of the word), ambulatory: its *situs* is not definitively fixed; the route for its location though surveyed and marked, and supposed to be determined, is subject to such change as progress in the work may show to be expedient. What then? Do these deviations though for many miles, from a line previously selected, destroy the identity of the road? And does the mortgage of the road become, thereupon, inoperative and valueless?

We cannot suppose that counsel for appellees would themselves insist on such conclusions from the premises, if the deviation from the previously adopted route designated in the mortgage were in the middle part, instead of at one end of the road. Yet, if they admit that in such a case, the mortgage might embrace the railroad thus constructed on a different line from that specified in the mortgage, they retire from the position first assumed, and concede that their authorities do not entirely cover and maintain it.

We do not controvert these authorities. The rule they enunciate is a sound one. The error is in the application of it, and arises from failing to recognize the different nature of the subjects of the deeds, in the one case and in the others. What was the principal subject of the trust deed now under consideration? It was not a prescribed strip of land extending through all the counties named, with its present and

future appurtenances, including as such the railroad—if it should be built thereon.    It was a railroad to be constructed—and as accessary thereto, and a part of the road, the land, or the right of the company in the land, whereon it should be built.

The nature of the transaction is well explained by Judge Barrett, in his able opinion concurred in by all the six judges, in the thoroughly argued case of *Miller* v. *R. & W. R. R. Co. et al*, (36 Vermont, 452.)    "At the time the transaction took place," (he says) "a road had been located between the two *termini* and put under contract and was in the process of construction, but was in no part completed as a railroad ready for use. . . . . . . . It is too plain to require discussion, that it was the design of the parties that the mortgage should take effect upon the road in its completed condition, proper and ready for use in running over it, in the ordinary manner of that kind of business, and such is the legitimate import and force of the term as used.

"It was not a *road*, viz: a *railroad* in the condition it was in at the time of making the mortgage. It was a mere *roadway* in the process of being wrought into a road.   The mortgage is not of a *roadway*, right of a roadway, or of a roadway in the process of being wrought into a road,—but of 'their *road*.'

. "It also seems plain that the mortgage was designed to take effect upon the road as it should exist under the rights of the corporation, at the time the mortgagees should succeed to the rights of the corporation by virtue of the due enforcement of the mortgage.

"It may be taken as granted, that in fact the location of the road was changed at different points, from the place fixed upon in the original location, after the mortgage took effect, and that it has been located and constructed beyond one *terminus* of its location and survey, as it was at that time.    Still if it is the railroad of the corporation under its charter, the whole becomes, in our apprehension, subject to the mortgage.    No other view is practicable without impeaching both parties of a very inadequate comprehension of the subject they are dealing with.

"The value of the security depended entirely on its capability of being used as a railroad.   Only by reason of its being so used, would either the corporation or the mortgagees hold any right in reference to it; for the abandonment of such use would subject the rights to a forfeiture, and the land covered by the road, to a reverter to the owners of the fee.   This fact seems conclusive as to what was the intent of

[Meyer *v.* Johnston.]

the parties, so far as the change of the location is concerned —for, to the territory covered by the abandoned location, the corporation and their assignees lost all right by the fact of abandonment."

"So too, in respect to the addition to one end of the road the same rule applies. The idea that two miles, more or less, of a railroad continuous between two fixed limits, constructed in the same right and as a part of the same road, was to be severed and held by the corporation, as against the effect and operation of the mortgage, if it exists at all, must have had its origin at a period much more recent than the mortgage now in question." (pp. 494–5).

The railroad cases to which we have been referred, are either those in which there was a disregard of the limits assigned by the charter for the road, and hence a violation of State statutes was involved, or those in which subscribers for stock defended against the payment of their subscriptions, on account of material alterations made without their consent. They are not suits between the corporation *which made the change and was the debtor-party,* and its mortgage creditors.

In this case there is no violation of a State law, for what was done was authorized by law; and there is no subscriber for stock resisting payment, but a mortgage creditor seeking payment; which is resisted on the ground that the company by changing the direction of the road at the upper end, with the consent of the State, has itself effected a release of its railroad from the mortgage.

It is to be remembered that this road extended 135 miles from its base upon the navigable Alabama river at Selma, and was reaching forth for a connection—which was a main object from the beginning and necessary for its success—with other great lines of communication northward. This was found to be unattainable in the direction first taken toward Gadsden : and afterwards with a view to the accomplishment of the same main object, the legislature allowed the company to continue its road to the State line, in the same general course which it kept from Selma, instead of turning at right angles and going to Gadsden ; and this the company chose to do.

Too much weight we think is attached to the fact that this was done by a legislative alteration of a charter which did not at first permit it. If the charter as originally written had, as some other charters have, permitted a large enough scope at the upper end in seeking for the best connection, and after starting upon the course first selected, the

[Brainard v. Harrison.]

road had been made to take the other, we think no one would have esteemed the alteration material, to the question under consideration. Why should the fact that, instead of being allowed by the original charter, this was permitted by a subsequent amendment to it, make such a difference, if the character of the enterprise was not thereby changed? The question still is—in the one case, as in the other—is the road as constructed, the great trunk highway in Alabama of this company? If it is, it is the same road which the company mortgaged, though not upon the same land on which, at first, it was expected that it would be built. And that it is the great trunk road of this company, its main line, substantially that which the company was incorporated to make, no one acquainted with the facts of the case, and who will read over the trust deed of October 1st, 1867, to the complainants in this cause, can have any doubt.

It is now of no moment that the company was permitted under the amended charter, if it should so choose, to construct a road from Jacksonville to Gadsden. The company did not choose to do so, but it proceeded with alacrity, as all their acts, as well as said trust deed, show, to build the road along the new route and make this their main line—*the* railroad, (by way of eminence) of the company. Even a road from Jacksonville to Gadsden would now be but a branch from the main trunk, and not pass by the mortgage—which covers only the one main road which the company was established to build.

We adhere to the opinion and reasoning heretofore expressed on the subject under consideration. The application for a rehearing is denied.